No. 24-1770

_____

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

B.B., by and through her mother, Chelsea Boyle,

Plaintiffs – Appellants,

v.

Capistrano Unified School District; Jesus Becerra, an individual in his individual and official capacities; Cleo Victa, an individual in her individual and official capacities,

Defendants – Appellees.

_____

On Appeal from the United States District Court
for the Central District of California
Honorable David O. Carter, District Judge

_____

**Excerpts of Record, Vol. 1 of 1**

_____

WILSON FREEMAN
Pacific Legal Foundation
3241 E. Shea Blvd., #108
Phoenix, Arizona 85028
Telephone: (916) 419-7111
Fax: (916) 419-7747
WFreeman@pacificlegal.org

CALEB R. TROTTER
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
CTrotter@pacificlegal.org

*Attorneys for Plaintiffs – Appellants*

# Index

| Document Description | File Date | Dkt. No. | Page |
|---|---|---|---|
| Judgment | March 6, 2024 | 94 | ER-4 |
| Order Granting Defendants' Motion for Summary Judgment on Plaintiff's Federal Law Claims and Declining supplemental Jurisdiction over Plaintiff's State Law Causes of Action | Feb. 22, 2024 | 92 | ER-7 |
| Third Amended Complaint | Nov. 6, 2023 | 56 | ER-18 |
| Exhibit A to Third Amended Complaint | Nov. 6, 2023 | 56-1 | ER-50 |
| Exhibit B to Third Amended Complaint | Nov. 6, 2023 | 56-2 | ER-52 |
| Exhibit C to Third Amended Complaint | Nov. 6, 2023 | 56-3 | ER-56 |
| Transcript, Deposition of B.B., Vol. 2, excerpts | Nov. 6, 2023 | | ER-61 |
| Transcript, Deposition of Jesus Becerra, excerpts | Oct. 11, 2023 | | ER-70 |

| Document Description | File Date | Dkt. No. | Page |
|---|---|---|---|
| Transcript, Deposition of Cathy Clay, excerpts | Oct. 5, 2023 | | ER-74 |
| Transcript, Deposition of B.B., Vol. 1, excerpts | Oct. 5, 2023 | | ER-91 |
| Transcript of Proceedings, Hearing on Motion for Summary Judgment as to Plaintiff's Third Amended Complaint | Feb. 12, 2024 | 86 | ER-111 |
| Notice of Appeal | March 23, 2024 | 98 | ER-132 |
| District Court Docket Sheet | July 10, 2024 | | ER-134 |



**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| B.B., a minor by and through her mother, CHELSEA BOYLE; and CHELSEA BOYLE, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CAPISTRANO UNIFIED SCHOOL DISTRICT, et al.<br><br>Defendant. | CASE NO. 8:23-cv-00306-DOC-ADS<br><br>*Assigned for All Purposes to:*<br>*Hon. David O. Carter – Courtroom 10A*<br><br>**JUDGMENT GRANTING DEFENDANTS' CAPISTRANO UNIFIED SCHOOL DISTRICT, JESUS BECERRA, AND CLEO VICTA'S MOTION FOR SUMMARY JUDGMENT**<br><br>*Trial Date:    March 19, 2024*<br><br>*Complaint filed: February 21, 2023* |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

**JUDGMENT GRANTING CAPISTRANO UNIFIED SCHOOL DISTRICT, JESUS BECERRA, AND CLEO VICTA'S MOTION FOR SUMMARY JUDGMENT**

## JUDGMENT

On September 22, 2023, Defendants' Capistrano Unified School District, Jesus Becerra, and Cleo Victa's Motion to Dismiss Plaintiffs', B.B., a minor by and through her mother, Chelsea Boyle, and CHELSEA BOYLE, an individual, Second Amended Complaint was filed with the Court. After due consideration of the briefing submitted by the parties, on October 27, 2023, the Court granted Defendants' Motion to Dismiss with prejudice pursuant to *Fed. R. Civ. P.* 12(b)(6) as to Plaintiff CHELSEA BOYLE's only cause of action for Negligent Supervision against Capistrano Unified School District.

On February 12, 2024, Defendants' Capistrano Unified School District, Jesus Becerra, and Cleo Victa's Motion for Summary Judgment, or in the alternative, Partial Summary Judgment, was heard by the Honorable David O. Carter. After due consideration of the briefing submitted by the parties, and oral argument of counsel, on February 22, 2024, the Court granted summary judgment pursuant to *Fed. R. Civ. P.* 56 as to Plaintiffs' federal causes of action for (1) Violation of the First Amendment against Becerra (42 *U.S.C.* § 1983); and (2) Retaliation in Violation of First Amendment against Becerra and Victa (42 *U.S.C.* § 1983). The Court declined to exercise supplemental jurisdiction over Plaintiffs' state law causes of action.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

**2**
**JUDGMENT GRANTING CAPISTRANO UNIFIED SCHOOL DISTRICT, JESUS BECERRA, AND CLEO VICTA'S MOTION FOR SUMMARY JUDGMENT**

1    IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Judgment

2    shall be entered in favor of Defendants, Capistrano Unified School District, Jesus

3    Becerra, and Cleo Victa, and against Plaintiff, B.B., a minor by and through her

4    mother, Chelsea Boyle; and CHELSEA BOYLE, an individual.

5    It is further ordered:

6    1.  Plaintiffs B.B. and CHELSEA BOYLE to take nothing by way of their

7        claims;

8    2.  Costs are awarded to Defendants in an amount to be determined by this

9        court.

10   **IT IS SO ORDERED.**

11

12

13   DATED: March 6, 2024

14

15   By: _David O. Carter_____

16   **HON. DAVID O. CARTER**
     United States District Court Judge

17

18

19

20

21

22

23

24

25

26

27

28

**3**

**JUDGMENT GRANTING CAPISTRANO UNIFIED SCHOOL DISTRICT, JESUS
BECERRA, AND CLEO VICTA'S MOTION FOR SUMMARY JUDGMENT**

JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| **B.B.,** | **Case No. 8:23-CV-00306-DOC-ADSx** |
| Plaintiff, | |
| | |
| vs. | **ORDER GRANTING DEFENDANTS'** |
| | **MOTION FOR SUMMARY** |
| **CAPISTRANO UNIFIED SCHOOL** | **JUDGMENT ON PLAINTIFF'S** |
| **DIST., et al.,** | **FEDERAL LAW CLAIMS [81] AND** |
| Defendants. | **DECLINING SUPPLEMENTAL** |
| | **JURISDICTION OVER PLAINTIFF'S** |
| | **STATE LAW CAUSES OF ACTION** |

-1-

Before the Court is Defendants Capistrano Unified School District ("CUSD"), Jesus Becerra ("Becerra"), and Cleo Victa ("Victa") (collectively "Defendants") Motion for Summary Judgment ("Motion" or "Mot.") (Dkt. 70). The Plaintiff in this case is B.B., a minor. For the reasons explained below, the Court GRANTS Defendants' Motion as to Plaintiff's two federal causes of action and DECLINES supplemental jurisdiction over the remaining state law claims.

## I.    BACKGROUND

### A. Facts

When B.B. was in first grade, she made a drawing (the "Drawing") that included the phrase "Black Lives Mater [sic]" printed in black marker. SUF (Dkt. 70-2) # 1. Beneath that sentence, B.B. added "any life," in a lighter color marker. Id. B.B. gave the Drawing to a classmate, M.C., who took it home. *Id.* # 3. When M.C.'s mother saw the Drawing, she emailed the school, stating that she would not "tolerate any more messages given to [M.C.] at school because of her skin color" and that she "trust[ed]" the school would address the issue. *Id.* # 6.

Later that day, the school's principal, Becerra, approached B.B. at recess. Becerra told B.B. that the Drawing was "inappropriate" and "racist,"[1] and that she was not allowed to draw anymore. PSDF (Dkt. 77) # 9; SUF # 10. He also instructed B.B. to apologize to M.C., which B.B. did twice. SUF # 11-10. When B.B. returned to class from recess, two of her teachers told her that she was not allowed to play at recess for the next two weeks. *Id.* # 14. The teachers did not tell B.B. the reason she could not play at recess, and there is no direct evidence that Becerra directed B.B.'s teachers to punish B.B. in this way. *Id.* # 19. This incident with the Drawing is the basis for Plaintiff's first cause of action for violation of the First Amendment.

Around one year after the incident, B.B.'s mother, Chelsea, and another parent were discussing an unrelated dispute that Chelsea had with M.C.'s mother. During that conversation, the other parent informed Chelsea about the incident with the Drawing. Chelsea then filed a complaint with the school, and went through several levels of appeals. When her appeals were unsuccessful, she filed this lawsuit—about two years after the initial incident.

---

[1] At the hearing, the parties disputed whether B.B. testified that Becerra told her the Drawing was racist. Although B.B.'s deposition is unclear, the Court must construe her testimony in the light most favorable to B.B.

Shortly after Chelsea filed her complaint with the school, B.B.'s brother, K.B., was distraught and walking around the school's courtyard when he was supposed to be in class. *Id.* # 25. Becerra radioed for Victa, a counselor at the school, to join him at the blacktop and help get K.B. back to class. *Id.* Victa feared that K.B. would abscond from campus, so she followed him around the blacktop at a distance. *Id.* # 27; *see also* Ex. A at 0:00-1:47 (Dkt. 78). B.B., on her way to the restroom, encountered Victa and K.B. Victa asked B.B. to help get her brother back to class. *Id.* B.B. approached her brother, and the two began walking together. Ex. A at 1:47. B.B. testified that she asked Victa to stop following them, but Victa continued to supervise the two children from a significant distance. *Id.* B.B. then went to the restroom to call her mother and ask for her to pick them up from school. While B.B. was in the bathroom, Victa called into the bathroom to ask whether anyone was inside, and Victa left the bathroom when she did not hear a response. B.B.'s mother picked both B.B. and K.B. up from school. B.B. testified that, during this interaction, Victa was nice to her. SUF # 31. This incident on the schoolyard blacktop forms the basis of Plaintiff's final three causes of action—retaliation, intentional infliction of emotional distress, and negligent supervision.

**B. Procedural History**

Plaintiff's original complaint, filed in February 2023, had seven causes of action. At the motion to dismiss stage, the Court dismissed the causes of action brought by B.B.'s mother and dismissed the Monell claims against CUSD. See generally Order  (Dkt. 55); Order Dkt. 69). Plaintiff's surviving causes of action are: (1) Violation of the First Amendment against Becerra (42 U.S.C. § 1983), (2) Retaliation in Violation of the First Amendment against Becerra and Victa (42 U.S.C. § 1983), (3) Intentional Infliction of Emotional Distress against Becerra and Victa, and (4) Negligent Supervision against CUSD.

Defendants moved for summary judgment on all four of these causes of action on January 12, 2024. Plaintiff filed her Opposition ("Opp'n") (Dkt. 75) on January 22, 2024. Defendants submitted their Reply (Dkt. 79) on January 29, 2024. The Court heard oral argument on Defendant's motion on February 12, 2024.

**II.    LEGAL STANDARD**

1     Summary judgment is proper if "the movant shows that there is no genuine dispute as to

2 any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

3 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have

4 its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S.

5 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must view

6 the facts and draw inferences in the manner most favorable to the non-moving party. *United*

7 *States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d

8 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the

9 absence of a genuine issue of material fact for trial, but it need not disprove the other party's

10 case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the

11 claim or defense, the moving party can meet its burden by pointing out that the non-moving

12 party has failed to present any genuine issue of material fact as to an essential element of its

13 case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

14     Once the moving party meets its burden, the burden shifts to the opposing party to set out

15 specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248–49.

16 A "material fact" is one which "might affect the outcome of the suit under the governing law . . .

17 ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions

18 in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*,

19 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible, evidence

20 identifying the basis for the dispute. *See id.* The Court need not "comb the record" looking for

21 other evidence; it is only required to consider evidence set forth in the moving and opposing

22 papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F.*

23 *Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he

24 mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on

25 which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

26

27

28

**III.    DISCUSSION**

The Court addresses each of the Plaintiff's four causes of action in turn.

**A. First Amendment Claim**

Plaintiff argues that Becerra's response to the Drawing—compelling her to apologize to M.C., prohibiting her from drawing other pictures for her friends, and preventing B.B. from playing at recess for two weeks[2]—violates her First Amendment right to free speech. Opp'n at 7-12. However, this schoolyard dispute, like most, is not of constitutional proportions.

**1.    Legal Background Regarding School Speech**

Although students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), their rights are "not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). For school children, the First Amendment must be "applied in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506. Because educators best understand those special characteristics, courts give "educators substantial deference as to what speech is appropriate." *LaVine v. Blain Sch. Dist.*, 257 F.3d 981, 988 (9th Cir. 2001). "[T]he determination of what manner of speech is inappropriate" at school "properly rests with the school board, rather than with the federal courts." *Hazlewood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (internal quotations omitted).

There are three categories of student speech, each with its own line of Supreme Court precedent. The parties in this case agree that the Drawing falls in the third category, pure speech, which is governed by *Tinker*. "Under *Tinker*, schools may restrict speech that 'might reasonably lead school authorities to forecast substantial disruption of or material interference with school activities' or that collides 'with the rights of other students to be secure and let alone.'" *Wynar v. Douglas Cnty. Sch. Dist.*, 728 F.3d 1062, 1070 (9th Cir. 2013) (quoting *Tinker*, 393 U.S. at 508).

---

[2] There is no direct evidence that Becerra instructed the teachers to tell B.B. that she could not play at recess because of the Drawing. However, given the close temporal proximity between Becerra's conversation with B.B. and the teacher's punishment, a reasonable jury could infer that Becerra directed this punishment. *Cf. Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741 (9th Cir. 2001) (concluding that "proximity in time between the protected action and the allegedly retaliatory employment decision" precluded summary judgment on a retaliation claim).

Much of the caselaw applying *Tinker* focuses on its "substantial disruption" prong. As a result, "[t]he precise scope of *Tinker*'s 'interference with the rights of others' language is unclear." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (Alito, J.); *see also Parents Defending Education v. Olentangy Local Sch. Dist. Bd. of Educ.*, __ F. Supp. 3d __, 2023 WL 4848509, at * 9 (S.D. Ohio 2023) ("*Parents*"). However, the cases reveal three principles that help identify when speech unduly infringes on the rights of other students such that it is not protected under the First Amendment.

First, where speech is directed at a "particularly vulnerable" student based on a "core identifying characteristic," such as race, sex, religion, or sexual orientation, educators have greater leeway to regulate it. *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1181-83 (9th Cir. 2006), *vacated as moot by*, 549 U.S. 1262 (2007); *see also J.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d 1094, 1122-23 (C.D. Cal. 2010). Although speech that is "merely offensive to others" cannot be regulated, *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1153 (9th Cir. 2016), courts have recognized that denigrations based on protected characteristics do more than offend—they can inflict lasting psychological harm and interfere with the target student's opportunity to learn. *See, e.g.*, *Harper*, 445 F.3d at 1179; *Parents*, 2023 WL 4848509 at * 13. These types of denigrations, moreover, have little countervailing benefit to the learning environment. Derogatory speech is therefore "not the conduct and speech that our educational system is required to tolerate, as schools attempt to educate students about 'habits and manners of civility' or the 'fundamental values necessary to the maintenance of a democratic political system.'" *Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565, 574 (4th Cir. 2011) (quoting *Bethel*, 478 U.S. at 681). Thus, "[w]hatever the outer boundary of *Tinker*'s interference inquiry," the case law "establish[es] that students have the right to be free" from speech that "denigrate[s] their race" while at school. *Shen v. Albany Unified Sch. Dist.*, 2017 WL 5890089, at * 10 (N.D. Cal. Nov. 29, 2017).

Second, the mere fact that speech touches upon a politically controversial topic is not sufficient to bring it under the First Amendment's protective umbrella. In *Harper*, for instance, the district court denied a preliminary injunction brought by a student who was told that he

could not wear a homophobic shirt to school. The Ninth Circuit affirmed the district court despite the "political disagreement regarding homosexuality" that existed at the time. *Id.* at 1181; *see also Parents*, 2023 WL 4848509 at * 9 - * 13 (upholding a school's regulation prohibiting speech that is both derogatory and the subject of societal disagreement against a First Amendment challenge). At the same time, however, school administrators must have a justification above the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" before they may regulate student speech. *Tinker*, 393 U.S. at 510.

Third, and most pertinent for the present case, age is an important factor when deciding whether speech is protected. In *Tinker*, the Court held that a high school could not ban students from wearing black arm bands that signaled opposition to the Vietnam War. *Id.* at 514. The Court emphasized that denying students this type of expression—which neither interfered with the school environment nor intruded on other students' rights—may coerce political orthodoxy and "strangle the free mind" of high school students. *Id.* at 507. An elementary school, by contrast, is not a "marketplace of ideas." *Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1538 (7th Cir. 1996). Thus, the downsides of regulating speech there is not as significant as it is in high schools, where students are approaching voting age and controversial speech could spark conducive conversation. *See Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 876 (7th Cir. 2011). As the Seventh Circuit has recognized, elementary schools "are more about learning to sit still and be polite, rather than robust debate." *Muller*, 98 F.3d at 1538. To fulfill that mission, elementary schools require significant latitude to discipline student speech. Indeed, "much—perhaps most—of the speech that is protected in high grades" may be regulated in elementary schools. *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 417-18 (7th Cir. 2003).

"The targeted student's age is also relevant to the analysis." *C.R.*, 835 F.3d at 1153. Younger students may be more sensitive than older students, so their educational experience may be more affected when they receive messages based on a protected characteristic. Relatedly, first graders are impressionable. If other students join in on the insults, the disruption

could metastasize, affecting the learning opportunities of even more students. *See id.* at 1153 n.5.

### 2. Application

Giving great weight to the fact that the students involved were in first grade, the Court concludes that the Drawing is not protected by the First Amendment. B.B. gave the Drawing to M.C., a student of color.[3] The Drawing included a phrase similar to "All Lives Matter," a sentence with an inclusive denotation but one that is widely perceived as racially insensitive and belittling when directed at people of color.[4] Indeed, M.C.'s mother testified that those kinds of messages "hurt." Soon after discovering the Drawing in M.C.'s backpack, M.C.'s mother emailed the school, and stated that she believed her daughter received the Drawing because of her race. Based on this email and the content of the Drawing, Becerra concluded that the Drawing interfered with the right of M.C., a first grader, "to be let alone."[5] *See Tinker*, 393 U.S. at 503.

Undoubtedly, B.B.'s intentions were innocent. B.B. testified that she gifted the Drawing to M.C. to make her feel comfortable after her class learned about Martin Luther King Jr. But *Tinker* does not focus on the speaker's intentions. Rather, it examines the effects of speech on the learning environment and other students, giving deference to school officials' assessments about what speech is acceptable in an educational setting. *See Wynar*, 728 F.3d at 1071; *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 766 (9th Cir. 2006). Such deference to schoolteachers is especially appropriate today, where, increasingly, what is harmful or innocent speech is in the eye of the beholder. Teachers are far better equipped than federal courts at identifying when speech crosses the line from harmless schoolyard banter to impermissible harassment. Here,

---

[3] There is no direct evidence that M.C. is a student of color; however, there is strong circumstantial evidence to support such a finding.

[4] The phrase "All Lives Matter" gained popularity in response to the growth of the Black Lives Matter movement ("BLM"), a social movement protesting violence against Black individuals and communities, with a focus on police brutality. "All Lives Matter" can be seen as an offensive response to BLM because that phrase obscures "the fact that [B]lack people have not yet been included in the idea of 'all lives.'" Daniel Victor, *Why 'All Lives Matter' is Such a Perilous Phrase*, N.Y. TIMES, (Jul. 15, 2016), https://www.nytimes.com/2016/07/16/us/all-lives-matter-black-lives-matter.html.

[5] Plaintiff argues that Becerra's punishment was not justified because the speech was directed at only one student, M.C. Opp'n at 12. However, "[n]othing in the Supreme Court's decision in *Tinker* suggests that more than one student's right to be secure and let alone need be materially invaded before school officials" act. *Castro v. Clovis Unified Sch. Dist.*, 604 F. Supp. 3d 944, 952 (E.D. Cal. 2022). In fact, that the speech was targeted at one person may weigh in favor of a finding that the speech invaded that person's rights.

Becerra concluded that the Drawing, although well-intentioned, fell on the latter side of that line.

A parent might second-guess Becerra's conclusion, but his decision to discipline B.B. belongs to him, not the federal courts. Elementary schoolteachers make thousands of disciplinary decisions on American playgrounds every day. Federal court review of all these decisions would unduly interfere with school administration and overwhelm the judiciary. Regardless of whether Becerra was right or wrong, the decision is his, and this schoolyard dispute—like most—does not warrant federal court intervention.

Summary Judgment is GRANTED on Plaintiff's First Amendment claim.

## B. First Amendment Retaliation Claim

The First Amendment prohibits government officials from retaliating against individual for their speech. *See Blair v Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010). Plaintiff argues that Becerra retaliated against her for the Drawing when he punished her for the Drawing, and when Becerra did not step in to prevent Victa from following B.B. and her brother on the blacktop one year after the Drawing. Opp'n at 16-17. Plaintiff also argues that Victa's decision to follow B.B. and her K.B. after "B.B. asked her to go," was in retaliation for the Drawing. Opp'n at 18.

"To establish a First Amendment retaliation claim in the student speech context, a plaintiff must show that (1) [s]he engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *Pinard*, 467 F.3d at 770 (9th Cir. 2006). As discussed above, the Drawing was not "constitutionally protected activity," so Defendants Becerra and Victa are entitled to summary judgment on Plaintiff's retaliation claim. *See id.*

Defendants Becerra and Victa are also entitled to summary judgment for a separate reason: They would have—and, indeed, should have—addressed the situation on the blacktop. K.B., an elementary school student, was walking in a circle, distraught and refused to return to his class. Victa was concerned that K.B. would abscond from campus. B.B. joined her brother

1  on the blacktop and asked Victa, who was following the duo at a significant distance, to leave

2  the two of them alone. It would have been irresponsible for Victa to leave K.B. unsupervised

3  while he was in a distressed state. Because the undisputed evidence shows that Becerra and

4  Victa "would have taken the same action even in the absence of" the Drawing, Plaintiff's First

5  Amendment retaliation claim fails as a matter of law. *See Keyser v. Sacramento City Unified*

6  *Sch. Dist.*, 265 F.3d 741, 750 (9th Cir. 2001).

7       Therefore, the Court GRANTS Defendants' Motion for Summary Judgment on Plaintiff's

8  First Amendment Retaliation Claim.

9    **C. State Law Claims**

10       Plaintiff's two other claims arise under California law, and the only basis for federal

11  subject matter jurisdiction over them is supplemental jurisdiction. "A district court should

12  dismiss a supplemental state law claim where all of the claims over which it had original

13  jurisdiction have been dismissed." *Khosroabadi v. North Shore Agency*, 439 F. Supp. 2d 1118,

14  1125 (S.D. Cal. 2006) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726-27

15  (1966)); *see also Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997). Given the

16  Court's dismissal of Plaintiff's federal claims, the Court DECLINES supplemental jurisdiction

17  over Plaintiff's state law claims.

18       Plaintiff may refile her state claims in state court. B.B. and M.C. have undoubtedly

19  moved on from this incident that occurred three years ago. B.B. stated that the Drawing did not

20  strain the friendship between them. They have taught us an important lesson about moving on.

21

22

23

24

25

26

27

28

**IV.     DISPOSITION**

       For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's federal law claims. The Court **DECLINES** supplemental jurisdiction over Plaintiff's state law claims. Those claims are **DISMISSED WITHOUT PREJUDICE**. Plaintiff may refile the state law claims in state court.

       All future dates in this matter are **VACATED**.


       DATED: February 22, 2024

DAVID O. CARTER

UNITED STATES DISTRICT JUDGE

LEX REX INSTITUTE
ALEXANDER H. HABERBUSH, ESQ. SBN 330368
DEBORAH L. PAULY, ESQ. SBN 350345
444 West Ocean Boulevard, Suite 1403
Long Beach, CA 90802
Telephone: (562) 435-9062
E-mail: AHaberbush@LexRex.org

HEATH LAW, PLLC
RYAN L. HEATH (AZ SBN 036276)*
AMBER R. TERRY (DC BN 1766035)*
16427 N. Scottsdale Rd., Suite 370
Scottsdale, Arizona 85254
Telephone: (480) 522-6615
E-mail: ryan.heath@thegavelproject.com
*pro hac vice*

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| B.B., a minor by and through her mother, Chelsea Boyle, <br><br> Plaintiffs, <br><br> v. <br><br> CAPISTRANO UNIFIED SCHOOL DISTRICT; JESUS BECERRA, an individual in his individual and official capacities; CLEO VICTA, an individual in her individual and official capacities; and DOES 1 through 50, inclusive, <br><br> Defendants. | CASE NO. 8:23-cv-00306-DOC-ADS <br><br> *Assigned for All Purposes to:* <br> *Hon. David O. Carter – Courtroom 10A* <br><br> **THIRD AMENDED COMPLAINT FOR** <br> **1)   VIOLATION OF B.B.'S FIRST AMENDMENT RIGHTS (42 U.S.C. § 1983)** <br> **2)   VIOLATION OF B.B.'S FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS (42 U.S.C. § 1983)** <br> **3)   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** <br> **4)   NEGLIGENT HIRING, SUPERVISION AND/OR RETENTION OF EMPLOYEE** <br> **5)   RETALIATORY HARASSMENT (42 U.S.C. § 1983)** |

1

**THIRD AMENDED COMPLAINT**

1   COMES NOW B.B., a minor by and through her mother, Chelsea
2   Boyle ("B.B.") ("Plaintiff"), for causes of action against Defendants Capistrano
3   Unified School District ("CUSD"); Jesus Becerra ("Becerra"), an individual, in his
4   individual and official capacities; Cleo Victa ("Victa"), an individual, in her
5   individual and official capacities; and DOES 1 through 50, inclusive (collectively,
6   "Defendants"). Plaintiffs allege as follows:

7                          **JURISDICTION AND VENUE**

8       1.     This action arises under the laws of the United States and the State of
9   California.

10      2.     This Court has subject matter jurisdiction over the federal claims
11  presented herein pursuant to 28 U.S.C. §§ 1331 and 1343, as they arise under the
12  Constitution and laws of the United States.

13      3.     Supplemental jurisdiction over the state law claims is conferred by 28
14  U.S.C. § 1367, as these state law claims are so related to the federal claims that they
15  form part of the same case or controversy and derive from a common nucleus of
16  operative facts.

17      4.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a
18  substantial part of the events giving rise to this claim occurred in this district.

19                                   **PARTIES**

20      5.     Plaintiff B.B. is a minor and the daughter of Chelsea Boyle and Darren
21  Boyle. At all times relevant herein, B.B. was a resident of the State of California in
22  the County of Orange.

23      6.     Defendant CUSD is a public school district located in the State of
24  California in the County of Orange.

25      7.     Defendant Becerra is and was, at all times relevant herein, an employee
26  of CUSD and is and was, at all times relevant herein, the principal of Viejo
27  Elementary School (hereinafter "Viejo"), an elementary school within CUSD.
28

                                        **2**
                          **THIRD AMENDED COMPLAINT**

1  Plaintiff is informed, believes, and, on that basis alleges that Becerra resides in the
2  State of California in the County of Orange.

3      8.    Defendant Victa is, and was at all times relevant herein, an employee of
4  CUSD and a counselor at Viejo. Plaintiff is informed, believes, and, on that basis
5  alleges that Victa resides in the State of California in the County of Orange.

6                        **FACTUAL ALLEGATIONS**
7                        **(CUSD District Policies)**

8      9.    CUSD is a public school system and the governmental body
9  responsible for operating public schools within its district, including Viejo and San
10  Juan Elementary School. CUSD's offices are located at 33122 Valle Rd., San Juan
11  Capistrano, CA 92675.

12     10.   According to its website, the mission of the CUSD is to prepare
13  "students to meet the challenges of a rapidly changing world."

14     11.   Plaintiffs are informed, believe, and, on that basis allege that CUSD –
15  through the Board of Trustees – has adopted a series of policies governing staff and
16  student behavior on campus.

17     12.   In addition, CUSD publishes a disciplinary policies and procedures
18  manual for each level of education (e.g., elementary, middle, and high school).

19     13.   CUSD School Board Policy 5140(a) mandates that "the District shall
20  encourage attitudes and behaviors that promote mutual respect and harmonious
21  relations." This policy further mandates that "The District shall provide instruction
22  and counseling designed to promote positive racial and ethnic identity, help students
23  understand diverse cultures, teach them to think critically about racial bias, and
24  show them how to deal with discriminatory behavior in appropriate ways."

25     14.   CUSD School Board policy 5141(a) provides that "[s]tudents are
26  expected to exhibit appropriate conduct that does not infringe upon the rights of
27  others or interfere with the school program while on school grounds, going to or

28

                                  **3**
                        **THIRD AMENDED COMPLAINT**

1  coming from school, at school activities, or using District transportation."

2      15.    Prohibited student conduct under CUSD School Board Policy 5141(a)

3  includes, but is not limited to "[c]onduct that disrupts the orderly classroom or

4  school environment." It provides that "[s]tudents who violate District or school rules

5  and regulations may be subject to discipline including, but not limited to,

6  suspension, expulsion, transfer to alternative programs, referral to a student success

7  team or counseling services, or denial of participation in extracurricular or

8  cocurricular activities or other privileges in accordance with Board policy and

9  administrative regulation. The Superintendent or designee shall notify local law

10 enforcement as appropriate."

11     16.    The CUSD disciplinary policies and procedures manual for elementary

12 school students sets forth a list of "infractions" that includes but is not limited to

13 "general misconduct."

14     17.    CUSD policy BP 5184(a) provides the process that should occur when

15 a freedom of speech issue arises. Accordingly, "[s]tudents shall not be disciplined

16 solely on the basis of constitutionally protected speech or other communication."

17 See cf. 6144. This CUSD policy also lists the process for an appeal, once the

18 freedom of speech issue occurs. According to CUSD policy, the "Superintendent or

19 designee shall ensure that due process is followed." (p. 12)

20     18.    According to CUSD Elementary School Disciplinary Policies and

21 Procedures Manual, the process to be followed in the appeal stage is as follows:

22         a.  The following procedures shall be used to address disputes regarding

23             student freedom of expression:

24             i.  The student and faculty member shall first attempt to resolve the

25                 problem by themselves.

26             ii. If the student and faculty member are unable to resolve the

27                 dispute, the student and/or faculty member may bring the matter

28

to the *principal or designee*, who shall hear both sides and strive to resolve the dispute as quickly as possible.

iii.  If the principal or designee is unable to resolve the dispute, the student and/or faculty member may bring the matter to the *Superintendent or designee*, who shall hear both sides and strive to resolve the dispute as quickly as possible.

iv.  If the *Superintendent or designee* is unable to resolve the dispute, the student and/or faculty member may ask for a hearing to determine whether a deprivation of freedom of expression was justified under the above regulations. This hearing shall be held before the Board or impartial person(s) appointed by the Board as soon as possible after it is requested. *Both sides shall be given an opportunity to demonstrate that Board policy and administrative regulations were properly applied.*

19.   The CUSD policy listed above clearly establishes that those who operate the Level II, Level III, and Level IV investigations (designee Pati Romo and Cary Johnson, the Assistant Superintendent, then the Board for CUSD) do so with the decision-making authority needed to make such evaluations.

**(The Drawing)**

20.   From on or about August 2018, through on or about June 2022, B.B. was a student at Viejo Elementary School.

21.   From on or about September 2022, through on or about January 2023, B.B. was a student at San Juan Elementary School.

22.   At all times relevant herein, B.B. was an elementary school student at schools within CUSD.

23.   B.B. suffers from Attention Deficit Hyperactivity Disorder ("ADHD") and art is her primary therapeutic outlet for this disorder. Because of this, she

1  regularly draws pictures at school.

2     24.    On or about March 2021, while at school, B.B. drew a picture (the
3  "Drawing") depicting individuals of various races getting along, with the words
4  "Black Lives Mater [sic]" and "Any Life" written below. B.B.'s intent was to show
5  children of various races getting along. She drew the Drawing because she had a
6  diverse set of friends. A true and correct copy of the Drawing is included
7  hereinbelow.



17     25.    One of B.B.'s classmates took the Drawing home, and, on information
18  and belief, while at her own home and not on school grounds, the classmate showed
19  the Drawing to the classmate's parents who took issue with the Drawing. They
20  subsequently presented their concerns about the Drawing to Becerra.

21     26.    On or about March 31, 2021, Becerra confronted B.B. about the
22  Drawing and reprimanded her by calling the drawing "inappropriate." Becerra then
23  demanded B.B. apologize for the Drawing.

24     27.    Becerra further "benched" B.B. as a result of the Drawing, meaning
25  B.B. was told she could not play at recess for the next two weeks.

26     28.    B.B. suffered severe emotional distress, humiliation, and ostracization
27  as a result of the compelled apology and benching.

28

29.     As a result of the incident, B.B. felt ashamed and confused for the way she was treated by Becerra and other Viejo staff.

30.     B.B. did not inform either Darren Boyle or Chelsea Boyle about the incident surrounding the Drawing, out of fear she would be punished a second time at home.

31.     Chelsea Boyle was not informed of the incident until over eleven (11) months after it had occurred, on or about March 8, 2022, when a friend and parent of another student at B.B.'s school mentioned it via text message.

32.     Boyle brought this incident surrounding the Drawing to the attention of Becerra, via email, and he told her in reply that the incident had never occurred.

33.     However, after filing a formal complaint with CUSD, Becerra backtracked his initial response and stated that he had informed Chelsea Boyle about her daughter's drawing but that no disciplinary action had taken place.

34.     Upon information and belief, Becerra had received help from CUSD staff in crafting the Level I Response – the first investigation that was to occur unbiased.

35.     Upon information and belief, CUSD did not adequately train its employees, including Becerra and Victa, on its school board policy, BP 5184(b), particularly those policies relating to treatment of students who do not share employees' political ideologies.

36.     Upon information and belief, CUSD did not adequately train its employees, including Becerra and Victa, on its school board policy, BP 5184(b), particularly those policies relating to the due process standards that the staff of CUSD must follow to ensure that an elementary school child's rights are not infringed upon.

37.     Upon information and belief, CUSD did not adequately train its employees, including Becerra and Victa, on its school board policy, BP 6144, on

how to appropriately interact with students on matters of a controversial nature, ensuring that "[t]he teacher shall not suppress any student's view on the issues as long as its expression is not malicious or abusive toward others."

38.    Upon information and belief, CUSD did not adequately train its employees, including Becerra and Victa, on its school board policies, which collectively focus on how to appropriately interact with students on matters of a politically volatile nature, how to properly identify and address subjects of reprimand, or to ensure that disciplinary actions do not aggravate students' existing disabilities or impede their ability to cope.

39.    Upon information and belief, CUSD did not adequately train its employees, including Becerra and Victa, on the proper procedures and protocols in handling an investigation, whether an informal investigation or a formal investigation requested at the behest of a parent or guardian.

40.    Upon information and belief, CUSD did not adequately train its employees, including Becerra and Victa, on its school board policy, BP 1312.1(a), on how retaliation against complainants is prohibited.

**(The CUSD Complaint)**

41.    CUSD responded to Boyle by opening a Level I investigation into the incident surrounding the Drawing.

42.    However, CUSD appointed Becerra to investigate the complaint, despite the claim being against Becerra. In his report of his findings (the "Level I Response"), he concluded that B.B. had not been reprimanded.

43.    On information and belief, CUSD had a part in the Level I Response letter that was given to Chelsea Boyle. On information and belief, Pati Romo, who works directly for CUSD, helped Becerra craft his response letter, paving the course for her own "unbiased" investigation that occurs in Level II. Further, on information and belief, CUSD did not conduct any interviews of further investigation into what

**8**
**THIRD AMENDED COMPLAINT**

had taken place, with regard to the Drawing, specifically during the Level I phase.

44.     In its Level I Response, CUSD failed to properly prepare/train Becerra in how to handle such an investigation. On information and belief, Becerra does not know the proper protocols that should have been followed when conducting a Level I investigation. On information and belief, Becerra was not trained on how to handle Level I investigations generally, much less Level I investigations centering around freedom of speech issues. On information and belief, Becerra was not well equipped to be an unbiased investigator into the Drawing incident. On information and belief, there are *no* written standards of practice for a principal (or any person) to follow in *how* to conduct these investigations.

45.     In its Level I Response, CUSD failed to maintain an ethical boundary line between the person being accused of wrongdoing (Becerra), the person who was to investigate the Drawing incident (again, Becerra) and the CUSD staff (Pati Romo) as Pati Romo inserted herself into the initial investigation (but was then designated the Level II investigator). In failing to maintain due process from the outset, that is to hold an unbiased investigation that is not mingled between CUSD and the person who was being accused of wrongdoing, CUSD not only failed to train, but actually taught Becerra that such a process is not only appropriate but tolerated and encouraged by CUSD.

46.     On information and belief, Becerra approached CUSD (Dave Stewart) about the Level I investigation and was told to still proceed, ignoring the obvious due process violations.

47.     A true and correct copy of the Level I Response is attached hereto and incorporated herewith as Exhibit "A."

48.     On or about March 15, 2022, Chelsea Boyle escalated the complaint to Level II.

49.     During the Level II review process, CUSD designated Pati Romo, who

1    had a part in Level I, to conduct the Level II investigation.

2    50.    Pati Romo (as mentioned above in ¶ 46, for helping Becerra in his

3    Level I response letter), falsely and knowingly attributed statements to Chelsea

4    Boyle that she did not make and used these fabricated and fragmented statements to

5    discredit the whole purpose of the investigation – to consider critical evidence

6    regarding the Drawing incident and to ensure that B.B.'s rights were not infringed

7    upon.

8    51.    CUSD did not take into account critical facts pertaining to the initial

9    comments made by Becerra to Chelsea Boyle via e-mail. CUSD even went so far as

10   to *change* the words Chelsea Boyle spoke/wrote in its Level II findings.

11   52.    In its Level II response, CUSD failed to address the underlying cause of

12   Boyle's complaint and instead repeated numerous statements from her private text

13   messages, out of context, in an attempt to discredit her, rather than solve the actual

14   concern – determining what had occurred with the Drawing and the extent of harm

15   done to B.B. as a result of CUSD's punitive measures.

16   53.    There is no indication that CUSD conducted any interviews (other than

17   briefly speak with the mother of the child who received the Drawing) or other

18   substantial steps to determine what had occurred, as part of the Level II

19   investigation. On information and belief, CUSD did not interview B.B., Becerra, the

20   classmate that B.B. gave the Drawing to, B.B.'s teacher at the time the Drawing

21   incident occurred, or anyone else who could have been present at the time the

22   Drawing incident took place.

23   54.    CUSD's Level II Response is riddled with biased inaccuracies and

24   handled by the same person who helped Becerra craft his initial Level I Response –

25   Pati Romo.

26   55.    A true and correct copy of the Level II Response is attached hereto and

27   incorporated herewith as Exhibit "B."

28

**10**
**THIRD AMENDED COMPLAINT**

56. Chelsea Boyle subsequently appealed her claim to Level III and had an in-person meeting with CUSD Assistant Superintendent Cary Johnson in early April 2022. Until this time, Boyle did not have a copy of the Drawing.

57. CUSD ultimately rejected the appeal but acknowledged that it had improperly appointed Becerra to investigate himself.

58. There is no indication that any witnesses were interviewed or any other substantial steps taken as a part of the Level III investigation.

59. A true and correct copy of the Level III response is attached hereto and incorporated herewith as Exhibit "C."

60. On information and belief, CUSD's actions with respect to its internal complaint process are consistent with its express policy, custom or practice of inadequately addressing grievances, allowing individuals named in complaints to investigate themselves, and using selective information without context to potentially discredit complainants with whom they disagree.

61. On information and belief, CUSD's actions with respect to its internal complaint process are consistent with ratification of Becerra's underlying constitutional violations by allowing Becerra, who was named in the complaint to investigate himself, approving CUSD staff Pati Romo to help Becerra craft the initial Level I response and then proceed to conduct an "unbiased" Level II investigation. Further, the Level III investigation, conducted by Assistant Superintendent Cary Johnson, simply regurgitated what had already been found in the mishandled Level I and Level II investigations – ratifying the underlying violation that had taken place by Becerra.

**(The Retaliation)**

62. On or about the first school day of the fall semester, 2022, B.B. wrote a letter to Becerra asking him to treat her mother better.

63. As a result of Chelsea Boyle's use of the internal complaint process and

1  various other assertions of B.B.'s legal rights, on information and belief, gossip
2  began to spread regarding B.B. and her family in and among the faculty and staff of
3  CUSD.

4       64.    As a result of the ongoing gossip, during the first few weeks of the
5  2022 fall semester at Viejo, B.B. experienced bullying and harassment from other
6  students and faculty at CUSD. Despite being notified of the bullying and harassment
7  experienced by B.B., CUSD did nothing to address the issue. In fact, one of the
8  students who bullied B.B. was the child of a faculty member who, on information
9  and belief, had received and/or participated in gossip regarding B.B.

10      65.    As time progressed and the bullying and harassment continued
11  unaddressed, B.B. experienced extreme stress and anxiety.

12      66.    On information and belief, Defendant Victa had received and/or
13  participated in gossip regarding B.B and her family. On information and belief, she
14  had developed the belief that Chelsea Boyle was "mentally unstable." As a result of
15  this belief, Plaintiff is informed, believes, and on that basis, alleges that Victa began
16  to give special attention to B.B. without her knowledge or consent and without the
17  knowledge or consent of Chelsea Boyle.

18      67.    Unwanted and harassing conduct from Victa directed toward B.B.
19  nevertheless continued and worsened, shortly thereafter.

20      68.    On or about August 23, 2022, upon noticing a situation involving her
21  brother, who was being aggressively followed by Victa as he tried to escape while
22  crying hysterically, B.B. went over to her brother to comfort him on the school
23  playground. Both Victa and Becerra were present.

24      69.    When B.B. and her brother tried to leave, Victa began to follow B.B.
25  and her brother around the concrete playground. To escape Victa's uncomfortable
26  pursuit, B.B. and her brother hid in a hallway. B.B. asked Victa to leave them alone.
27  Meanwhile, Becerra stood by and said nothing.

28

12

**THIRD AMENDED COMPLAINT**

70.     After realizing Victa was not going to listen and give her space, B.B. ran into the nearest bathroom to call her mother on her Apple Watch. However, Victa followed B.B. into the bathroom, standing in the doorway, blocking her exit.

71.     B.B. experienced significant stress, anxiety, and mental anguish as a result of this interaction.

72.     Because of Victa and Becerra's actions on August 23, 2022, B.B. experienced shock, severe anxiety, humiliation, and shame. These actions were objectively outrageous and constitute bullying and harassment in violation of school policies.

73.     Additionally, the actions of Victa and Becerra on or about August 23, 2022, were done in retaliation for B.B.'s and her mother, Chelsea Boyle's, complaints against CUSD and Becerra.

74.     Lastly, the actions of Victa and Becerra caused B.B. and her brother to disenroll from Viejo.

75.     It is apparent from the consistent pattern of behavior exhibited by CUSD staff, including but not limited to Victa and Becerra, that CUSD maintains, either explicitly or implicitly, a custom, or practice of neglecting to properly train, supervise, and direct its staff members in the appropriate and professional handling of parental and student complaints. This includes a failure to uphold standards of confidentiality, proper etiquette for conducting investigations, standards of conducting investigations (formal or informal), refrain from engaging in or propagating gossip, and provide a safe and respectful environment free from bullying, harassment, and retaliation. CUSD's systematic neglect to intervene, even after being made aware of such inappropriate behavior and breaches, showcases a deep-rooted custom of indifference and neglect towards the well-being and rights of its students and their families. This pervasive neglect not only jeopardizes the physical and emotional safety of students like B.B. but also stifles the trust and

1  respect inherent in the student-school relationship. Such a custom or practice,
2  whether formally adopted or informally tolerated, creates an environment conducive
3  to violations of students' and parents' rights, leading to the unnecessary distress,
4  humiliation, and educational disruption experienced by the Plaintiff.

5                           **(The Claim for Damages)**

6       76.    On or about July 13, 2022, Chelsea Boyle, presented a claim for
7  damages to CUSD on behalf of B.B. for the incident in which B.B. was compelled
8  to apologize for her Drawing.

9       77.    On or about October 24, 2022, Chelsea Boyle, received CUSD's
10  response to Plaintiff's claim for damages. The response denied the claim and
11  informed Plaintiff of the six-month deadline for filing an action in court.

12                           **FIRST CLAIM FOR RELIEF**
13      **Violation Of B.B.'S First Amendment Rights (42 U.S.C. § 1983)**
                     **(B.B. Against Becerra and CUSD)**
14

15      78.    Plaintiffs re-allege and incorporate by reference the allegations in
16  paragraphs 9-61, as if fully set forth herein.

17      79.    CUSD is a local government entity.

18      80.    At all times relevant to the allegations in this Complaint, CUSD and
19  Becerra acted under the color of state law.

20      81.    At all times relevant to the allegations in this Complaint, B.B. had a
21  federally protected right and privilege to be free from deprivation of her freedom of
22  speech, expression, and association under the First Amendment to the United States
23  Constitution as incorporated and applicable to the state by the Fourteenth
24  Amendment to the United States Constitution.

25      82.    At all times relevant to the allegations in this Complaint, B.B. had a
26  constitutionally protected and clearly established right to express herself during
27  school and not be disciplined for such speech where the exercise of such right does
28

                                   14
                      **THIRD AMENDED COMPLAINT**

1  not materially and substantially interfere with the requirements of appropriate
2  discipline in the operation of the school.

3      83.   B.B. had a constitutionally protected and clearly established right to
4  express herself during school without discipline, provided her speech did not
5  materially and substantially interfere with the school's operation. The longstanding
6  principle forbids schools from censoring speech based on its content unless the
7  speech is threatening or significantly disruptive.

8      84.   CUSD and Becerra were aware or should have been aware that, despite
9  pedagogical concerns, neither students nor teachers shed their constitutional rights
10  to freedom of speech or expression at the schoolhouse gate.

11      85.   The Drawing was B.B.'s protected First Amendment speech,
12  symbolizing equality of rights regardless of skin color.

13      86.   The Drawing did not cause any material disruption to education at
14  CUSD or substantially interfere with the operations of the school or school
15  activities, nor was it reasonably likely to do so.

16      87.   The Drawing did not interfere with the rights of other students at
17  CUSD.

18      88.   The general rule that schools may not regulate speech that they or their
19  employees disagree with or consider inappropriate (as opposed to truly threatening
20  or substantially disruptive speech) has been established for decades. Therefore, the
21  rights violated by CUSD and Becerra were clearly established.

22      89.   As such, CUSD and Becerra violated B.B.'s First Amendment Rights
23  by compelling her to apologize for her Drawing and punishing her by benching her
24  and instructing her not to draw pictures for her friends at school or express her
25  beliefs.

26      90.   Becerra personally participated in depriving B.B. of her First
27  Amendment Rights by compelling her to apologize for her Drawing and telling her

28

**15**
**THIRD AMENDED COMPLAINT**

1   that the Drawing was "inappropriate." Becerra restrained B.B. from expressing her

2   beliefs and compelled speech from her by forcing her to apologize for a Drawing

3   that merely expressed her harmless beliefs. In addition, B.B. was scolded for her

4   speech, told to apologize for her speech, and then punished for her speech by

5   benching her at recess.

6       91.    As a further direct result of both Becerra's and CUSD's actions, B.B.

7   suffered damages including but not limited to, the suppression of her First

8   Amendment rights, emotional damages, harm to reputation, embarrassment,

9   humiliation, severe stress and/or mental anguish, and all other damages directly

10   and/or consequentially associated with the deprivation of one's civil rights,

11   including attorneys' fees and costs associated with vindicating her civil rights.

12                       **CUSD's Express Policy**

13       92.    CUSD had an express policy (CUSD policy BP 5184(a)) that allowed

14   Becerra to investigate himself. This express policy states that "the first step in the

15   appeal process if to address the matter with the site principal (Level 1). If you are

16   dissatisfied with the Level 1 resolution by the principal you may then file a formal

17   complaint." CUSD does not give any options or notice to parents or staff that if

18   there is a conflict of interest (rather, that the principal is the one being investigated)

19   that the conflict should be addressed by someone *other* than the principal himself.

20       93.    This express policy would eventually cause issues or at least put CUSD

21   on notice to correct this potential conflict as the complaint that Chelsea Boyle raised

22   against Becerra cannot be the only complaint raised against a principal within

23   CUSD.

24       94.    CUSD did not give Becerra another option either expressly or

25   impliedly, either. On information and belief, Becerra opted to consult with CUSD

26   on whether to conduct the investigation and CUSD (Dave Stewart) informed

27   Becerra to proceed, ignoring the obvious conflict of interest.

28

16

**THIRD AMENDED COMPLAINT**

1   95. Defendant CUSD's express policy was adopted and/or maintained with

2 deliberate indifference to B.B.'s constitutional rights.

3   96. It would the obvious that there should be a provision in place for the

4 common chance that a parent would file a complaint against a school principal.

5   97. As a direct, proximate, and foreseeable result of CUSD's conduct, B.B.

6 has incurred special and general damages, the precise amount of which will be

7 proven at trial.

8       **Widespread Long Standing Practice or Custom**

9   98. Defendant CUSD had a custom, or practice of failing to properly train

10 its employees in handling situations of this kind, both of which were the direct cause

11 of this violation. CUSD had a longstanding custom of allowing principals to

12 investigate themselves. Being that the Board Policies that handle this area of

13 disciplinary matters are silent on this topic, it is clear that CUSD allows principals to

14 normally investigate themselves. If a principal was not normally allowed to

15 investigate himself, because of the obvious conflict, there would be a policy to

16 explain that so that there would be no confusion when it comes to the due process

17 required in such investigations. However, the policies are silent on this and even

18 when Becerra asked CUSD (Dave Stewart) whether he should be conducting the

19 investigation, he was told to continue.

20   99. Additionally, on information and belief, CUSD has a clear custom of

21 intermingling their levels of investigation – leaving no room for proper due process

22 procedures as each investigator was already biased in the results.

23   100. On information and belief, there are lengthy e-mail chains between all

24 investigators involved in this case, at times that would violate a proper due process –

25 all the way through Level IV. In fact, on information and belief, there is an e-mail in

26 which Pati Romo (the designated Level II investigator, who also helped Becerra

27 craft the Level I Response) sends an e-mail requesting help in crafter her Level II

28

1  Response letter and even admits "[Pati] need[s] a cvillage on this one."

2      101.   The custom of allowing the investigators to intermingle between their

3  own investigations is cause for concern to all who have had these "investigations"

4  conducted within the CUSD appeal process.

5      102.   Defendant CUSD's custom or practice was adopted and/or maintained

6  with deliberate indifference to B.B.'s constitutional rights. CUSD (Dave Stewart)

7  knew/should have known that due process would be violated if a principal

8  conducted his own investigation.

9      103.   As a direct, proximate, and foreseeable result of CUSD's conduct, B.B.

10  has incurred special and general damages, the precise amount of which will be

11  proven at trial.

12                              **Failure to Train**

13      104.   On information and believe, Plaintiff alleges that CUSD did not have

14  any training in place in the areas of freedom of speech and appropriate investigative

15  procedures when speech is at issue, such that CUSD knew or should have known,

16  that the inadequate and/or non-existent training program was likely to result in a

17  deprivation of rights.

18      105.   CUSD failed to train Becerra in the areas of freedom of speech

19  (relevant to being the principal of an elementary school) and appropriate

20  investigative procedures. This failure to train led to the deprivation of B.B.'s

21  constitutional rights.

22      106.   The training procedures of CUSD was not adequate to prevent

23  violations of Becerra in situations that are usual and recurring.

24      107.   CUSD was deliberately indifferent to the known or obvious

25  consequences of its failure to train Becerra. The failure of training Becerra led to the

26  deprivation of B.B.'s constitutional rights.

27      108.   Becerra's actions deprived B.B. of her constitutional right to free

28

                                      **18**
                          **THIRD AMENDED COMPLAINT**

1  speech as B.B. was scolded for her speech, told to apologize for her speech, and
2  then punished for her speech by benching her at recess, further harming her.

3      109.   On information and belief, there had been no official training for
4  Becerra, or any other staff at Viejo, on the protocols needed when free speech issues
5  arise. Considering that a public school is filled with many children and staff
6  members learning and voicing opinions, it is not unexpected that speech issues
7  could and will arise. On information and belief, Becerra was not versed on the bare
8  minimum rights that are still afforded elementary students when they step inside a
9  public-school classroom. On information and belief, Becerra has not received
10 training on how to properly handle controversial issues, including those centering
11 around the topic of "Black Lives Matter." On information and belief, Becerra was
12 not aware of an official method for executing an investigation which centers on
13 freedom of speech. On information and belief, Becerra was not under the impression
14 that there was a standard in how to conduct informal and formal investigations –
15 leaving the window open for violations of student speech and due process.

16     110.   As a direct result of both Becerra's and CUSD's actions, B.B. suffered
17 damages including but not limited to, the suppression of her First Amendment
18 rights, emotional damages, harm to reputation, embarrassment, humiliation, severe
19 stress and/or mental anguish, and all other damages directly and/or consequentially
20 associated with the deprivation of one's civil rights, including attorneys' fees and
21 costs associated with vindicating her civil rights.

22     111.   Defendant CUSD failed to properly train its employees in handling
23 situations of this kind, which was the direct cause of this violation.

24     112.   As a direct, proximate, and foreseeable result of CUSD's conduct, B.B.
25 has incurred special and general damages, the precise amount of which will be
26 proven at trial.
27 ///
28

**19**
**THIRD AMENDED COMPLAINT**

**Ratification**

113.   CUSD staff, namely Pati Romo and Cary Johnson, the Assistant Superintendent of Curriculum and Instruction within CUSD, had final policy making authority with the CUSD.

114.   Cary Johnson held the final chance to rectify the violations of B.B.'s First Amendment rights, but simply ratified the conduct of Becerra and further, ratified the conduct that occurred during the Level I and Level II investigations.

115.   CUSD and Becerra deprived B.B. of her constitutional right to free speech, as they ordered the first investigation to be completed by Becerra, the person who was to be investigated.

116.   On information and belief, CUSD was aware that Becerra was the target of this investigation and yet, still assigned him to conduct it. Pati Romo, CUSD staff, also had a role in the Level I Response that was issued to Plaintiff, intertwining the bias of CUSD and Becerra from the outset.

117.   Becerra was given the authority directly from CUSD to conduct the Level I investigation. Pati Romo, who had a part in crafting the Level I investigation letter, was subsequently tasked by CUSD with conducting the Level II investigation. Then, the final investigation conducted by CUSD staff member Cary Johnson, Assistant Superintendent, was based on these first two investigations' findings. On information and belief, no actual investigative procedures were conducted in the Level III investigation.

118.   Each investigation was conducted by an employee of CUSD with the assignment of the investigators being made by those in CUSD with final policy making authority. Then, the final appeal by CUSD, claiming that the other findings were correct, is CUSD's ratification of the underlying constitutional violation.

119.   CUSD retained the original copy of the Drawing and not once has made clear that the Drawing was not inappropriate to B.B. or any of the students

1   that were in her class at the time, continuing to enforce the notion that

2   B.B.'s speech should have been silenced.

3        120.   Defendant CUSD ratified Becerra's actions which violated B.B.'s right

4   to free speech.

5        121.   Defendants' actions were objectively unreasonable and caused B.B.

6   emotional distress and humiliation.

7        122.   As a direct, proximate, and foreseeable result of CUSD's conduct, B.B.

8   has incurred special and general damages, the precise amount of which will be

9   proven at trial.

10                  **SECOND CLAIM FOR RELIEF**

      **Violation of B.B.'s Fourteenth Amendment Right to Due Process**

11                   **(42 U.S.C. § 1983)**

            **(B.B. Against CUSD and Becerra)**

12

13        123.   Plaintiffs re-allege and incorporate by reference the allegations in

14   paragraphs 9-61 and 93-122 as if fully set forth herein.

15        124.   At all times relevant to the allegations in this Complaint, CUSD and

16   Becerra acted under color of state law when implementing and enforcing CUSD

17   policies.

18        125.   By their actions and inactions described herein, CUSD and Becerra

19   deprived B.B. of her due process rights under the Fourteenth Amendment.

20        126.   CUSD's policies and procedures are unconstitutional because they

21   provide school officials unbridled discretion to discipline students over arbitrary

22   matters.

23        127.   On information and belief CUSD does not provide adequate protocol,

24   written or otherwise, to be followed when actually conducting investigations into

25   parental complaints.

26        128.   While there is a baseline appeals process, as laid out in ¶ 18, on

27   information and belief, there is no written standard that Becerra (or any of the

28

1    investigators in this case) was given to follow.

2    129. A standard for these investigative procedures should include, at the

3    bare minimum, the follows: the acceptable standard to interview students, what

4    persons are permitted access to the interviews, how are the interviews recorded, how

5    are the student's rights kept secure, when should a parent be notified, how can a

6    child be disinclined without a parent being notified, etc.

7    130. According to CUSD's own school policy, B.B.'s Drawing caused no

8    interference whatsoever and met no requirements of appropriate discipline in the

9    operation of the school. In fact, the only offense it did cause – to the parents of

10   B.B.'s classmates – was entirely off-campus, until they brought it on campus.

11   131. CUSD's policies and procedures allow students to be disciplined for

12   on-campus speech that does not materially and substantially interfere with the

13   requirements of appropriate discipline in the operation of the school, but that is not

14   what occurred here.

15   132. CUSD's practice of permitting individuals implicated in complaints to

16   self-investigate is not only a glaring conflict of interest but also represents a

17   profound betrayal of due process principles, fundamentally undermining the

18   integrity and fairness of the investigative process.

19   133. Despite CUSD's acknowledgment at the Level III Review that allowing

20   Becerra to investigate himself was improper, CUSD's failure to subsequently

21   reassess or rectify the earlier decisions stemming from this flawed investigation

22   exhibits disregard for both procedural fairness and the rights of the individuals

23   involved. Such oversight calls into question the legitimacy of the entire investigative

24   process and underscores the systemic issues within CUSD's complaint-handling

25   procedures.

26   134. The lack of due process in this case is alarming.

27   135. Not only was there a lack of due process in the initial Level I

28

1   investigation, where CUSD assigned Becerra to investigate himself (a command that
2   came from Dave Stewart), but there was a fundamental disregard of B.B.'s rights to
3   due process.

4        136.   CUSD staff members Pati Romo and Dave Stewart both helped Becerra
5   craft his initial Level I Investigation Report. Via e-mail, Becerra requested help with
6   the Level I investigation Report and both Dave Stewart and Pati Romo provided
7   Becerra feedback on what should have been a neutral party's findings (barring the
8   glaring defect that Becerra was the one being investigated).

9        137.   This e-mail communication occurred *prior* to Pati Romo beginning her
10  "unbiased" Level II investigation. Pati Romo should have never been assigned to
11  conduct the Level II investigation by CUSD. CUSD was aware that both Dave
12  Stewart and Pati Romo had played a part in helping Becerra craft his initial letter.
13  However, Pati Romo did conduct the Level II investigation into the Drawing
14  incident.

15       138.   There is a lengthy e-mail chain between Pati Romo, Dave Stewart and
16  other members of CUSD (including Cary Johnson, who conducts the Level III
17  investigation) in which Pati Romo emphasized "I need a village on this one."
18  Unfortunately, that village contained other designated CUSD investigators into the
19  case.

20       139.   Plaintiff does not argue that more than one person can be involved in
21  an investigation of these types, but the problem lies in the timing of these persons'
22  input. Becerra had a biased interest in the Level I investigation, as he was
23  investigating himself. Then, Pati Romo also had a bias based on her
24  communications with Becerra and Dave Stewart before beginning Level II, as
25  evidenced through e-mail communications. Pati Romo even goes so far as to ask
26  Becerra substantive information on interviews he conducted (all biased, of course) –
27  *prior* to when she should have begun Level II.

28

140. Then, regarding the Level III investigation, conducted by Cary Johnson, similar issues arose. Pati Romo forwarded an entire e-mail chain of negative thoughts and information regarding the Level II response *before* it was even concluded. These e-mails consist of Dave Stewart giving substantive feedback on the Level II response letter so that Pati Romo may send it to Chelsea Boyle. Cary Johnson then went on to conduct another "unbiased" investigation into the Drawing incident.

141. Each and every level of the appeals process conducted by CUSD was tainted before it even began. The underlying foundation of due process is to be heard by a neutral party – that is not what happened here. What occurred during CUSD's investigative procedures was a systemic failure of the worst kind – utter disregard for the rights a child.

142. CUSD, from the outset, had a hand in the investigative process. The Level I investigation, which should have set the tone for proper due process procedures, was primarily handled by Becerra, who was the subject of the complaint filed by Chelsea Boyle. Even ignoring this glaring defect in the investigation, upon information and belief, another critical fact remains. Pati Romo, who CUSD designated to conduct the Level II investigation, actually *helped* Becerra craft the Level I investigation response letter too. Being that Pati Romo would be expected to give an unbiased look at the initial Level I response, for the Level II investigation, it bears emphasizing the obvious conflict of having the same person involved with both the Level I and Level II results.

143. There was no impartial investigator in this case, at any level. They each intertwined themselves.

144. Even in the Level III investigation, conducted by Cary Johnson, an Assistant Superintendent and designee of CUSD, there were no outside interviews conducted of the students (not even B.B. or the student who B.B. gave the initial

1  Drawing to), or other Viejo staff that could or would have knowledge of the facts
2  pertaining to the Drawing. The Level III findings were based on the tainted Level I
3  and Level II findings – essentially restating them in whole or in part.

4      145.   On information and belief, the Defense will argue that Chelsea Boyle
5  was asked to discuss the matter with Cary Johnson and to speak to the CUSD Board,
6  but declined. However, Chelsea Boyle was sent a letter by the CUSD informing her
7  that they would let her know *if* they needed her.

8      146.   The appeal process, as required by CUSD (and laid on in ¶ 18) states
9  that "[b]oth sides *shall* be given an opportunity to demonstrate that Board policy and
10  administrative regulations were properly applied." This never happened. The Board
11  never did contact her about speaking to them again. She did not decline an interview
12  or hearing with the Board, she was simply never asked.

13      147.   B.B.'s right to due process in each investigation wasn't just overlooked
14  once and then corrected by later investigations; it was completely abandoned from
15  the outset with no recourse ever adopted.

16      148.   CUSD had its hands in the complaint process from the Level I stage
17  and simply restated those findings over and over attempting to appear impartial.

18      149.   CUSD's actions in this case, including the policies, procedures and
19  practices referenced herein, have injured and continue to injure B.B. Unless the
20  disciplinary action against B.B. is rescinded, withdrawn or otherwise expunged,
21  these unlawful actions will become a permanent part of B.B.'s academic record.

22      150.   As a direct, proximate, and foreseeable result of CUSD's conduct, B.B.
23  has incurred special and general damages, the precise amount of which will be
24  proven at trial.

25  ///
26  ///
27  ///
28

**25**
**THIRD AMENDED COMPLAINT**

**THIRD CLAIM FOR RELIEF**
**Intentional Infliction of Emotional Distress**
**(B.B. against Becerra and Victa)**

151.  B.B. re-alleges and incorporates by reference the allegations in paragraphs 9-77 as if fully set forth herein.

152.  Becerra intentionally or recklessly inflicted severe emotional distress on B.B. by compelling her to apologize to another student for the Drawing and benching her for two weeks from recess. Such conduct was outrageous and intended to cause B.B. emotional distress.

153.  By demeaning her beliefs as inappropriate and forcing B.B. to apologize for them, Becerra acted with reckless disregard that B.B. would suffer extreme anxiety, shock, confusion, and severe emotional distress—all of which B.B. has experienced and continues to experience as a result of Becerra's conduct. Becerra's conduct was a substantial factor in causing B.B. severe emotional distress.

154.  Victa further inflicted severe emotional distress on B.B. by aggressively following her around the playground as she harassed and tormented B.B. on or about August 23, 2022. Victa's conduct on or about August 23, 2022, was outrageous and intended to cause B.B. emotional distress.

155.  By standing by and watching Victa harass B.B., Becerra acted with reckless disregard for the high probability that B.B. would experience severe emotional distress.

156.  The conduct of Victa and Becerra on or about August 23, 2022, was intentional, extreme, and outrageous. Such conduct caused B.B. to experience severe anxiety, worry, shock, dread, grief, and emotional trauma.

157.  The severe emotional distress caused by Victa and Becerra on August 23, 2022, manifested in inconsolable tears, shortness of breath, subsequent anxiety attacks, physical harm, and emotional agony for B.B.

158.   Victa and Becerra's actions were extreme and outrageous and caused B.B. further emotional distress and humiliation.

159.   As a direct, proximate, and foreseeable result of Becerra and Victa's conduct, B.B. has incurred damages, the precise amount of which will be proven at trial.

### FOURTH CLAIM FOR RELIEF
**Negligent Hiring, Supervision and/or Retention of Employee**
**(B.B. against CUSD)**

160.   B.B. re-alleges and incorporates by reference the allegations in paragraphs 9-61 and 92-120 as if fully set forth herein.

161.   Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's state law claims for negligent supervision and negligent hiring, as these claims are so related to Plaintiff's federal claims that they form part of the same case or controversy. The state law claims arise from a common nucleus of operative facts and are such that a plaintiff would ordinarily be expected to try them in one judicial proceeding.

162.   CUSD has a legal duty to exercise reasonable care and protect the students under its charge, including B.B. In executing these duties, CUSD owed a duty to exercise reasonable care in the hiring, supervision, and/or retention of the employees and to ensure all employees are competent to perform their duties. *See Phyllis P. v. Superior Court*, 183 Cal. App. 3d 1193, 1196 (1986). School administrators must ensure that policies and procedures are followed by school employees and that such employees have the requisite knowledge and training. *Virginia G. v. ABC Unified School District*, 15 Cal.App.4th 1848, 1855 (1993).

163.   A school district or county office of education, such as CUSD, may be liable for the negligence of its administrators and supervisors in hiring, supervising and/or retaining a school employee who harms a student pursuant to Cal. Gov't

1  Code § 815.2. *See also C.A. v. William S. Hart Union High School Dist,* 53 Cal.4th
2  861, 879 (2012); *Garcia v. City of Merced*, 637 F. Supp. 2d 731, 747 (E.D. Cal.
3  2008); *Koussaya v. City of Stockton*, 54 Cal. App. 5th 909, 944 (2020).

4      164.   At all times relevant herein, CUSD had a legal duty to protect and
5  supervise the students of CUSD, including B.B. in accordance with these standards.

6      165.   CUSD hired Becerra and Victa to work at Viejo elementary school in
7  their respective roles.

8      166.   Chelsea Boyle filed a complaint with CUSD about Becerra in March of
9  2022 and continued to make CUSD aware of issues with Becerra until December of
10  2022.  Chelsea Boyle filed a complaint with CUSD about Victa in August of 2022.

11      167.   Becerra became unfit to perform his work as a school principal after
12  showing retaliation efforts against B.B. for complaining about the infringement on
13  B.B.'s right to freedom of speech and the subsequent bias investigative procedures.

14      168.   Victa became unfit to perform her work as a school counselor after
15  aiding Becerra in retaliation efforts against B.B.

16      169.   Chelsea Boyle made CUSD aware of the issues with Becerra and Victa
17  over the course of many months – sounding the alarm for CUSD to act.

18      170.   CUSD failed to act.

19      171.   CUSD did not take any meaningful remedial measures.

20      172.   Even though CUSD attempted to "investigate" the incident, the video
21  footage alone of Becerra and Victa's retaliation efforts disproves their findings.

22      173.   CUSD was put on notice that Becerra and Victa were both unfit to
23  continue in their professional capacities as staff members with influence on other
24  vulnerable children. This decision by CUSD, to continue the employ of Becerra and
25  Victa, created a known and particular risk to the other students within Viejo
26  elementary.

27      174.   CUSD was negligent in retaining Becerra and Victa and it is because of
28

**28**
**THIRD AMENDED COMPLAINT**

1  this retention that B.B. continued to be plagued with severe anxiety and stress. B.B.
2  was forced to continue to see and interact with both Becerra and Victa after the
3  retaliatory incidents occurred – making clear where CUSD stood on the issue.

4      175.   At no point after Chelsea Boyle confronted CUSD about the retaliation
5  efforts made by both Becerra and Victa, did CUSD remove Becerra or Victa from
6  the school (even temporarily) nor did they, on information and belief, provide
7  trainings for their staff on how to handle complaints and how to refrain from
8  retaliation against students.

9      176.   Having a continuous duty to retain and supervise staff members in
10 order to ensure they are competently performing their duties, CUSD knew or should
11 have known that Becerra and Victa were or became unfit and/or incompetent to
12 perform the work for which they were hired and were unfit and/or incompetent to
13 carry out their duties, thereby posing a particular risk to students, including B.B.

14     177.   Despite having a duty, CUSD failed to exercise reasonable care in the
15 hiring, supervision, and/or retention of their employees. Further, the negligent
16 hiring, supervision, and/or retention, were substantial factors in causing B.B.'s
17 harm. Specifically, CUSD breached the duties owed to B.B. when it, *inter alia*:

18        a.  Failed to supervise administrators, teachers, aides, paraeducators and/or
19            staff in the performance of their duties;

20        b.  Failed to ensure administrators, teachers, aides, paraeducators and/or
21            staff had the requisite knowledge and/or training to competently carry
22            out their duties, including how to properly handle complaints,
23            investigate incidents, and interact with students; and,

24        c.  Failed to ensure that administrators, teachers, aides, paraeducators
25            and/or staff followed CUSD policies and administrative regulations
26            designed to protect students' right to freedom of speech.

27     178.   Defendants' actions were objectively unreasonable and caused B.B.
28

1  severe emotional distress and humiliation.

2      179.   As a direct, proximate, and foreseeable result of CUSD's conduct, B.B.

3  has suffered severe humiliation, mental anguish, and emotional and physical

4  distress, embarrassment, anger, loss of enjoyment of life, and have been injured in

5  mind and body, the precise amount of which will be proven at trial.

6

7                          **FIFTH CLAIM FOR RELIEF**
                   **Retaliatory Harassment (42 U.S.C. § 1983)**
8                       **(B.B. Against All Defendants)**

9      180.   B.B. re-alleges and incorporates by reference the allegations in 9-61

10  and 62-75, and 92-120 as if fully set forth herein.

11     181.   At all times relevant herein, CUSD, Becerra, and Victa acted under

12  color of state law.

13     182.   B.B.'s drawing, sharing of that drawing with her friend, and subsequent

14  actions (prior to Becerra's compelled apology) are constitutionally protected

15  activities and do not materially and substantially disrupt the work and discipline of

16  the school.

17     183.   Being forced to apologize and "benched" would chill a person of

18  ordinary firmness from continuing to engage in protected activity of the kind in

19  which B.B. was engaged.

20     184.   Victa's harassment of B.B., including following her around and into the

21  bathroom, would chill a person of ordinary firmness from continuing to engage in

22  protected activity of the kind in which B.B. was engaged.

23     185.   Becerra's actions in compelling B.B. to apologize and benching her

24  after she drew the Drawing containing the words "Black Lives Mater [sic.]." Any

25  life" were motivated by a desire to retaliate against B.B. for exercising her First

26  Amendment rights. Specifically, on information and belief, Becerra was upset that

27  B.B.'s picture contained the phrase "Any life."

28

186.   However, Becerra's retaliation did not end with the March 31 incident. After Boyle learned of the incident and demanded an apology from Becerra, CUSD officials engaged in a sham investigation in which they falsely attributed statements to Chelsea Boyle that she did not make, called her a liar, failed to investigate the underlying claims of the complaint, gossiped about Boyle and B.B. to other CUSD employees, and refused to take appropriate action to address the harm caused to B.B.

187.   Despite recognizing that Becerra was improper in investigating his own conduct, CUSD, in its Level III Review, did nothing to correct its prior actions.

188.   The August 23, 2022 incident involving Victa and Becerra harassing B.B. was an act of retaliation for speaking up against Becerra and utilizing CUSD's internal complaint process.

189.   As a result of Becerra's retaliatory harassment and CUSD's subsequent actions, B.B. suffered severe emotional distress and the violation of her constitutional rights.

190.   Defendants, through their employees, agents, and representatives, engaged in retaliatory harassment against B.B., in violation of 42 U.S.C. § 1983 and the First Amendment to the U.S. Constitution.

191.   Defendant CUSD had a policy, custom, or practice of failing to properly investigate or adjudicate internal claims predicated on perceived ideological disagreements with students.

192.   Defendant CUSD's policies, customs, or practices were the direct cause of the violation herein complained of.

193.   Defendant CUSD's policy, custom, or practice was adopted and/or maintained with deliberate indifference to B.B.'s rights.

194.   Defendants' conduct was motivated by a desire to retaliate against B.B. for her Drawing, a protected free speech activity, speaking out about the hostile

1  environment at the school, and lodging complaints.

2      195.   Defendants' retaliatory conduct was severe and pervasive and deprived

3  B.B. of her constitutional rights.

4      196.   As a result of Defendants' conduct, B.B. suffered severe emotional

5  distress which manifested itself through physical harm.

6      197.   As a direct, proximate, and foreseeable result of Defendants' conduct,

7  B.B. has incurred damages, the precise amount of which will be proven at trial.

8                          **PRAYER FOR RELIEF**

9      WHEREFORE, Plaintiff prays for relief as follows:

10     1.    Compensatory damages in an amount to be determined at trial;

11     2.    Punitive damages against CUSD, Defendant Becerra and Cleo Victa;

12     3.    Attorneys' fees and costs;

13     4.    Prejudgment interest;

14     5.    Any other relief that the Court deems just and proper.

15

16                              Respectfully submitted,

17                              LEX REX INSTITUTE

18

19
    Dated: November 6, 2023        By_____*/s/ Alexander H. Haberbush*_____
20                                     ALEXANDER H. HABERBUSH,
                                       ESQ., *Attorneys for Plaintiffs*
21

22

23

24

25

26

27

28

                                    **32**
                          **THIRD AMENDED COMPLAINT**



# CAPISTRANO UNIFIED SCHOOL DISTRICT

33122 Valle Road, San Juan Capistrano CA 92675
Telephone: (949) 234-9200/FAX: 496-7681 www.capousd.org

March 15, 2022

*VIA EMAIL AND U.S. MAIL*

CONFIDENTIAL

Mrs. Chelsea Boyle

Re: Your Level 1 Complaint Dated: 3/8/2022

Case #: Click here to enter text

Dear Mrs. Boyle,:

This letter is in response to your Level 1 complaint filed on 3/8/2022 at 3:53pm..

In your Level 1 complaint you reported the following:

"I have JUST become aware that last year my first grade daughter drew a picture of children holding hands together  (all races and colors) and titled the picture "All Lives Matter.""

"My daughter was brought in to your office and made to APOLOGIZE to children in her class for her picture and she was LECTURED AND PUNISHED by you because of this picture and EDUCATED about "Black Lives Matter.""

"I am so so so BEYOND upset that this happened, I am JUST finding out about this now from ANOTHER PARENT who thought I already KNEW.  Please find BELOW an email sent to YOU that YOU replied to on September 6th, 2020."

"Why was I NEVER called? Why was I not even INFORMED that this happened to my daughter?"

After conducting a thorough investigation of this matter, the following are the District's findings:
From my recollection, the drawing you are referring to was created by your daughter. This was about a year ago when she was in first grade. I am confident that she was not punished for her drawing nor would she be made to apologize for it. I do not teach nor have I ever taught about Black Lives Matter to anyone. I can say that she is a kind student and did not mean anything by it aside from wanting to give a friend a picture.

Serving the Communities of:

Aliso Viejo • Coto de Caza • Dana Point • Ladera Ranch • Laguna Niguel • Las Flores • Mission Viejo

Rancho Mission Viejo • Rancho Santa Margarita • San Clemente • San Juan Capistrano

EXHBIIT "A"                              Page 33

From my recollection, I communicated to you regarding your daughter's drawing and it was just to make you aware of it. I vaguely recall our conversation and the discussion was lighthearted knowing your daughter was coming from a good place in her heart.

I am confident you were notified in some manner regarding your daughter's picture. You provide specific details in your email regarding the picture. Due to the innocent nature of this event, no documentation of communication was kept.

As the result of our investigation, the following action has been taken by the District in an effort to resolve this complaint.
An effort was made for Mr. and Mrs. Boyle to meet with the Principal, Assistant Principal, and School Counselor to discuss any misunderstandings or to clarify any misconceptions.

Under District Board Policy 1312.1, you may file a Level 2 complaint, which will be addressed to Pati Romo, Executive Director, College and Career Readiness, if you choose to pursue further review of the complaint.   You have 10 working days to appeal the Level 1 decision to Level 2.  The complaint should be filed on the CUSD website under Complaints located at: https://webapps.capousd.org/Complaint/

Sincerely,

*Mr. Becerra*

Principal, Viejo Elementary

EXHBIIT "A"                    Page 34



# CAPISTRANO UNIFIED SCHOOL DISTRICT

33122 VALLE ROAD, SAN JUAN CAPISTRANO CA  92675
TELEPHONE: (949) 234-9200/FAX: 496-7681 www.capousd.org

BOARD OF TRUSTEES

GILA JONES
PRESIDENT

MARTHA MCNICHOLAS
VICE PRESIDENT

PATRICIA HOLLOWAY
CLERK

JUDY BULLOCKUS

KRISTA CASTELLANOS

AMY HANACEK

JIM REARDON

SUPERINTENDENT
KIRSTEN M. VITAL

DATE:         March 24, 2022

TO:           Chelsea Boyle

FROM:         Patricia Romo
              Executive Director

SUBJECT:      Level 2 Complaint Response- Complaint # 3717

Mrs. Boyle,

With this letter, I am responding to your Level 2 complaint regarding your complaint regarding Mr. Jesus Becerra's handling of a March 2021 incident involving your daughter in which you disagree. **Capistrano Unified School District takes complaints very seriously.** The following is a summary of the steps taken thus far:

After conducting a thorough investigation of this matter, the Principal provided a response letter dated March 8, 2022. In summary, the Level 1 complaint and response was as follows:

In your Level 1 complaint you reported the following:

"I have JUST become aware that last year my first grade daughter drew a picture of children holding hands together (all races and colors) and titled the picture "All Lives Matter.""

"My daughter was brought in to your office and made to APOLOGIZE to children in her class for her picture and she was LECTURED AND PUNISHED by you because of this picture and EDUCATED about "Black Lives Matter.""

"I am so so so BEYOND upset that this happened, I am JUST finding out about this now from ANOTHER PARENT who thought I already KNEW. Please find BELOW an email sent to YOU that YOU replied to on September 6th, 2020."

"Why was I NEVER called? Why was I not even INFORMED that this happened to my daughter?"

The Principal's response was:

SERVING THE COMMUNITIES OF:
ALISO VIEJO • COTO DE CAZA • DANA POINT • LADERA RANCH • LAGUNA NIGUEL • LAS FLORES • MISSION VIEJO
RANCHO MISSION VIEJO • RANCHO SANTA MARGARITA • SAN CLEMENTE • SAN JUAN CAPISTRANO

EXHBIIT "B"                          Page 35

"From my recollection, the drawing you are referring to was created by your daughter. This was about a year ago when she was in first grade. I am confident that she was not punished for her drawing nor would she be made to apologize for it. I do not teach nor have I ever taught about Black Lives Matter to anyone. I can say that she is a kind student and did not mean anything by it aside from wanting to give a friend a picture."

In your Level 2 complaint you reported the following:

"Principal has not informed me of racist activities. Principal has punished my daughter, PARENTED my daughter and made her to apologize for repeating what she LEARNED IN SCHOOL.

Principal LIED PLEASE SEE MANY MANY EMAIL COMMUNICATIONS [Requested Resolution:] I HAD asked for an apology but couldn't even receive that. The principal decided to completely lie instead."

After speaking with you and conducting a thorough investigation of this matter, the following are the level 2 complaint process District's findings:

- The District spoke to the parent of the other child (Parent B) involved who remembers the incident very clearly and corroborated what the Principal has stated. She stated that your child drew a picture with children of different colors and the title "Black Lives Matter, All Lives." Staff has reviewed a copy of the picture. Parent B remembers that the Principal discussed the picture that was given to her daughter, by your daughter, and that they both decided that the picture was not given to her daughter with ill intent. In fact, Parent B felt that your daughter meant to make her daughter feel more comfortable and included. Since they both felt that the picture was innocent, no action was taken and both Parent B and her husband were supportive of Principal Becerra and his handling of the incident. They thought nothing of it and put it out of their minds until they started receiving text messages from you.

- Staff is in possession of several text message exchanges between you and  Parent B stating that the District was teaching children inappropriate content and you included a picture of a video presentation on a computer screen in which there is a sign in the background that had several statements such as "This is a safe place" and "Black Lives Matter."  There was also one banner that stated "Social Justice."  Upon further investigation, staff could find no evidence that any of those subjects were taught in extended learning during that time frame, though the students may have watched a video where the presenter had those signs in the background, the video was not about those subjects. Those lessons have been removed since in-person instruction resumed and online instruction was removed.

- Mrs. and Mr. Parent B asked you to stop texting them. Parent B stated that they did not believe that anything inappropriate was being taught at their daughter's school and that their daughter felt safe and included in her classroom and on the school campus. Parent B further stated that her only concern has been that you have made comments related to

EXHBIIT "B"                                    Page 36

the earlier incident in which you relayed to her that you felt wasn't handled correctly, and have tried to discuss with her on several occasions when she is not interested in revisiting the incident related to the drawing.

- Staff is in possession of several text message exchanges between you and Mr. and Mrs. Parent B regarding their daughter's appearance in which you commented on her hair being messy. Parent B explained that she had hurt her hand and was unable to style her daughter's hair that morning and asked you not to comment about her daughter's appearance. You stated that you meant it as a compliment and that you liked her daughter's hair looking wild and crazy, but beautiful. Mr. Parent B then took the phone and texted you back, asking you to stop texting them and stop making comments on their daughter's appearance. You continued to text them, defending your comments, but also stating, "I feel sorry for you as a man, taking the phone from your wife and reading her text messages" along with other derogatory comments. Parents B asked you several times to stop texting them. Parent B then met with Mr. Becerra to ensure that her daughter is safe in the classroom from any actions or comments you might say in her presence, since you are in the classroom and on campus during your work on the yearbook. Mr. Becerra agreed to maintain a safe environment for the students and any volunteers on campus.
- The District has corroborated the Principal's statements that the original incident did not warrant any disciplinary action with your child, and none was taken. There is no evidence that your daughter was made to apologize to the other child, and the parents of that child, have corroborated that.

After conducting an investigation of the Level 2 complaint and response, staff has concluded that the Principal took the appropriate action and provided you with reasonable explanations regarding the incident and his response, and any related incidents since that time. There is no evidence that any action was taken by the Principal, and although the words "Black Lives Matter" were shown on a sign behind the presenter in the video, the concept was never taught in any lessons provided to your daughter.

Capistrano Unified School Districts strives to ensure that every student has a healthy, happy, and safe environment to learn. The hope of the District staff, the Principal, and the parents who were interviewed is that we continue to move forward to focus on the safety and success of your daughter and all students at Viejo Elementary School.

If you are not satisfied with these findings, under District Board Policy 1312.1, you may file a Level 3 complaint if you choose to pursue further review of the complaint. In order to file a Level 3 complaint, please visit the Capistrano Unified School District Complaint Information and Resources website and fill out the online complaint form for a Level 3 complaint appeal. You will be asked your reason for appealing the Level 2 response as well as your recommended resolution. You have 10 business days to appeal the Level 2 decision to Level 3.

EXHBIIT "B"                              Page 37

Please contact me if you require further information.

Sincerely,

Patricia Romo
Executive Director, College and Career Readiness
(949) 234-9464



**CAPISTRANO UNIFIED SCHOOL DISTRICT**

33122 VALLE ROAD, SAN JUAN CAPISTRANO CA 92675
TELEPHONE: (949) 234-9200/FAX: 496-7681 www.capousd.org

**BOARD OF TRUSTEES**

**PRESIDENT**
MARTHA MCNICHOLAS

KRISTA CASTELLANOS
**VICE PRESIDENT**

GILA JONES
**CLERK**

JUDY BULLOCKUS

LISA DAVIS

AMY HANACEK

**SUPERINTENDENT**
KIRSTEN M. VITAL BRULTE

July 21, 2022

*VIA EMAIL AND U.S. MAIL*

CONFIDENTIAL

July 21, 2022

Chelsea Boyle
25271 Pike Road
Laguna Hills, CA 92653

Re: Your Complaint Dated:  March 30, 2022

Case #:  3717

Dear Ms. Boyle,

This letter is the District's response to your Level 3 complaint received on March 30, 2022.  It informs you that your Complaint has been escalated to a Level 4 Appeal to the Board of Education, for their consideration on August 17, 2022. Below is a summary of the complaint process so far:

### Level One

You filed a Level 1 complaint on March 8, 2022 alleging that Viejo Elementary School Principal, Jesus Becerra, lectured and punished your daughter because of a picture she drew.  You inquired as to why you were not notified or informed about what had occurred.  On March 15, 2022, Principal Becerra provided you with a response to your complaint clarifying that in response to your daughter's drawing, which happened during the 2020-2021 school year, your daughter had not been punished.  There was a conversation between your daughter, the student she gave the drawing to, and staff regarding the drawing.  A meeting was offered between you, the Principal, the Assistant Principal, and the School Counselor to discuss any ongoing issues.

### Level Two

You appealed the complaint to Level 2. In your Level 2 complaint you reported the following: *The principal did not inform you of racist activities. The principal has punished your daughter, parented your daughter and made her apologize for repeating what she learned in school. The principal lied.* You shared that you had many email communications.

SERVING THE COMMUNITIES OF:
ALISO VIEJO · COTO DE CAZA · DANA POINT · LADERA RANCH · LAGUNA NIGUEL · LAS FLORES · MISSION VIEJO
RANCHO MISSION VIEJO · RANCHO SANTA MARGARITA · SAN CLEMENTE · SAN JUAN CAPISTRANO

EXHBIIT "C"                                                     Page 39

As part of your complaint, your requested resolution stated, *"I had asked for an apology but couldn't even receive that. The principal decided to completely lie instead."*

On or about March 24, 2022, you received Level 2 Findings from Pati Romo.  Ms. Romo conducted additional investigation, including speaking with the parent of the other student involved regarding the circumstances surrounding the incident.  She determined that Principal Becerra took appropriate action and provided you with reasonable explanations regarding the incident and his response.  He clarified that while the words "Black Lives Matter" were shown on a sign behind a presenter during a virtual lesson, the concept was never taught in any lessons provided to your daughter.

<u>Level Three</u>

You disagree with Ms. Romo's findings.  In response to Mr. Romo's findings, you stated: *"This level 2 response is complete and utter nonsense."* You went on to add, "*At that time, I would like to see said proof of texts provided by the Clay family that you quoted in your response. No derogatory remarks were made by me & the quotes you provided in your response were never texted, emailed etc. NEVER to anyone.  I have all the originals and nothing I wrote could be conveyed as such"*

As part of the Level 3 resolution, you met with Dr. Cary Johnson and Heidi Crowley on Monday, April 11, 2022 to discuss your concerns.  At that meeting you indicated that there was an employee witness that could corroborate your claims, but declined to provide the name of the employee. Additionally, you were asked if you were willing to have your daughter write a statement about the incident, to which you replied that you would think about it.

On April 15, 2022 Dr. Johnson met with Mr. Becerra as well as reviewed the Aeries Student Information System for information related to the incident. No information could be found to substantiate the claim that your daughter had been disciplined for the incident.

Regardless, staff attempted to set up a meeting to address your concerns and develop a plan for your student to feel welcomed at school. On April 18, 2022, Dr. Johnson sent you the following email:

> *Mrs. Boyle,*
>
> *I hope you had a good weekend. Met with Mr. Becerra on Friday and I am reaching out to see if you and your husband would be willing to meet with myself, Mr. Becerra, and Ms. Crowley at Viejo to resolve your concerns. We can coordinate on the dates and times. Thanks.*

You declined to meet with Mr. Becerra and Dr. Johnson.

On April 27, 2022, you emailed Trustees and staff requesting a phone call to resolve the situation. Dr. Johnson called you the same day and you made specific requests. After analyzing your requests, the following responses were provided:

- ***Request: A change in the complaint protocols: complaints about a principal to be handled by a supervisor***

  **Response:** This is excellent feedback, and we are adjusting the process so that Level 1 complaints about a principal go immediately to the principal's supervisor or other administrators to support with resolution.

- ***Request: A formal written apology from Mr. Becerra for his actions and how he handled himself***

  **Response:** To this point, no evidence substantiates that Mr. Becerra has engaged in any activity that would warrant an apology, however one of the reasons I had asked to meet with you and Mr. Becerra was to identify how the school and the principal could bridge gaps and make you feel more comfortable interacting with the school.

- ***Request: An apology from Pati Romo***

  **Response:** Ms. Romo followed the procedures outlined in the CUSD complaint process while investigating your complaint and was objective in her reporting of the findings.

- ***Request: An apology from Pati's supervisor***

  **Response:** As Pati Romo's supervisor, I am more than willing to apologize for your experience through the complaint process.

- **Request: Immediate settlement on a prior denied claim filed with the District**

  **Response:** Unfortunately, it is not possible to expedite this process, as it must follow specific legal steps. I can connect you with someone that can walk you through the process.

- ***Request: Switch Mr. Becerra to another school***

  **Response:** Principal assignments are strictly the purview of the District and multiple factors are taken into consideration when placing or reassigning administrators.

- ***Request: District staff to review reports of bullying at Viejo Elementary School***

  **Response:** This is a request the District can fulfill by reviewing bullying reports for Viejo Elementary School.

After conducting a thorough investigation of this matter, the following are the District's findings at Level 3:

The weight of the evidence does not substantiate your allegation that your daughter was punished or disciplined for her "All Lives Matter" picture.

EXHBIIT "C"                                   Page 41

Regardless, in response to the investigation and based on your subsequent requests, the following actions have been taken by the District in an effort to resolve this complaint:

- We have adjusted the process so that Level 1 complaints about a principal go immediately to the principal's supervisor or other administrator to support with resolution.
- District staff will review bullying reports for Viejo Elementary School

You have shared that you disagree with this outcome.  Please let me know by Wednesday, August 3, 2022 if this is the case and, based on District Board Policy 1312.1, your complaint will be escalated to Level 4 and your appeal will be brought forward for consideration by the Board in Closed Session at the August 17, 2022, Board Meeting. At that time, Trustees will determine if the Level 3 findings will be upheld or if you will be invited to present directly to Trustees at the subsequent Board meeting, September 21, 2022.

Sincerely,

Cary Johnson, EdD, Assistant Superintendent of Curriculum and Instruction

## CERTIFICATE OF SERVICE

I hereby certify that on **November 6, 2023**, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court Central District of California by using the CM/ECF system.

I further certify that parties of record in this action who either are registered CM/ECF users, or who have registered for electronic notice, or who have consented in writing to electronic service, will be served through the CM/ECF system.

I further certify that some of the parties of record to this action have not consented to electronic service. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days, to the following parties:


**November 6, 2023   Alexander S. Bostic**          /s/ Alexander S. Bostic
*Date                        Printed Name*                    *Signature*

Page 44

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CASE NO: 8:23-CV-00306-DOC-ADS

B.B., a minor by and through
her mother, CHELSEA BOYLE;
and CHELSEA BOYLE, an individual,

               Plaintiffs,

vs.

CAPISTRANO UNIFIED SCHOOL
DISTRICT,

               Defendant.
_____/

CONTINUED VIDEOTAPED VIDEOCONFERENCE DEPOSITION of B.B.

Monday, November 6, 2023
12:04 p.m. - 1:34 p.m.
Zoom Videoconference

Reported by:
Marsha Travis, Court Reporter
Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 55

1    Q    Okay.  And after Mr. Becerra talked to you,
2  did you still draw at school?
3    A    Yeah.
4        MR. HEATH:  Objection.  Asked and answered.
5  BY MS. HYLTON:
6    Q    And when would you draw at school?
7    A    Still in Ms. Mesa's class when we watched
8  those shows.
9    Q    Okay.  And the last time you told me that
10 Ms. Mesa was your second teacher.  Do you remember that?
11   A    Yeah.
12   Q    Who was your first?
13   A    Ms. Vera was my first.
14   Q    Okay.  And did Ms. Vera ever talk to you about
15 the drawing?
16   A    No, but both my teachers still said that I
17 wasn't allowed to have recess.
18   Q    Okay.  When did Ms. Vera tell you you weren't
19 allowed to have recess?
20   A    When I got back from Ms. Mesa's class, because
21 that was like at the end of the day, we always come back
22 to that class to get our backpacks.
23   Q    Okay.  So -- just so I understand, after
24 Mr. Becerra talked to you, what class did you go to?
25   A    Ms. Mesa.



Page 58

```
 1       A    I don't think so.
 2       Q    Okay.  And did you actually have to miss
 3  recess?
 4       A    Yeah.
 5       Q    And so on the days that you missed recess, was
 6  it morning recess, or lunch, or some other time?
 7       A    All of them, but I still -- I still got to eat
 8  my lunch and stuff like that, just I wasn't allowed to
 9  have recess.
10       Q    Okay.  And so what did you do instead of
11  recess?
12       A    I just sat down on, like, the benches.  Not
13  under the tree, but the other one on the side.
14       Q    And was anybody on the benches with you?
15       A    Yeah, some kids sat on the benches and were
16  playing with, like, stuffed animals.
17       Q    And were you playing with anything when you
18  were sitting on the benches?
19       A    No.
20       Q    So what did you do while you were sitting on
21  the benches?
22       A    I just sat and watched, um, kids play on the
23  hula hoops, because there's always competitions and I
24  wanted to see who won.
25       Q    Okay.  And who told you you had to sit at the
```



Page 61

1    Q    Okay.  And do you remember if it was for a
2    week, or two weeks, or a month?  What was that?
3    A    Two weeks.
4    Q    Did someone tell you that it was going to be
5    two weeks that you had to sit out from recess?
6    A    Ms. Mesa and Ms. Vera.
7    Q    So Ms. Mesa and Ms. Vera told you that you had
8    to miss recess and you had to sit out for two weeks and
9    you had to sit on the benches; is that right?
10   A    Yeah.  I sat down.  Nobody told me.  I just
11   sat by myself.
12   Q    Okay.  Was anybody watching you to make sure
13   that you didn't do recess?
14   A    I don't think so.  I don't know.
15   Q    Okay.  Did Ms. Vera or Ms. Mesa tell you
16   anything else about sitting out from recess?
17   A    No.
18   Q    Do you remember anyone -- excuse me -- excuse
19   me -- do you remember anyone else who had to sit out
20   from recess at that time?
21   A    No, I don't.
22   Q    Okay.
23        Okay.  So the first time that you apologized
24   to Marlena, that was out on the playground, right, or on
25   the blacktop?



Page 62

1      A      Yes.

2            MR. HEATH:  Asked and answered.

3   BY MS. HYLTON:

4      Q      And do you remember what Marlena said to you

5   after you apologized to her?

6            MR. HEATH:  Objection.  Asked and answered.

7      A      She didn't really say anything.  She just was

8   confused.

9   BY MS. HYLTON:

10     Q      Okay.  What made you think she was confused?

11     A      The look on her face.  She was, like, looking

12  with her head tilted.  She looked confused.

13  BY MS. HYLTON:

14     Q      And then the second time that you apologize to

15  Marlena, that was the same day, right?

16     A      Yeah.

17     Q      And what did -- what did Marlena say to you,

18  if anything, the second time you apologized?

19     A      She was still confused.

20     Q      Okay.  Did you ever talk to Marlena again

21  about the drawing after you apologized?

22     A      No, because I didn't even know why I was

23  benched or anything like that.  But I did know why I had

24  to say sorry, but I just didn't know why I was benched.

25     Q      Okay.  So -- can you say that one more time?



Page 63

1    I think I missed what you were saying.

2        A    Um -- um -- so I knew I had to say sorry to

3    her, but I just didn't know why I had to sit out from

4    recess.

5        Q    Okay.  And so why did you have to say sorry to

6    her?

7        A    Because of the picture.

8        Q    Okay.  And then -- and you didn't know why you

9    were made to sit out from recess?

10       A    Uh-huh.  I mean, yeah.

11       Q    Okay.  Perfect.  Thank you for fixing that

12   "uh-huh".

13            Okay.  Did Mr. Becerra ever tell you that you

14   had to sit out from recess?

15       A    No, just my teachers.

16       Q    Okay.  Did you ever tell your mom that you had

17   to sit out from recess?

18       A    No, because I thought, like, the school would

19   tell her.  So I really didn't think about it.

20       Q    Okay.  And you said that it made you sad when

21   Mr. Becerra told you that you couldn't draw anymore and

22   not to give your pictures to people, right?

23       A    Yeah, because I love drawing.

24       Q    Okay.  And you said that you still continued

25   drawing at school; is that right?



Page 64

1      A    Yeah.

2      Q    Did you give your pictures to people?

3           MR. HEATH:  Objection.  Asked and answered.

4    We've been over this during the last deposition.

5      A    Sometimes.  Not really.  No, but I still -- I

6    still draw -- I still was drawing.

7    BY MS. HYLTON:

8      Q    Okay.  And did drawing make you happy?

9      A    Yeah.

10     Q    Does drawing still make you happy?

11     A    Yeah.

12     Q    How long were you sad for after Mr. Becerra

13   told you that you couldn't draw and couldn't give people

14   your drawings?

15     A    I was still sad, but I just -- I was still

16   drawing, but I was sad that people didn't know that I

17   was still drawing and that I couldn't give them

18   pictures.

19     Q    And so how long did that sadness go on?  Did

20   it go on for a day, a week, the rest of the school year?

21     A    For a long time, but I don't know when I

22   stopped feeling sad.

23     Q    Are you still sad about it?

24     A    Yeah, kinda.

25     Q    Are you sad about it when you think about it?



```
                                                      Page 103
 1                    CERTIFICATE OF OATH

 2

 3

 4   STATE OF FLORIDA      )

 5

 6

 7            I, MARSHA TRAVIS, Florida Professional

 8   Reporter, Notary Public, State of Florida, certify that

 9   B.B. appeared before me BY VIDEOCONFERENCE on the 6th

10   day of November, 2023, and was duly placed under oath to

11   tell the truth.

12            Signed this 15th day of November, 2023.

13

14

15

16   _____

                     MARSHA E. TRAVIS

17                   Notary Public, State of Florida

                     Commission No. HH 004575

18                   Commission expires:  5/31/2024

19

20

21

22

23

24

25
```



ER-68

Page 104

```
1                 REPORTER'S CERTIFICATE
2    STATE OF FLORIDA        )
     COUNTY OF PALM BEACH    )
3
4
             I, Marsha E. Travis, Florida Professional
5    Reporter, certify that I was authorized to and did
     report the Continued Deposition of B.B., pages 48
6    through 102, and that the transcript is a true record of
     my notes.
7
8
             I further certify that I am not a relative,
9    employee, attorney or counsel of any of the parties, nor
     am I a relative or employee of any of the parties'
10   attorneys or counsel connected with the action, nor am I
     financially interested in the action.
11
12
13           Dated this 15th day of November, 2023.
14
15
16           _____
             MARSHA E. TRAVIS, FPR
17           Florida Professional Reporter
18
19
20
21
22
23
24
25
```



ER-69

Deposition Of Jesus Becerra

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3
 4   B.B., a minor by and through
 5   her mother, CHELSEA BOYLE; and
 6   CHELSEA BOYLE, an individual,
 7                  Plaintiffs,
 8       vs.              Case No. 8:23-cv-00306-DOC-ADS
 9                        Hon. David O. Carter
10   CAPISTRANO UNIFIED SCHOOL DISTRICT;
11   JESUS BECEERA, an individual in his
12   individual and official capacities, et al,
13                  Defendants.
14   _____
15
16
17       The Videotaped Videoconference Deposition
18       Of JESUS BECERRA,
19       Commencing at 9:02 a.m.,
20       Wednesday, October 11, 2023,
21       Before Cindy Mendenhall, CSR-14488, RPR.
22
23
24
25
```

Deposition Of Jesus Becerra

```
 1    A.?
 2          A. I don't recall speaking with M. or A.
 3          Q. When you saw this drawing, did you think
 4    that there was an issue with the drawing?
 5          A. No.
 6          Q. If there was no issue with the drawing, why
 7    did you speak to B. about it?
 8          MR. GARDINER:  Objection.  Calls for
 9 speculation.  Incomplete hypothetical.
10          A. Whenever a parent reaches out to me or to a
11    teacher, I will -- I will follow up with it.
12 BY MS. TERRY:
13          Q. But you didn't follow up with M. or A. about
14    the drawing?
15          A. I don't recall.
16          Q. Did you document your follow-up with B.?
17          A. I don't recall.
18          Q. Would it be standard practice to document
19    your interactions with children when you're
20    investigating something?
21          MR. GARDINER:  Objection.  Vague and ambiguous
22 as to the word investigating.  Incomplete hypothetical.
23 Calls for speculation.
24          You can answer.
25          A. No.
```

Deposition Of Jesus Becerra

1    Chelsea Boyle in the initial email that she sent you
2    in your response of this conversation that you were
3    referring to?
4          MR. GARDINER:  Objection.  Calls for
5    speculation.  Incomplete hypothetical.
6          You can answer.
7          A. Honestly, I didn't think it was a big deal
8    back then regarding the drawing, and when she brought
9    it up the second time, she went straight to a
10   Level 1, which is where I responded formally.
11   BY MS. TERRY:
12         Q. What was -- when was the first time Chelsea
13   brought this up, the drawing incident?
14         A. From what I just saw, I think March of last
15   year.
16         Q. You're referring to the email that she had
17   sent you?
18         A. Correct.
19         MS. TERRY:  Ryan, can you scroll up, please?
20   BY MS. TERRY:
21         Q. So the -- you mentioned that Ms. Boyle
22   brought the drawing incident up twice?
23         MR. GARDINER:  Objection.  Misstates
24   testimony.
25         A. I don't recall how many -- I don't recall.

Deposition Of Jesus Becerra

```
        CERTIFICATE OF NOTARY
        I, CYNTHIA C. MENDENHALL, certify that this
deposition was taken remotely on the date hereinbefore
set forth; that the foregoing questions and answers
were recorded by me stenographically and reduced to
computer transcription; that this is a true, full and
correct transcript of my stenographic notes so taken;
and that I am not related to, nor of counsel to,
either party nor interested in the outcome of this
cause.
                        CYNTHIA C. MENDENHALL, CSR 5220
                        Georgia 5401-0642-5421-0048
                        Hawaii CSR 528
                        California CSR 14488
                        Texas CSR 12495
                        Washington CSR 22036178
                        RPR 820761
                        Notary Public,
                        Oakland County, Michigan.
My Commission expires:  April 5, 2030
```

Deposition Of Cathy Clay

```
                    UNITED STATES DISTRICT COURT

                    CENTRAL DISTRICT OF CALIFORNIA




B.B, et al,                )
                           )
        Plaintiff,         )
                           )
        vs.                )CASE NO. 8:23-CV-00306-doc-ads
                           )
CAPISTRANO UNIFIED SCHOOL)
DISTRICT,                   )
                           )
        Defendant.         )
_____)


DEPOSITION OF : CATHY CLAY
Taken by       : ALEXANDER HABERBUSH, ESQUIRE
Commencing     : 10:00 A.M.
Location       : BY REMOTE DEPOSITION
Day, Date      : Wednesday, October 5, 2023
Reported by    : JEANNA M. COMMANS, C.S.R. NO. 10949
Pursuant to    : Notice
Original to    : CODE


Pages 1-105

JOB NO.  229813
```

ER-74

Deposition Of Cathy Clay

1    be the drawing and display that to the witness, please.
2            (The document was marked Exhibit A for
3            identification and is attached hereto.)
4        Q    BY MR. HABERBUSH:  Okay.  Can you see the
5    drawing on your screen right now, Mrs. Clay?
6        A    Yes.
7        Q    Have you ever seen this drawing before today?
8        A    Yes.
9        Q    Okay.  When did you first see this drawing?
10       A    I don't remember.
11       Q    You don't remember at all?  Was it a week ago
12   that you first saw this, or longer?
13       A    Longer.
14       Q    Was it, you know, a year ago?  Two years ago?
15   Somewhere in that timeframe?
16       A    March.
17       Q    March.
18            March of what year?
19       A    I want to say '21.
20       Q    March of '21.  Okay.
21            And how was it that you came to see this
22   drawing?
23       A    It was in my daughter's backpack that she
24   brought home.
25       Q    Okay.

Deposition Of Cathy Clay

```
 1          MS. BRACCIALE:  Same objection.  Third-party
 2    privacy.
 3          THE WITNESS:  It was hand-delivered to her at
 4    school.
 5       Q  BY MR. HABERBUSH:  Okay.  And was that all she
 6    said about the drawing?
 7          MS. SHELECHI:  Same objection.
 8          THE WITNESS:  She asked me what that picture was
 9    about.
10       Q  BY MR. HABERBUSH:  Okay.  And did you answer --
11          MS. SHELECHI:  She didn't understand it.
12       Q  BY MR. HABERBUSH:  Did you answer that question?
13          MS. SHELECHI:  Same objection.
14          THE WITNESS:  Yes, I did.
15       Q  BY MR. HABERBUSH:  What did you tell her?
16          MS. BRACCIALE:  Objection.  Hearsay.
17    Third-party privacy.
18          MS. SHELECHI:  Join.
19          THE WITNESS:  I said don't worry about it.  It's
20    not part of your curriculum.
21       Q  BY MR. HABERBUSH:  Okay.  And did you at any
22    point ask her who had drawn the drawing?
23          MS. SHELECHI:  Objection.  Hearsay.  Lacks
24    foundation.
25          MS. BRACCIALE:  Join.  Objection.  Third-party
```

Deposition Of Cathy Clay

1          THE WITNESS:  She does not go to school to be
2   judged because she's a black girl.
3       Q   BY MR. HABERBUSH:  Okay.  So did you take -- so
4   you did -- I'm sorry, I interrupted you.
5          What was the second part of your answer?
6       A   She doesn't go to school to be singled out.  She
7   shouldn't have gotten it.
8       Q   Okay.  So you didn't object to the fact that
9   your daughter was given a picture.  You objected to the
10  message that was on this picture; is that right?
11         MS. BRACCIALE:  Objection.  Misstates the
12  testimony.  Argumentative.  Relevance.
13         MS. SHELECHI:  Join.
14         THE WITNESS:  It's not part of her curriculum.
15      Q   BY MR. HABERBUSH:  Was what I just said
16  accurate?
17         MS. SHELECHI:  Same objections.
18      Q   BY MR. HABERBUSH:  I'm sorry, Mrs. Clay, did you
19  answer the question?
20      A   Yeah, I said it's not part of her curriculum.
21  It's not social studies, it's not English, it's not math,
22  it's not PE, it's not music.
23      Q   So when you say it's not part of her curriculum,
24  are you referring to the phrase "Black Lives Matter, any
25  life"?

Deposition Of Cathy Clay

```
 1      Q   BY MR. HABERBUSH:  Same question.
 2      A   It's not part of her curriculum.
 3      Q   Okay.  That was -- that was the same objection
 4  that you voiced the hypothetical.
 5      A   On her curriculum, she concentrates in school.
 6  That's what she does.  She's good in all her -- all her
 7  subjects.  That's a distraction.
 8      Q   Okay.  So that was the same thing that you said
 9  about the hypothetical picture of a flower.  So I guess
10  that means there was nothing about the text on this
11  picture that offended you?
12          MS. SHELECHI:  Objection.  Lacks foundation.
13  Misstates earlier testimony.  Relevance.
14          MS. BRACCIALE:  Join.
15          THE WITNESS:  No.
16      Q   BY MR. HABERBUSH:  No.  Okay.
17          Did you ever approach Jesus Becerra regarding
18  this picture?
19      A   We emailed him.
20      Q   When you say "we," who is included in that?
21      A   My husband and I.
22      Q   Okay.  So is it fair to say at some point prior
23  to that, you discussed the picture with your husband?
24          MS. BRACCIALE:  Objection.  Hearsay.
25  Third-party privacy.
```

Deposition Of Cathy Clay

1          MS. SHELECHI:  Objection.  Calls for
2   speculation.  Lacks foundation.  Hearsay.
3      Q   BY MR. HABERBUSH:  As best -- as best you were
4   able to tell, is it fair to say he had roughly the same
5   reaction you did?
6          MS. BRACCIALE:  Same objections.
7          THE WITNESS:  No.
8      Q   BY MR. HABERBUSH:  No?
9          How was his reaction different?
10          MS. SHELECHI:  Same objection.
11          THE WITNESS:  He didn't understand why a child
12   got that picture from another child.
13      Q   BY MR. HABERBUSH:  Okay.  So did he object to
14   the contents of the picture then?
15          MS. BRACCIALE:  Objection.  Speculation.
16   Relevance.  Foundation.  Third-party privacy.  Hearsay.
17          MS. SHELECHI:  Join.
18      Q   BY MR. HABERBUSH:  As far as you were able to
19   tell?
20      A   The ending part of the picture.
21      Q   I'm sorry.  Can you repeat that?
22      A   The ending part of the picture, the last two
23   words on the picture.
24      Q   The end -- I see.  So he objected to the phrase
25   "any life" in the picture?

Deposition Of Cathy Clay

```
 1      A    Yes.
 2      Q    Okay.  And do you know why he objected to that?
 3           MS. BRACCIALE:  Objection.  Speculation.
 4   Relevance.
 5           MS. SHELECHI:  Join.
 6           THE WITNESS:  It's not part of her curriculum.
 7   It's not anything part of her homework, her schoolwork.
 8      Q    BY MR. HABERBUSH:  Okay.  Okay.  So did you and
 9   he jointly or did one of you decide to email Becerra?
10      A    We both.
11      Q    Okay.
12      A    As in unity, as in two people married, one
13   person.
14      Q    Okay.  And do you remember when that was that
15   you emailed Becerra?
16      A    I can't recall.
17      Q    Did you review that email in preparation for
18   today?
19      A    No.
20      Q    No.  Okay.
21           And what -- do you remember roughly what that
22   email said?
23           MS. BRACCIALE:  Objection.  Hearsay.  Relevance.
24           MS. SHELECHI:  Join.
25           THE WITNESS:  It just said that she got this
```

Deposition Of Cathy Clay

1  picture.  We didn't think it was right that she got it,
2  and she was the only child to get it.  She's the only
3  black child to get it in her grade.
4      Q   BY MR. HABERBUSH:  Okay.  And did it attach the
5  picture as an image?
6      A   Yes.
7      Q   Is that the image that you're looking at right
8  now?
9      A   Yes.
10      Q   So is this your hand in the picture at the
11  bottom?
12      A   Yes.
13      Q   Okay.  And did you ever receive a response back
14  to the email that you sent to Becerra?
15      A   Yes.
16      Q   And roughly what did that response say?
17          MS. SHELECHI:  Objection.  Hearsay.
18          THE WITNESS:  It was forwarded to Becerra.  The
19  address we had was not the correct one.
20      Q   BY MR. HABERBUSH:  Okay.  And then when Becerra
21  responded, what did he say?
22          MS. SHELECHI:  Objection.  Hearsay.
23          THE WITNESS:  He called me.
24      Q   BY MR. HABERBUSH:  Okay.  So he did not send an
25  e-mail reply?

Deposition Of Cathy Clay

```
 1      A   Repeat that again.
 2      Q   Is it fair to say that Becerra said roughly the
 3   same things to you in that conversation that he had in
 4   the last phone call that we talked about?
 5      A   The first one, he didn't know who did it.  I had
 6   just talked to him about it.
 7      Q   Okay.
 8      A   The second conversation, he verified who did it,
 9   and why it was done.
10      Q   And then in the third one, what did he say that
11   was new or different from those first two, if anything?
12          MS. SHELECHI:  Objection.  Calls for hearsay.
13   Relevance.
14          THE WITNESS:  That the picture was not anything
15   to do with school, with any of the homework or curriculum
16   being taught.  That it went against everything that they
17   teach there, which is like, you know, like kindness and
18   respect and everyone is equal.
19          It went against, you know, that.  And that, you
20   know, that's what they teach; that everyone's equal.
21      Q   BY MR. HABERBUSH:  Okay.  And so --
22      A   And that --
23      Q   I'm sorry, finish your answer.
24      A   Yeah, do let me.
25          To just -- reminded the student to be mindful
```

Deposition Of Cathy Clay

1  that those aren't -- I mean, not to give those kind of

2  pictures to my daughter.

3       Q   So Becerra told you that he believed this

4  picture went against the school's values and that it was

5  hateful?

6          MS. SHELECHI:  Objection.

7          THE WITNESS:  He didn't say that.

8          MS. SHELECHI:  Objection.  Hearsay.  Lacks

9  foundation.  Calls for speculation.  Misstates earlier

10  testimony.  Argumentative.

11         MS. BRACCIALE:  Join.

12      Q   BY MR. HABERBUSH:  Can I repeat the question,

13  Mrs. Clay?

14      A   Go right on ahead.

15      Q   So did Becerra tell you that he -- to confirm

16  what you just said, did Becerra tell you that he thought

17  that the picture was against the school's values and that

18  it was hateful?

19         MS. SHELECHI:  Same objections.  And I don't --

20  I don't remember if I said, but I'm adding hearsay.

21         THE WITNESS:  No, he didn't say that.

22      Q   BY MR. HABERBUSH:  But you just told me that

23  that was what he talked to you about?

24         MS. SHELECHI:  No.  She didn't say that.

25         THE WITNESS:  That he said that, okay?  That was

Deposition Of Cathy Clay

```
 1        A    Becerra.
 2        Q    Okay.  And which conversation was that in of
 3   the -- we'll call them No. 1, 2, and 3, in sequential
 4   order.
 5        A    I would say all three because it was a child.
 6        Q    Did you agree with him that it was from an
 7   innocent child?
 8             MS. SHELECHI:  Objection.  Relevance.
 9             THE WITNESS:  There was no --
10             MS. BRACCIALE:  I'll object based on
11   speculation.
12             You can answer, if you know.
13             THE WITNESS:  It was not in malicious form.
14        Q    BY MR. HABERBUSH:  So is that a "yes," you
15   agreed with him?
16        A    Repeat the question.
17        Q    Did you agree with -- earlier you said that the
18   picture was from an innocent child, and you represented
19   that as something that Becerra had said.
20             Did you agree with that assessment?
21        A    Yes, because it's a child.
22        Q    Okay.  Now, is that something that you
23   believed -- strike that.
24             Did you believe that it was drawn by an innocent
25   child before you sent it to the school, the email to the
```

Deposition Of Cathy Clay

```
 1   school?
 2           MS. BRACCIALE:  Objection.  Speculation.
 3           MS. SHELECHI:  Join.
 4           THE WITNESS:  She's a child.
 5       Q   BY MR. HABERBUSH:  So is that "yes"?
 6       A   Yes.
 7       Q   Okay.  When you sent the picture to the school
 8   originally, did you suspect that it might have been part
 9   of the school's curriculum, something that they taught at
10   the school?
11       A   When I sent the picture.  You mean?
12       Q   In the email.
13       A   Repeat the question.
14       Q   Let me phrase it differently.
15       A   Do.
16       Q   Prior to speaking with Mr. Becerra, did you
17   suspect that this picture might have been part of a
18   school assignment?
19       A   No.
20       Q   No?
21           Why not?
22       A   No.  It's not part of the curriculum.
23       Q   How did you know that?  You know, it came from
24   the school.  It was in your daughter's backpack.
25           How did you know it wasn't part of the
```

Deposition Of Cathy Clay

1  time," has your opinion changed since then?

2      A   No.

3      Q   I'm sorry, did you say "no"?

4      A   I said no.

5      Q   Okay.  So you still believe that it was not

6  meant to hurt your child?

7      A   Huh-uh.  No.

8      Q   Okay.  What about prior to that?  At some point

9  earlier than that, did you think it was intended for

10 another reason?

11         MS. SHELECHI:  Objection.  Calls for

12 speculation.  Relevance.

13         THE WITNESS:  Prior to that?

14     Q   BY MR. HABERBUSH:  Yeah, because -- I'm just

15 asking because you said that at that time you didn't

16 believe that it was intended to hurt your child.

17         So I'm wondering if at any time you thought that

18 it was intended to hurt your child?

19     A   No.

20     Q   Now, this -- this claims that you told the

21 school district that BB intended this picture to make

22 your daughter feel more comfortable and included.

23         Is that something that you, in fact, told them?

24     A   Because that is what her daughter told my

25 daughter.

Deposition Of Cathy Clay

```
1        Q   Is that something that you told the district?
2        A   Yes, because I overheard.  My daughter told
3    me --
4        Q   Okay.  Understood.
5        A   -- to feel included.
6        Q   Okay.  Let's see.  So you mentioned that BB had
7    told your daughter that her goal was to make her feel
8    included.
9            When did you learn about that?
10           MS. BRACCIALE:  I'm going to object based on
11   hearsay.  Relevance.  Third-party privacy.
12           MS. SHELECHI:  Join.
13           THE WITNESS:  When my daughter said that her
14   daughter went up to my daughter during recess by
15   themselves, they were by themselves.  My daughter was
16   eating her snacks, and she came up to her and apologized
17   to her, and MC said she's like okay.
18       Q   MS. SHELECHI:  Okay.  So you learned about that
19   when -- when BB apologized?
20       A   Yes.
21       Q   Or after BB apologized, I guess.
22       A   Yes.
23       Q   Is that right?
24       A   Yes.
25       Q   Okay.  Now, the information here that we're
```

Deposition Of Cathy Clay

```
 1            Do you see that?
 2      A    Yes.
 3      Q    And do you recall writing that?
 4      A    Yes.
 5      Q    Can you explain what you meant when you wrote
 6   that?
 7      A    I told Becerra we did not have any, like -- how
 8   do you say it?  Like bad -- what's the word?  Like, not
 9   animosity, but like, we didn't have any ill will towards
10   the little girl.  We didn't think that she meant any harm
11   by it.
12            It was -- I think she just wasn't clear as to
13   what that message meant.  And she saw MC and just acted
14   on, you know, her heart, and which I understand.  And
15   what many people don't understand is my husband was the
16   first one to defend her daughter.
17            He said, make sure -- I don't want her punished.
18   I don't want her humiliated.  I don't want her, you know,
19   talked down to.  I don't want her made fun of.  I don't
20   want any of this.
21            We don't want that picture out because she's a
22   minor, and no one needs to judge a 7-year-old.  Because
23   sometimes at that age, you don't know what you're doing,
24   and you're confused.  Like, maybe it was not intent to
25   hurt MC, but those kind of things hurt.
```

Deposition Of Cathy Clay

```
 1      Q   I apologize.  Let me -- let me rephrase the
 2  question.
 3          Earlier you mentioned an apology between the two
 4  children wherein BB approached your daughter.
 5          Do you recall that?
 6      A   Yes.
 7      Q   Okay.  Were you there for the apology?
 8      A   No.
 9      Q   Okay.  Did your daughter tell you about the
10  apology?
11      A   Yes.
12      Q   Did your daughter say that she was by herself
13  when the apology occurred?
14      A   She said it was during recess, everyone else was
15  playing.  She was eating her snacks near the big tree.
16  And that her daughter came up to my daughter and said,
17  "I'm sorry."
18          And MC was just like, "Okay.  It's okay."
19          And she said to her, I just didn't want you to
20  be, or left -- be left out or feel left out or something
21  to that.  MC didn't understand because she's never
22  excluded.  If anything, she always feels included by all
23  her friends.
24          She doesn't see color.  She doesn't -- it's not
25  nothing that she needs to worry about.
```

Deposition Of Cathy Clay

```
 1                    REPORTER'S CERTIFICATE
     STATE OF CALIFORNIA    )
 2                          )   ss
     COUNTY OF LOS ANGELES  )
 3

 4
             I, JEANNA M. COMMANS, C.S.R. No. 10949,
 5

 6   Certified Shorthand Reporter for the State of California,

 7   do hereby certify;

 8           That the deponent, CATHY CLAY, named in the

 9   foregoing deposition, prior to being examined, was by me

10   first duly sworn to testify to the truth, the whole truth

11   and nothing but the truth;

12           That the said deposition was taken before me at

13   the time and place therein stated and was thereafter

14   transcribed into print under my direction and

15   supervision, and I hereby certify the foregoing

16   deposition is a full, true and correct transcript of my

17   shorthand notes so taken.

18           I further certify that I am not of counsel or

19   attorney for either of the parties hereto or in any way

20   interested in the event of this case and that I am not

21   related to either of the parties hereto.

22           WITNESS my hand this 19th day of OCTOBER, 2023.

23

24           _____
                 JEANNA M. COMMANS
25               C.S.R. NO. 10949
```

ER-90

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CASE NO.: 8:23-cv-00306-DOC-ADS

B.B., a minor by and through her mother,
CHELSEA BOYLE; and CHELSEA BOYLE, an
Individual,

    Plaintiffs,

vs.

CAPISTRANO UNIFIED SCHOOL DISTRICT,
et al.,

    Defendants.
_____'

CONTINUED VIDEOTAPED DEPOSITION OF B.B.
THURSDAY, OCTOBER 5, 2023
7:30 P.M. - 8:22 P.M.

VIA ZOOM

Magna Legal Services
www.MagnaLS.com
866-624-6221
Reported by Kimberly Renchen
Notary Public, State of Florida



ER-91

Page 9

1      A.   B.B.  That's my cousin's nickname for me.

2      Q.   B.B.  Okay.  Well, I will try to call you B.B. and we

3  will change that in the record to B.B. also.  But if I slip up

4  and call you B.B., will that be okay?

5      A.   Yeah.

6      Q.   Okay.  All right.  Do you know your birthday?

7      A.   Yeah.

8      Q.   What is your birthday?

9      A.   June 1st.

10     Q.   Do you know what year?  If you don't, it's okay.

11     A.   I don't remember.

12     Q.   Okay.  Do you go to school?

13     A.   Yeah.

14       MR. HABERBUSH:  Objection, vague.

15  BY MS. HYLTON:

16     Q.   What school do you go to?

17     A.   I go to Gulf Elementary (phonetic).

18     Q.   What is it called?

19     A.   Gulf Elementary.

20     Q.   Gulf Elementary?

21     A.   Yeah.

22     Q.   And what grade are you in?

23     A.   Fourth.

24     Q.   And what's your favorite subject?

25     A.   Art.



Page 12

1  BY MS. HYLTON:

2      Q.   And do you remember when you went to school at Viejo

3  Elementary?

4          MR. HABERBUSH:  Objection, relevance.  Assumes facts

5      not in evidence.  Ambiguous, overly broad, vague.

6          THE WITNESS:  Well, yeah, I do remember.

7  BY MS. HYLTON:

8      Q.   Okay.  And do you remember when you were in first

9  grade at Viejo Elementary?

10         MR. HABERBUSH:  Objection.  Assumes facts not in

11     evidence.

12         THE WITNESS:  I do.

13  BY MS. HYLTON:

14     Q.   Okay.  Do you remember doing a drawing at some point

15  when you were first grade?

16     A.   Yeah.

17         MR. HABERBUSH:  Objection.  Vague, overbroad.  Over

18     generalized, lacks foundation, assumes facts not in

19     evidence.

20  BY MS. HYLTON:

21     Q.   Okay.  I'm going to show you a document I'm going to

22  mark as Exhibit A to your deposition.

23     A.   Okay.

24         (Exhibit A was marked for identification.)

25  BY MS. HYLTON:



```
                                              Page 13

 1      Q.    Okay.  Give me one second here.  Let me get it up on

 2  my screen.  All right.  Do you see that?

 3      A.    Yeah.

 4      Q.    Do you know who drew that?

 5          MR. HABERBUSH:  Objection, vague.

 6          THE WITNESS:  I did.

 7  BY MS. HYLTON:

 8      Q.    Okay.  And why did you draw this?

 9          MR. HABERBUSH:  Objection.  Vague, overbroad,

10      ambiguous, speculative, calls for editorializing.

11          THE WITNESS:  Because my teacher was reading a book

12      about Martin Luther King and talking about how we should

13      respect black people because they were put in a worse

14      position, and I felt bad.  So I drew that and I gave it to

15      Marlena (phonetic).

16  BY MS. HYLTON:

17      Q.    So is one of the people in this picture supposed to be

18  Marlena?

19          MR. HABERBUSH:  Objection.  Leading, ambiguous, lacks

20      foundation.

21          THE WITNESS:  They're all my friends holding hands.

22  BY MS. HYLTON:

23      Q.    Okay.  And what friends are these that are in the

24  picture?

25      A.    Am I allowed to say?
```



Page 14

1    Q.    Yes.

2    A.    Matt (phonetic) and Marlena, Amelia and me.

3    Q.    And did you write the words that are on this picture?

4    A.    Yeah, I did.

5         MR. HABERBUSH:  Objection.  Vague.

6    BY MS. HYLTON:

7    Q.    Okay.  The words that say, "Black lives matter," in

8    black marker, did you write those?

9    A.    Yeah.

10        MR. HABERBUSH:  Objection.  Lacks foundation.

11   BY MS. HYLTON:

12   Q.    And why did you write those?

13        MR. HABERBUSH:  Objection.  Speculative, vague,

14   overbroad, ambiguous.

15        THE WITNESS:  Because they were supposed to be all my

16   friends holding hands, and I felt bad for Marlena.

17   BY MS. HYLTON:

18   Q.    Okay.  But the words, "Black lives matter," why did

19   you write those words?

20        MR. HABERBUSH:  Objection.  Assumes facts not in

21   evidence.  Asked and answered, ambiguous, overly broad.

22        THE WITNESS:  I wrote them because it was part of the

23   book at, like, the ending.  And I wrote that because all

24   lives matter.

25   BY MS. HYLTON:



Page 15

1    Q.   Okay.  Had you ever heard the saying, "Black lives

2   matter" before you wrote this?

3         MR. HABERBUSH:  Objection.  Speculative, assumes facts

4      not in evidence, vague.

5         THE WITNESS:  I heard it at the end of the story.

6   BY MR. HABERBUSH:

7    Q.   At the end of what story?

8    A.   The book about Martin Luther King.  We were

9   celebrating a birthday.

10    Q.   You were celebrating Martin Luther King's birthday?

11    A.   Mm-hmm.

12    Q.   Is that a yes?

13    A.   Yes.

14    Q.   And what were you told about the words, black lives

15   matter?

16         MR. HABERBUSH:  Objection.  Lacks foundation.

17         THE WITNESS:  I was never told -- like, wait, what was

18      the question again?

19   BY MR. HABERBUSH:

20    Q.   Well, what were you told that black lives matter

21   means?

22         MR. HABERBUSH:  Same objection.

23         THE WITNESS:  I never heard what it meant.

24   BY MS. HYLTON:

25    Q.   Okay.  Do you know what black lives matter means?



MAGNA ▶
LEGAL SERVICES

Page 16

1        MR. HABERBUSH:  Objection.  Vague, ambiguous and

2    speculative, lacks foundation.

3  BY MS. HYLTON:

4      Q.   Okay.  And were you shaking your head no?

5      A.   I still don't know what it means.

6      Q.   Okay.  So you didn't know what it means then, and you

7  still don't know what it means; is that right?

8        MR. HABERBUSH:  Objection.  Asked and answered.

9        THE WITNESS:  No.  I still don't know what it means.

10  BY MS. HYLTON:

11      Q.   Okay.  And then in purple writing it says, "Any life;"

12  do you see that?

13      A.   Yeah.

14      Q.   And did you write that?

15      A.   Mm-hmm.

16      Q.   Is that a yes?

17      A.   Yeah.

18      Q.   Thank you.  And why did you write, any life?

19        MR. HABERBUSH:  Objection.  Vague.

20        THE WITNESS:  Because all lives matter.

21  BY MS. HYLTON:

22      Q.   And had you ever heard that before?

23        MR. HABERBUSH:  Objection.  Vague, calls for hearsay,

24  lack of foundation.

25        THE WITNESS:  I only heard this, like, black lives



```
                                                              Page 17

 1   matter, any life, in the book.  That's when I heard it and saw

 2   it.

 3          MS. HYLTON:  Okay.

 4          THE WITNESS:  And I think I was reading it.

 5   BY MS. HYLTON:

 6      Q.   Okay.  And what book was it?  Do you remember?

 7      A.   I think it was the book about Martin Luther King, Jr.

 8      Q.   Okay.  So you remember that book talking about black

 9   lives matter and any lives matter?

10      A.   Mm-hmm.

11          MR. HABERBUSH:  Objection.  Asked and answered.

12   BY MS. HYLTON:

13      Q.   Was that a yes?

14      A.   Yeah.

15      Q.   Okay.  So you gave this drawing to Marlena?

16      A.   Yeah.

17      Q.   And what did Marlena say when you gave it to her?

18          MR. HABERBUSH:  Objection.  Lacks Foundation.  Calls

19   for hearsay.

20          THE WITNESS:  Like, pretend this is the paper, right?

21          MS. HYLTON:  Okay.

22          THE WITNESS:  And I put it on her desk and she takes it

23   and she says, "Thank you."

24   BY MS. HYLTON:

25      Q.   Okay.  So you set the paper on her desk and she took
```



Page 18

1   it and said, thank you.

2       A.   Mm-hmm.

3          MR. HABERBUSH:  Objection.  Asked and answered.

4   BY MS. HYLTON:

5       Q.   And then did she say anything else about it to you

6   after that?

7          MR. HABERBUSH:  Objection.  Calls for hearsay.

8          THE WITNESS:  No.

9   BY MS. HYLTON:

10      Q.   Okay.  And then at some point, did someone from the

11  school, either a teacher or somebody that works at the school,

12  talk to you about the picture?

13         MS. HABERBUSH:  Objection.  Vague, ambiguous, unclear

14      as to scope.  Overly broad, calls for hearsay.  Compound

15      question.

16         THE WITNESS:  Mr. Becerra talked to me about it.

17  BY MS. HYLTON:

18      Q.   Okay.  And what did Mr. Becerra say to you about the

19  picture?

20         MR. HABERBUSH:  Objection.  Calls for hearsay.

21         THE WITNESS:  He said that Marlena's parents are not

22      happy about it.  And, like, he said that it's not

23      appropriate for me to do it.  And he said that I'm not

24      allowed to draw anything anymore, and I'm not allowed to

25      give drawings to friends.  And the last thing he said to me



ER-99

Page 19

1     was, "Go say sorry to her."

2  BY MS. HYLTON:

3     Q.   Okay.  And where did Mr. Becerra have this

4  conversation with you?

5     A.   Under the big tree.

6     Q.   And how long did this conversation last?

7     A.   Almost the whole recess.

8     Q.   Okay.  And did Mr. Becerra have a copy of the drawing

9  when he talked to you about it?

10         MR. HABERBUSH:  Objection.  Speculative.

11         THE WITNESS:  I don't know.  I don't remember.

12  BY MS. HYLTON:

13     Q.   Okay.  So when Mr. Becerra first came up to you, what

14  did he say?

15         MR. HABERBUSH:  Objection.  Asked and answered, calls

16     for hearsay, lacks foundation.

17         THE WITNESS:  He said, "Can I talk to you?"

18  BY MS. HYLTON:

19     Q.   Okay.  And what did you say?

20         MR. HABERBUSH:  Objection.  Calls for hearsay.

21         THE WITNESS:  I said, "Okay."

22  BY MS. HYLTON:

23     Q.   And then what did he say?

24         MR. HABERBUSH:  Objection.  Calls for hearsay.

25         THE WITNESS:  He said, "Come with me."  And then I did.



Page 22

1           MR. HABERBUSH:  Objection.  Asked and answered,

2      misstates testimony.

3  BY MS. HYLTON:

4      Q.   Did he tell you what to say, other than you needed to

5  apologize?

6           MR. HABERBUSH:  Objection.  Asked and answered.

7           THE WITNESS:  No.  He just said, "Go apologize to her."

8  BY MS. HYLTON:

9      Q.   Okay.  Did Mr. Becerra say you that should apologize

10  or that you have to apologize?

11      A.   I have to.

12      Q.   And what did you do after he told you that you have to

13  apologize?

14           MR. HABERBUSH:  Objection.  Lacks foundation,

15      speculative, vague, overly broad and ambiguous.

16           THE WITNESS:  I went to the line to go find her and I

17      went and I said sorry to her.

18  BY MS. HYLTON:

19      Q.   Did you tell her what you were sorry for?

20      A.   I said, "I'm sorry for the drawing."

21      Q.   Did you say anything else to her?

22           MR. HABERBUSH:  Objection.  Calls for hearsay.

23           THE WITNESS:  No.

24  BY MS. HYLTON:

25      Q.   And what did Marlena say?



Page 25

1    Q.   Okay.  Other than the book that your teacher was

2  reading, had you ever heard anyone say, "Black lives matter" at

3  school before that?

4         MR. HABERBUSH:  Objection.  Overly broad, vague.

5         THE WITNESS:  I don't think so.

6  BY MS. HYLTON:

7    Q.   Okay.  Did you ever hear anybody say or see anything

8  that said, black lives matter?

9         MR. HABERBUSH:  Objection.  It's extremely broad.

10        THE WITNESS:  Yeah, I did.

11 BY MS. HYLTON:

12   Q.   Where did you see it or hear something?

13   A.   In the big yellow room where all the copy -- colored

14 papers are.  And on top of the brown cabinets, there was, like,

15 a picture.  And it had like the fist going like this.  And at

16 the top it said, "Black lives" and then at the bottom it said,

17 "matters."

18   Q.   So where was that?

19   A.   In the big yellow room where all the colored copy

20 papers are on top of the brown cabinets.

21   Q.   That's at school?

22   A.   Yeah.

23   Q.   Okay.  Any place else that you saw anything that said,

24 "Black lives matter"?

25   A.   No.  But I did hear it from my teacher.  She just said



Page 26

1   it when she was reading the book.

2       Q.   Okay.  Other than when she was reading the book, did

3   you ever hear your teacher say, "Black lives matter"?

4           MR. HABERBUSH:  Objection.  Asked and answered, calls

5       for hearsay.

6           THE WITNESS:  Yeah.  Well, the only time I heard it was

7       when she was reading the book.  I don't think I heard her

8       say it any other time.

9           MS. HYLTON:  Okay.

10          THE WITNESS:  If she did, I probably wasn't there.

11  BY MS. HYLTON:

12      Q.   Probably wasn't what?

13      A.   I probably wasn't there.

14      Q.   Okay.  So other than the drawing in the big yellow

15  room, any other times that you saw the words, black lives

16  matter?

17          MR. HABERBUSH:  Objection.  Overbroad.

18          THE WITNESS:  I don't think so.  Other than when I

19      walked in there every day to go to my classroom, I saw it

20      every day.

21  BY MS. HYLTON:

22      Q.   Okay.  And when was that you saw it every day?

23      A.   Huh?

24      Q.   When was that?

25          MR. HABERBUSH:  Objection.  Asked and answered.



Page 27

1  BY MS. HYLTON:

2       Q.   Is that when you were in first grade?

3       A.   Yeah.

4       Q.   Now, when you drew the picture for Marlena, was that

5  during school?

6            MR. HABERBUSH:  Objection.  Misstates testimony, vague.

7            THE WITNESS:  Yeah, I drew it at school.

8  BY MS. HYLTON:

9       Q.   Do you know what extended learning is?

10      A.   No, not really.

11           MR. HABERBUSH:  Objection.  Calls for an expert

12      opinion.

13  BY MS. HYLTON:

14      Q.   Do you know what extended learning at Viejo Elementary

15  was?

16      A.   No.

17      Q.   After school was over, did you stay at school for

18  extra learning?

19      A.   In kindergarten I had Kids Factory.

20      Q.   Okay.  What about in first grade?

21      A.   I don't think so.

22      Q.   Okay.  Did anyone tell you to draw the picture that I

23  showed you earlier, or did you just do that on your own?

24      A.   I did it on my own.

25      Q.   What other things did you like to draw when you were



Page 29

1        THE WITNESS:  I didn't really know how to draw people

2    either.

3  BY MS. HYLTON:

4    Q.   Okay.  And when you did drawings, did you usually give

5  them to people?

6        MR. HABERBUSH:  Objection.  Leading.

7        THE WITNESS:  Not really.  I did sometimes, though.  I

8    think so.  Yeah, I think.

9  BY MS. HYLTON:

10   Q.   All right.  So after Mr. Becerra told you to

11  apologize, you apologized to Marlena, and then did anyone talk

12  to you about the picture after that?

13       MR. HABERBUSH:  Objection.  Vague, overly broad, calls

14  for hearsay, misstates past testimony.

15       THE WITNESS:  My other teacher told me I had no recess.

16  BY MS. HYLTON:

17   Q.   Who told you that?

18       MR. HABERBUSH:  Objection.  Asked and answered.

19  BY HYLTON:

20   Q.   I'm sorry.  Who told you that?

21   A.   Ms. Mesa (phonetic).

22   Q.   And what did Ms. Mesa tell you?

23       MR. HABERBUSH:  Objection.  Calls for hearsay.

24       THE WITNESS:  She said that I don't have any recess.

25  BY MS. HYLTON:



Page 31

1      A.   I don't remember the date or what day was it.  I don't

2   know if it was Tuesday, Wednesday or anything like that.

3      Q.   Okay.  But do you actually remember it happening?

4      A.   Yeah.

5      Q.   Okay.  Now, you told --

6         MR. HABERBUSH:  And just to be clear, for the record,

7   it's 5 o'clock currently.  I think we can go a bit over.  B.B.

8   said she's okay to go, but we're not going to be able to go too

9   much longer.

10  BY MS. HYLTON:

11     Q.   And you said that Mr. Becerra also told you not to

12  draw pictures and give them to people anymore; is that right?

13        MR. HABERBUSH:  Objection.  Misstates witness's

14  testimony, calls for hearsay, asked and answered.

15        THE WITNESS:  He said that I'm not allowed to draw

16  anymore.

17  BY MS. HYLTON:

18     Q.   Did he tell you why?

19        MR HABERBUSH:  Objection.  Calls for hearsay.

20        THE WITNESS:  No.  He just said that I'm not allowed to

21     draw anymore.

22        BY MS. HYLTON:

23     Q.   And did he tell you not to give people drawings,

24     or did he just tell you not to draw anymore?

25        A.   He just said I can't draw anymore and no more



Page 32

1    giving drawings to people.

2  BY MS. HYLTON:

3      Q.   And did you stop drawing after that?

4      A.   No.

5      Q.   You still were drawing pictures?

6      A.   Yeah.

7      Q.   And did you still give them to people after that?

8      A.   I didn't give them to people, but I did do it secretly

9  without the teachers knowing.

10      Q.   Okay.

11      MR. HABERBUSH:  Belated objection.  Vague as to the

12  beginning of after that.  It's not clear whether it means

13  immediately after or years later.

14  BY MS. HYLTON:

15      Q.   And after Mr. Becerra talked to you that day, did you

16  tell your mom that he had talked to you?

17      MR. HABERBUSH:  Objection.  Calls hearsay.

18      THE WITNESS:  I didn't because I thought they'd tell

19   her.

20  BY MS. HYLTON:

21      Q.   Okay.  And did you ever tell your mom about it before

22  she asked you about it?

23      MR. HABERBUSH:  Objection.  Ambiguous, vague.

24      THE WITNESS:  I thought they had already told her.

25  BY MS. HYLTON:



Page 33

1    Q.   Okay.  And then --

2         THE WITNESS:  Can I please go have water?

3         MS. HYLTON:  Sure.  We can take a little break.

4         THE WITNESS:  Okay.

5         MR. HABERBUSH:  Five minutes?

6         MS. HYLTON:  Yeah, fine.

7         THE VIDEOGRAPHER:  Going off the video.

8                   (Break was taken.)

9         THE VIDEOGRAPHER:  The time is 8:09 p.m., going back on

10   the video record.

11   BY MS. HYLTON:

12   Q.   All right.  B.B., did you get some water?

13   A.   Yeah.

14   Q.   Okay.  Do you feel okay to keep going?

15   A.   Yeah.

16   Q.   Okay.  When you were talking to Mr. Becerra under the

17   big tree, do you remember him saying or using the word, racist?

18        MR. HABERBUSH:  Objection.  Leading, assumes facts not

19   in evidence, lacks foundation.

20        THE WITNESS:  I think he did.

21   BY MS. HYLTON:

22   Q.   Okay.  What did he say about that word, use that word?

23   A.   I don't know if he said it or not.  I don't remember.

24   Q.   Okay.  Did he use the word, inappropriate?

25        MR. HABERBUSH:  Objection.  Leading, assumes facts not



Page 34

1    in evidence, lack of foundation, hearsay.

2         THE WITNESS:  He said that the drawing is

3    inappropriate, and it's not appropriate for the school,

4    also.

5  BY MS. HYLTON:

6    Q.   Okay.  And then after you found Marlena and

7  apologized, what happened?

8         MR. HABERBUSH:  Objection.  Vague, ambiguous, not clear

9    in terms of scope.

10        THE WITNESS:  When I went to go say sorry to her, and

11   when I went back to class, I apologized to her again,

12   because I felt bad.

13  BY MS. HYLTON:

14    Q.   And what did you say the second time?

15        MR. HABERBUSH:  Objection.  Calls for hearsay.

16        THE WITNESS:  I said, "I'm really sorry."

17  BY MS. HYLTON:

18    Q.   And what were you sorry for?

19    A.   For the drawings.

20        MR. HABERBUSH:  Belated objection.  Misstates

21   testimony, assumes facts not in evidence, lack of

22   foundation.

23  BY MS. HYLTON:

24    Q.   Were you sorry when you apologized to her?

25    A.   Yeah.



Page 43

1                         C E R T I F I C A T E

2

          I, KIMBERLY RENCHEN, Notary Public in and for the State

3  of Florida at Large, do hereby certify that I was authorized to

   and did report said deposition and that the foregoing pages are

4  a true and correct transcription of my notes of said deposition.

5

          I further certify that said deposition was taken at the

6  time and place herein above set forth and that the taking of

   said deposition was commenced and completed as herein above set

7  out.

8

          I further certify that I am not an attorney or counsel

9  of any of the parties, nor am I a relative or employee of any

   attorney or counsel of party connected with the action, nor am I

10 financially interested in this action.

11

12        The foregoing certification of this transcript does not

13 apply to any reproduction of the same by any means unless under

14 the direct control and/or direction of the certifying reporter.

15

16

17        Dated this 24th day of October, 2023.

18

19        *Kimberly Renchen* _____

20        KIMBERLY RENCHEN

21

22

23

24

25



1

```
 1                      UNITED STATES DISTRICT COURT
                       CENTRAL DISTRICT OF CALIFORNIA
 2                      SOUTHERN DIVISION - SANTA ANA

 3

 4   B.B. et al,                     )  Case No. SACV 23-306-DOC (ADSx)
                                     )
 5        Plaintiff,                 )  Santa Ana, California
                                     )  Monday, February 12, 2024
 6             v.                    )  5:13 P.M. to 5:42 P.M.
                                     )
 7   CAPISTRANO UNIFIED SCHOOL       )
     DISTRICT et al.,                )
 8                                   )
          Defendants.                )
 9   _____)

10

11

12

13                      TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE DAVID O. CARTER
14                   UNITED STATES DISTRICT JUDGE

15

16   Appearances:                  See Page 2

17   Deputy Clerk:                 Karlen Dubon

18   Court Reporter:               Recorded; CourtSmart

19   Transcription Service:        JAMS Certified Transcription
                                   16000 Ventura Boulevard #1010
20                                 Encino, California  91436
                                   (661) 609-4528
21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

2

```
 1  APPEARANCES:

 2

 3  For the Plaintiffs:      Lex Rex Institute
                             By:  ALEXANDER H. HABERBUSH
 4                           444 West Ocean Boulevard, Suite 1403
                             Long Beach, California  90802
 5                           (562) 435-9062
                             ahaberbush@lexrex.org
 6

 7  For the Defendants:      Hylton and Associates
                             By:  COURTNEY L. HYLTON
 8                                BRENDAN GARDINER
                             18201 Von Karman Avenue, Suite 430
 9                           Irvine, California  92612
                             (949) 603-0404
10                           chylton@hyltonapc.com
                             bgardiner@hyltonapc.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1    SANTA ANA, CALIFORNIA, MONDAY, FEBRUARY 12, 2024, 5:13 P.M.

2           THE COURT:  Now, *B. and B.* [sic] *v. Capistrano.*

3    Come on up, folks.

4           ALEXANDER H. HABERBUSH:  Your Honor,

5    Alexander Haberbush appearing on behalf of plaintiff.

6           THE COURT:  All right.  Thank you very much.

7           COURTNEY L. HYLTON:  Good afternoon, Your Honor.

8    Courtney Hylton on behalf of Capistrano Unified School

9    District --

10          THE COURT:  Okay.  Thank you.

11          MS. HYLTON:  -- Mr. Becerra, and Ms. Victa, along

12   with Brendan Gardiner.

13          THE COURT:  Okay.  Thank you very much.

14          And, Counsel, your argument on behalf of B. and B.

15          MR. HABERBUSH:  Your Honor, we believe that our

16   argument has largely been adequately briefed.  If you do have

17   any specific questions, we'll be happy to answer them.

18   Otherwise, I'd like to respond to some points that were

19   raised in the reply brief.

20          THE COURT:  Please.

21          MR. HABERBUSH:  Okay.

22          Firstly, for the first time, in the reply brief the

23   issue of discretionary immunity is raised.  Defendants should

24   be barred from raising discretionary immunity pursuant to

25   *U.S. v. Puerta.*  This was not something that was raised

4

1  previously in any pleading despite several motions to dismiss
2  having been heard in this case.

3          Secondly, we believe that defendants severely
4  mischaracterize the evidence with respect to testimony
5  elicited during several depositions that took place.
6  Specifically, defendants refer to evidence that B.B. never --
7  I'm sorry -- that B.B. changed her answer with respect to
8  whether or not Becerra used the word "racist" to describe the
9  drawing that she had made.  A subsequent question essentially
10 repeated the same question to her, and her reply back was "I
11 think I used that language, but I'm not sure."  That's not a
12 change of answer, Your Honor.  That's the same answer from,
13 you know, a kid -- a nine-year-old kid who's not entirely
14 certain of what they saw when they're pressed on it.

15          Similarly, during the Clay deposition, Clay was
16 very clear throughout the entirety of that deposition that
17 she did not want any student punished on account of the
18 drawing that she had presented to Mr. Becerra.  She at no
19 point asked Mr. Becerra to contact B.B., much less to punish
20 B.B.  She did not describe the drawing as "racist."  She said
21 that she believed B.B. was well intended when she had drawn
22 that.  So any action taken by Becerra to punish B.B. or
23 that's suggestive of the drawing being racially charged or
24 inappropriate, I think, is totally unevidenced.  That was in
25 no one's deposition testimony.  It's not found anywhere in

5

1    the evidence that's been submitted to this Court.

2            There's also -- there's the implied or assumed

3    argument throughout the reply that because Ms. Clay perceived

4    the drawing that B.B. had done as inappropriate in some way

5    and believed that that drawing had been given to her daughter

6    on account of her daughter's race that therefore that drawing

7    "was" given to her daughter on account of her race.  This

8    assumption is never stated anywhere in defendants' briefing.

9    It's not stated in their statement of material facts.  It's

10   simply taken for granted.  And had they asserted this

11   statement, we would have opposed that because we do not

12   believe that's correct.

13           As stated, you know, repeatedly in our briefing,

14   B.B. drew this picture for her friend because she had friends

15   of a bunch of different races, she'd been exposed to language

16   on the school's website saying "Black Lives Matter," she had

17   questions about that because she believed that all of her

18   different friends' lives mattered so she drew a picture with,

19   you know, her Japanese friend, her Hispanic friend, her black

20   friend, her white friends -- they were all on this picture

21   getting along, and it says "Black Lives Mater Any Life" on

22   it.  So to the extent that -- you know, that it's necessary

23   to prove defendants' case by showing that this was motivated

24   -- this was given to M.C. on account of her race, I think

25   that's just plainly untrue and contradicted by testimony and

6

1   found nowhere in any evidence that's been presented to this

2   Court.

3          I would also stress that the *Tinker* standard

4   clearly applies here.  To -- the original case in *Tinker* was

5   heard with respect to symbolic speech.  Students were wearing

6   armbands in protest of a war that was currently ongoing.

7   Here, we also have symbolic speech in the form of a picture.

8   Even though that case wasn't about pictures, in particular,

9   there is other case law which dealt with pictures that were

10  drawn by students.  I think that clearly falls within the

11  purview of an established right, which would mean that in

12  order to prove that it doesn't fall within the *Tinker* -- you

13  know, within *Tinker*'s First Amendment protections, defendants

14  would need to show either that there -- that the drawing had

15  caused a substantial disruption at the school     or was

16  likely to cause a substantial disruption at the school.  I

17  don't believe they've done this with any adequacy.

18         The cases cited for substantial disruption are

19  things like in *Wynar*, where -- or -- I'm sorry -- not in

20  *Wynar* -- in *Mahanoy*, where vulgar Snapchat posts to a

21  classmate while off of campus were held to be outside the

22  scope of a school's control.  *Dariano Morgan Hill Unified*

23  *School District* says that peaceful and passive expression

24  cannot be suppressed based on the reactions of other

25  students.  Here, we did not even have a reaction to another

7

1  student.  It was purely a reaction from a parent.  I think,
2  plainly, there is no substantial disruption that was caused
3  here.

4          And secondly, raised in defendants' reply brief,
5  again for the first time, is the other criteria from *Tinker*
6  that speech may be suppressed if it interferes with another
7  student's rights.  The right alleged in the reply brief is
8  the right to be let alone.  I believe that this is not at all
9  applicable here.  The primary cases cited in support of this
10 are *Wynar* and *Harper*.  Interference with other students'
11 rights in those cases had to do, in the first instance, with
12 threats of violence -- concrete threats of violence made
13 against other students, which was held to be an interference
14 with their right to be let alone.  And in the *Harper* case, it
15 was actually a list of other students by name that was --
16 basically characterizes a hit list of students that he wanted
17 to cause harm or kill.

18          That is not at all the same as a drawing that, you
19 know, the defendants allege to be motivated based on M.C.'s
20 race but there's no indication was motivated based on M.C.'s
21 race.  It was merely a friendly drawing between friends.
22 There's no indication here that that caused any interference
23 whatsoever with M.C.'s rights.

24          And with that, if you have any questions,
25 Your Honor, I'd be happy to address them.

8

1      THE COURT:  Wait until the second round.

2      Counsel, your response, please?

3      MS. HYLTON:  Thank you, Your Honor.

4      Your Honor, as plaintiff did in the opposition,

5  there were a number of facts stated just now that are not

6  part of the record.  The record has been presented to the

7  Court, the Court received all the deposition testimony, and

8  there are a number of items that counsel just referenced that

9  are not even part of the record.

10      With respect to B.B. changing her answer, I was

11  deposing a young child who off the cuff makes a comment, and

12  I said, "Do you actually recall him using the word 'racist'?"

13  And her response to me was "I don't know.  I don't remember.

14  I don't know if he did or not."  She has no recollection of

15  him using that word and therefore for the continued

16  references -- I believe there nine -- in the opposition that

17  Becerra told her it was inappropriate and "racist" is a

18  blatant misrepresentation of the record.

19      Now, plaintiff just talked about the *Tinker*

20  analysis, Your Honor, and I'd like to talk about that

21  briefly.  Yes, the issues with respect to *Tinker* -- grab my

22  notes.

23      There does not have to already be a substantial

24  disruption.  Mr. Becerra is a principal of an elementary

25  school who is involving himself in an issue that was brought

9

1   to his attention by a upset, concerned parent regarding an
2   item that was provided to that parent's child at school.
3   Mr. Becerra was heading off a substantial disruption that
4   could have resulted in a material interference with the
5   rights of M.C., the minor.
6           Counsel didn't even address the second element of
7   qualified immunity having to do with "clearly established."
8   There is nothing in the record -- nothing -- no cases that
9   have been cited that deal with the "clearly established"
10  element having to do with qualified immunity -- the second.
11  So therefore under the -- even if the Court finds that there
12  is a constitutional violation pursuant to *Tinker*, it is not
13  something that has been clearly established by precedent at
14  this point.
15          Now, the rights of others that counsel indicated
16  that had not been addressed in the moving papers, it was
17  addressed in the moving papers -- in the MSJ on pages
18  17 through 19.  So that was something that was addressed.
19          Your Honor, the "invading the rights of others" on
20  the First Amendment analysis under *Tinker* -- again, this is
21  -- these are young first graders.  When a mother contacts the
22  school and informs the school that her daughter is being
23  treated differently because of her race, the principal of the
24  school has a right and an obligation to do something.
25          Getting into -- counsel didn't address the issues

10

1   with respect to qualified immunity as to the other causes of

2   action.  So unless the Court has questions, I believe they've

3   been appropriately briefed.

4            THE COURT:  Okay.

5            Counsel, your rebuttal, please?

6            MR. HABERBUSH:  Your Honor, defendants allege that

7   we misrepresent a number of facts, but I believe Your Honor

8   only heard one.  Specifically, that was in reference to

9   B.B.'s deposition testimony.  I'd like to read that testimony

10  for you verbatim.  I think that -- I can understand why they

11  think that it looks like a change in testimony.  Plaintiffs

12  take the position that it absolutely is not.  I believe

13  Your Honor is the best judge of that.

14           The question is (reading): Okay.  When you were

15  talking to Mr. Becerra under the big tree, do you remember

16  him saying or using the word 'racist'? to which the witness

17  responds (reading), I think he did.

18           There's a follow-up question of (reading): Okay.

19  What did he say about that word -- use that word?

20           And the answer is (reading) I don't know if he said

21  it or not.  I don't remember.

22           So to the best of the -- of plaintiff's

23  recollection here, he did use the word "racist."  There's no

24  change in that answer.  She's just not certain that exact

25  word was used.  I mean, there's a lot of different ways you

11

1  can describe the same concept, and it's clear to me that
2  she's answering that he did understand -- you know, that he
3  did use a word that was either "racist" or the equivalent of
4  that word.  That's the testimony.  I don't believe we
5  misrepresented that testimony, Your Honor.

6          Regarding defendants' claim that there does not
7  have to already be a substantial disruption to the school,
8  they are correct about that.  However, I don't believe
9  there's any potential for a substantial disruption here.
10 M.C., the student to whom B.B. gave this drawing, did not
11 object to it.  There's no indication on the record she had
12 any issue with this drawing.  This drawing was done not as
13 part of a school assignment but on B.B.'s own.  She often
14 draws things at school and draws things for friends,
15 regularly gives out drawings to her friends.  This was one
16 such drawing.

17          The only issue arose when M.C. took the drawing
18 home and her mother saw it and she misinterpreted the meaning
19 of that drawing, assuming that it had been given to her
20 daughter on account of her daughter's race.  That was the
21 issue about which M.C.'s mother, Cathy Clay, contacted
22 Principal Becerra, and there was no suggestion in her contact
23 of Becerra that he do anything punitive in regard to this
24 drawing.  It was purely bringing to his attention the fact
25 that her daughter -- in her belief -- had been given

12

1   something on account of her race.

2       You heard from defendants' counsel that Becerra had

3   an obligation to do something when contacted by a parent in

4   this fashion.  I think that's probably true, but the

5   obligation that he had was certainly not to punish,

6   especially given that that obligation was contrary to the

7   wishes of the parents who had brought the concern.  Rather,

8   the obligation was to investigate.  That could have taken a

9   form as simple as asking B.B. "Did you give this to M.C.

10   because of her race?"  No such question was ever asked.

11   Instead, there was either an expressed statement, or

12   certainly an insinuation, that B.B. had been racist in

13   sending this picture, despite the fact that Mrs. Clay had

14   testified that she did not believe it was motivated by racial

15   animus and that she believed that B.B.'s heart had been in

16   the right place.

17       Regarding a "clearly established" right, I believe

18   I did address that, Your Honor.  *Tinker* itself dealt with

19   symbolic speech.  So, you know, the seminal case on this

20   issue dealt with speech that was symbolic in character and

21   speech that, in fact, I think, would be much more likely to

22   cause a disruption than anything at issue here.  It was a

23   large number of students wearing armbands protesting a war

24   that was currently ongoing.  Public display for all students

25   to see -- certainly the sort of thing that could cause people

1   to get upset and to argue with them, and *Tinker*, I think,

2   reasoned that to the extent that it fostered discussion, that

3   was a good thing.

4         Here, looking at what B.B. did, it's a private

5   drawing between two friends. Only one friend ever saw it.

6   It didn't upset that friend. The only kind of disruption

7   that it had ever caused was disruption that was entirely off

8   campus when M.C.'s mom saw it and didn't like it. The only

9   person that brought this disruption to campus was Becerra

10   when he decided to address this with B.B. during recess. You

11   know, even Ms. -- Mrs. Clay's testimony even says that, when

12   B.B. approached her daughter to apologize about this, her

13   daughter accepted the apology and they were friends and there

14   was no issue that resulted from it.

15         So, as far as a substantial disruption that could

16   be forecast from B.B.'s speech, I just don't see what it is,

17   and I don't see anything in defendants' papers that tells us

18   what that disruption would have been. You know, with -- when

19   even the person that was complaining about it acknowledges

20   that her heart was in the right place, I'm at a loss to see

21   what disruption could result from this.

22         If Your Honor wishes for us to address the issues

23   regarding qualified immunity at this time, I can do that.

24         THE COURT: I'm leaving this entirely up to each of

25   you.

14

1          MR. HABERBUSH:  Okay.

2          Yeah, I mean, so to start with, qualified immunity

3    applies if the right violated is an established right.  I

4    believe that I've addressed that under *Tinker*.

5          I believe our showings in our opposition with

6    respect to qualified immunity are adequate, but if Your Honor

7    feels otherwise, I'm happy to answer any questions that you

8    have about that.  Otherwise, I think that does it.

9          THE COURT:  Okay.  Counsel, thank you.

10          Counsel, your surrebuttal?

11          MS. HYLTON:  Thank you, Your Honor.

12          The constitutional violation that needs to be found

13    needs to be something beyond debate.  What I have heard today

14    from counsel is that he didn't believe there could be a

15    disruption, but it's not for counsel to determine whether or

16    not there was -- there could be a disruption in the classroom

17    or at the school.  That was for Principal Becerra.  And this

18    is the exact same -- the -- this is an identical situation

19    for which qualified immunity would apply.  It was his

20    discretion, it was his determination that this could be an

21    issue on his campus.

22          Counsel talked about discipline for B.B.  There was

23    no discipline.  There was no discipline record.  The only

24    evidence of discipline, if you could call it discipline, was

25    that the principal pulled her aside and discussed the drawing

15

1   with her and told her to apologize.  That is the only

2   evidence of discipline.  There's nothing in her discipline's

3   file --

4               THE COURT:  What about the recess -- it's argued in

5   the record that she was deprived of recesses for -- I forget

6   -- a week or two weeks.  I want you to speak to me about

7   that.

8               MS. HYLTON:  Of course, Your Honor.

9               B.B. claims that she was instructed by her teacher

10  and another aide that she was to sit out for recess.  She was

11  asked specifically if Becerra told her that.  She said "no."

12  She was asked specifically if those two individuals told her

13  that she -- that Becerra was implementing that.  She said

14  "no."  Those two individuals were not deposed.  There is

15  absolutely zero evidence of a link between the two.  What

16  evidence we do have is that that purported discipline is

17  nowhere in B.B.'s file or record.

18              THE COURT:  Well, plaintiff's counsel has argued

19  that this, though, is a logical inference and nexus because

20  of the proximity of the teacher to the -- the teachers to

21  Becerra.  Now, on your hand, you're arguing no nexus, no

22  proof of any direct conversation or relationship.  Counsel

23  for the plaintiff is arguing, "Well, Judge" -- you know,

24  principal, teachers -- close proximity.

25              MS. HYLTON:  I would point out that the close

16

1   proximity from what B.B. says is immediate, and there's no

2   evidence that Mr. Becerra even had any conversations or

3   communications with these two individuals.

4           THE COURT:  Then how did the teachers find out

5   about this activity?

6           MS. HYLTON:  That is a great question, Your Honor.

7           THE COURT:  Okay.

8           MS. HYLTON:  There is zero evidence that the

9   teachers ever found out about this activity or were ever

10  aware of this.

11          THE COURT:  Well, just a moment.  They wouldn't

12  inflict discipline unless there was some reason, and

13  therefore there has to be some information that comes to

14  them.  There's no record of how that came to them?

15          MS. HYLTON:  Your Honor, there is --

16          THE COURT:  I'm left in a void.

17          MS. HYLTON:  I understand.

18          There is no evidence that this discipline actually

19  occurred.  Other -- B.B. testifies that at some point she --

20  or she testifies that she was told she had to sit out for

21  recess.  Those types of things are documented in the

22  student's cumulative file of which was -- and discipline file

23  --

24          THE COURT:  Well, just a moment.  Let's --

25          MS. HYLTON:  They were not in there.

17

1          THE COURT:  Let's delve into that with both of you.
2   In other words, when I'm trying to write this factual basis,
3   I'm trying for both of to give a good rendition of the facts
4   so whether you agree or disagree with the Court.
5          What evidence of -- is there of this discipline
6   actually occurring?
7          Let me speak to the plaintiff.
8          MR. HABERBUSH:  Yeah.  B.B.'s testimony is the
9   principal evidence that this disciplinary action did occur.
10  There's also the fact --
11         THE COURT:  I'm sorry.  That this what?
12         MR. HABERBUSH:  I'm sorry?
13         THE COURT:  I didn't hear you.
14         MR. HABERBUSH:  B.B.'s testimony during her
15  deposition is the principal evidence that this disciplinary
16  action did occur.
17         THE COURT:  Now, hold on.
18         Counsel?
19         MS. HYLTON:  That is the only evidence.
20         THE COURT:  Is B.B.'s testimony that the discipline
21  did occur?
22         MS. HYLTON:  Correct.
23         THE COURT:  Why is she fabricating that?  In other
24  words, if it's for a week or two, it's not --
25         MS. HYLTON:  It --

18

1           THE COURT:  -- for an hour.

2           MS. HYLTON:  Your Honor, if you're asking for my

3  opinion, I don't believe she is necessarily fabricating it.

4  She had a number of -- of course this is not before the

5  Court, but she had a number of discipline issues.  I think

6  she's confusing this discipline with other events where she

7  was instructed to sit out.

8           THE COURT:  Okay.

9           MS. HYLTON:  Because there's nothing in her file

10 reflecting this.

11          THE COURT:  Okay.

12          MR. HABERBUSH:  Your Honor, there's nothing in her

13 file reflecting that she was asked to sit out during this

14 period of time from recess for any reason.  So, you know, to

15 the extent that the discipline that we're alleging is

16 unevidenced, the idea that it's from a different source, I

17 think, is even more unevidenced because there's no testimony

18 or no record of any kind supporting it.

19          THE COURT:  Right.  I don't think it necessarily

20 turns on that, but some of the record is confusing, frankly,

21 and I want to be fair to both sides in putting out the

22 factual situation for any ruling by the Court and any

23 disagreement.

24          I'll be right back with you.  Let me check a note

25 for just a moment, and I'll -- let me just make sure.  I've

19

1  got a bunch of notes on your case in the back.  So give me

2  just five minutes.  Okay?

3          MR. HABERBUSH:  Thank you, Your Honor.

4      (Recess from 5:35 p.m. to 5:41 p.m.)

5

6                      AFTER RECESS

7          THE COURT:  -- to six, and I just apologize to you

8  sitting all day.  We've been in some litigation, and we had a

9  pretty heavy calendar, and I stacked that calendar to keep

10 the folks moving on this patent case.  So I'm sorry for you

11 waiting for all day.

12         But let me just humbly say to you it's a very

13 interesting case.  I really appreciate the work you put into

14 it.  Fascinating.  So thank you, and you'll hear from me

15 sometime this week.  I'm not sure, but I get back to cases

16 pretty quickly.  Otherwise, I've got, you know, 20 cases in

17 between.  So you'll hear from me shortly.  Okay?

18         MR. HABERBUSH:  Thank you, Your Honor.

19         May I address one more matter?

20         THE COURT:  Sure.

21         MR. HABERBUSH:  Thank you.

22         Regarding defendants' suggestion that Becerra got

23 to decide whether or not there was a reasonably foreseeable

24 threat of substantial disruption, I think that's just

25 patently untrue.  The test is whether or not it is

1  "reasonably" foreseeable, not just that Becerra foresaw it.

2  And if you look at the case *Castro v. Clovis*, even something

3  as inflammatory as a student using a racial slur on an online

4  social media with another student's picture on it, though

5  that was deemed to qualify the *Tinker* test under infringing

6  on rights of another student, the court did reason there that

7  that was not a substantial disruption on its own.  This

8  clearly falls far short of that standard.  It's nowhere near

9  that standard.

10           THE COURT:  I'm going to balance that with the age

11  of the child, also.  It's interesting.

12           MR. HABERBUSH:  Of course.

13           THE COURT:  I -- you know, *Tinker* is an adult --

14  well, high school, armband.  It's not like "I bomb for

15  Jesus," but, you know, interesting cases --

16           MR. HABERBUSH:  Yeah.

17           THE COURT:  -- dealing with adults or high school

18  students; here, dealing with minor age.  Let me just wrestle

19  with that.  There's a lot of balancing that goes into this.

20  I just want to humbly say to you I appreciate your arguments

21  -- very interesting.  Have a good day.

22           MR. HABERBUSH:  All right.  Thank you, Your Honor.

23           THE COURT:  And you'll hear from me probably this

24  week.  Okay?  I'll get back to it.

25       (Proceedings adjourned at 5:42 p.m.)

21

1

2

3

4                              CERTIFICATE

5        I certify that the foregoing is a correct transcript

6   from the electronic sound recording of the proceedings in the

7   above-entitled matter.

8

9   /s/ Julie Messa                 April 28, 2024
    Julie Messa, CET**D-403          Date
10  Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   CALEB R. TROTTER, SBN 305195
    CTrotter@pacificlegal.org
2   Pacific Legal Foundation
    555 Capitol Mall, Suite 1290
3   Sacramento, California 95814
    (916) 419-7111
4

5   *Attorney for Plaintiff*

6                   UNITED STATES DISTRICT COURT
7                   CENTRAL DISTRICT OF CALIFORNIA
8                        SOUTHERN DIVISION

9
10  B.B, a minor by and through her mother,    ) Case No.: 8:23-cv-00306-DOC-ADS
    CHELSEA BOYLE,                              )
11                                              ) **NOTICE OF APPEAL**
                    Plaintiff,                  )
12                                              )
           v.                                   )
13                                              )
    CAPISTRANO UNIFIED SCHOOL                   )
14  DISTRICT, *et al.*,                         ) Judge: Hon. David O. Carter
                                                ) Dept. 10A
15                  Defendants.                 ) Action Filed: February 21, 2023
                                                )
16                                              )
                                                )
17
18
19
20
21
22
23
24
25
26
27
28

    NOTICE OF APPEAL                                      8:23-cv-00306-DOC-ADSx

ER-132

1       Notice is hereby given that Plaintiff B.B., a minor by and through

2 her mother, Chelsea Boyle, appeals to the United States Court of Appeals

3 for the Ninth Circuit from the order and judgment granting Defendants'

4 Motion for Summary Judgment entered in this action on February 22,

5 2024 (Doc. 92), and March 6, 2024 (Doc. 94), respectively.

6       DATED: March 22, 2024.

7       Respectfully submitted,

8                  PACIFIC LEGAL FOUNDATION

9

10               By */s/ Caleb R. Trotter*

                  CALEB R. TROTTER

11

12               *Attorney for Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF APPEAL         1         8:23-cv-00306-DOC-ADSx

CM/ECF - California Central District    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?122202436349919-L_1_0-1

**Query    Reports    Utilities    Help    Log Out**

ACCO,(ADSx),APPEAL,CLOSED,DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Southern Division - Santa Ana)
### CIVIL DOCKET FOR CASE #: 8:23-cv-00306-DOC-ADS

B.B. et al v. Capistrano Unified School District et al    Date Filed: 02/21/2023
Assigned to: Judge David O. Carter    Date Terminated: 02/22/2024
Referred to: Magistrate Judge Autumn D. Spaeth    Jury Demand: Both
Case in other court: 9th CCA, 24-01770    Nature of Suit: 440 Civil Rights: Other
Cause: 42:1983 Civil Rights Act    Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 02/21/2023 | 1 | COMPLAINT Receipt No: ACACDC-34831154 - Fee: $402, filed by Plaintiffs Chelsea Boyle, B.B.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Attorney Alexander Hunt Haberbush added to party B.B.(pty:pla), Attorney Alexander Hunt Haberbush added to party Chelsea Boyle(pty:pla))(Haberbush, Alexander) (Entered: 02/21/2023) |
| 02/21/2023 | 2 | CIVIL COVER SHEET filed by Plaintiffs B.B., Chelsea Boyle. (Haberbush, Alexander) (Entered: 02/21/2023) |
| 02/21/2023 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening), 1 filed by Plaintiffs B.B., Chelsea Boyle. (Haberbush, Alexander) (Entered: 02/21/2023) |
| 02/22/2023 | 4 | NOTICE OF ASSIGNMENT to District Judge David O. Carter and Magistrate Judge Autumn D. Spaeth. (car) (Entered: 02/22/2023) |
| 02/22/2023 | 5 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (car) (Entered: 02/22/2023) |
| 02/22/2023 | 6 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (car) (Entered: 02/22/2023) |
| 02/22/2023 | 7 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening), 1 as to Defendants Jesus Becerra(in his official capacities), Jesus Becerra(an individual in his individual capacities ), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities), Cleo Victa(in her official capacities). (car) (Entered: 02/22/2023) |
| 02/22/2023 | 8 | NOTICE OF DEFICIENCIES in Attorney Case Opening RE: Complaint (Attorney Civil Case Opening), 1 . The following error(s) was found: No Notice of Interested Parties has been filed. A Notice of Interested Parties must be filed with every partys first appearance. See Local Rule 7.1-1. Counsel must file a Notice of Interested Parties immediately. Failure to do so may be addressed by judicial action, including sanctions. See Local Rule 83-7. Other error(s) with document(s): It appears a guardian ad litem is named in this case but no Petition seeking such appointment has been filed. A Petition for the Appointment of a Guardian Ad Litem must be filed when the appointment of a |

1 of 14    7/10/2024, 5:06 PM

|  |  | guardian ad litem is required by Fed. R. Civ. P. 17(c)(2). See Local Rule 17-1. Counsel must file a Petition for the Appointment of a Guardian Ad Litem immediately. Failure to do so may be addressed by judicial action, including sanctions. See Local Rule 83-7. (car) (Entered: 02/22/2023) |
|---|---|---|
| 02/23/2023 | 9 | NOTICE of Interested Parties filed by Plaintiff All Plaintiffs, (Haberbush, Alexander) (Entered: 02/23/2023) |
| 02/27/2023 | 10 | INITIAL STANDING ORDER FOLLOWING ASSIGNMENT OF CIVIL CASE TO JUDGE CARTER. (kdu) (Entered: 02/27/2023) |
| 03/01/2023 | 11 | PETITION for Appointment of Chelsea Goyle as Guardian ad Litem for B.B. filed by Plaintiffs B. B., Chelsea Boyle. (Attachments: # 1 Proposed Order Proposed Order Appointing Guardian Ad Litem, # 2 Certificate of Service) (Haberbush, Alexander) (Entered: 03/01/2023) |
| 03/02/2023 | 12 | ORDER by Magistrate Judge Autumn D. Spaeth: granting 11 PETITION to Appoint Guardian ad Litem, appointing Chelsea Boyle as Guardian ad Litem for B.B. (hr) (Entered: 03/02/2023) |
| 04/11/2023 | 13 | STIPULATION Extending Time to Answer the complaint as to Capistrano Unified School District answer now due 5/12/2023, re Complaint (Attorney Civil Case Opening), 1 filed by Defendant Capistrano Unified School District.(Attorney Courtney Lynn Hylton added to party Capistrano Unified School District(pty:dft))(Hylton, Courtney) (Entered: 04/11/2023) |
| 05/12/2023 | 14 | NOTICE OF MOTION AND MOTION to Dismiss Case *and/or Strike Portions of Plaintiffs Complaint Pursuant To FRCP 12(b)(6) and 12(f), and/or For A More Definite Statement Pursuant to FRCP 8 And 12(e); Memorandum of Points and Authorities; Declaration of Courtney L. Hylton In Support Thereof* filed by Defendant Capistrano Unified School District. Motion set for hearing on 6/12/2023 at 08:30 AM before Judge David O. Carter. (Hylton, Courtney) (Entered: 05/12/2023) |
| 05/12/2023 | 15 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Document RE: NOTICE OF MOTION AND MOTION to Dismiss Case *and/or Strike Portions of Plaintiffs Complaint Pursuant To FRCP 12(b)(6) and 12(f), and/or For A More Definite Statement Pursuant to FRCP 8 And 12(e); Memorandum of Points and Authorities; Declaration of* 14 *. The following error(s) was/were found: Local Rule 7-1.1 no notice of interested parties. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (lom) (Entered: 05/12/2023)* |
| 05/12/2023 | 16 | CERTIFICATE of Interested Parties filed by Defendants Jesus Becerra(in his official capacities), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities), (Attorney Courtney Lynn Hylton added to party Jesus Becerra(pty:dft), Attorney Courtney Lynn Hylton added to party Cleo Victa(pty:dft)) (Hylton, Courtney) (Entered: 05/12/2023) |
| 05/22/2023 | 17 | ORDER SETTING SCHEDULING CONFERENCE by Judge David O. Carter. Scheduling Conference set for 6/12/2023 at 08:30 AM before Judge David O. Carter. (kdu) (Entered: 05/22/2023) |

| | | |
|---|---|---|
| 05/30/2023 | 18 | First AMENDED COMPLAINT against Defendants All Defendants amending Complaint (Attorney Civil Case Opening, 1, filed by Plaintiffs B. B., Chelsea Boyle (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Certificate of Service) (Haberbush, Alexander) (Entered: 05/30/2023) |
| 05/30/2023 | 19 | OPPOSITION to NOTICE OF MOTION AND MOTION to Dismiss Case *and/or Strike Portions of Plaintiffs Complaint Pursuant To FRCP 12(b)(6) and 12(f), and/or For A More Definite Statement Pursuant to FRCP 8 And 12(e); Memorandum of Points and Authorities; Declaration of 14 filed by Plaintiffs B. B., Chelsea Boyle. (Attachments: # 1 Certificate of Service)(Haberbush, Alexander) (Entered: 05/30/2023)* |
| 05/31/2023 | 20 | NOTICE OF ERRATA filed by Plaintiffs B. B., Chelsea Boyle. correcting Amended Complaint/Petition, 18 (Attachments: # 1 Exhibit 1, # 2 Certificate of Service) (Haberbush, Alexander) (Entered: 05/31/2023) |
| 06/01/2023 | 21 | JOINT REPORT Rule 26(f) Discovery Plan ; estimated length of trial 5-7, filed by Defendant Capistrano Unified School District.. (Gardiner, Brendan) (Entered: 06/01/2023) |
| 06/09/2023 | 22 | SCHEDULING NOTICE by Judge David O. Carter Scheduling Conference set for 6/12/2023 is ADVANCED to at 07:30 AM before Judge David O. Carter. **TIME CHANGE ONLY**THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 06/09/2023) |
| 06/12/2023 | 27 | AMENDED MINUTES of Scheduling conference held before Judge David O. Carter re: MINUTES OF Scheduling Conference 24 : The case is called. The Court and counsel confer. The Courts scheduling order to issue. (bm) (Entered: 06/20/2023) |
| 06/13/2023 | 23 | SCHEDULING ORDER by Judge David O. Carter. Discovery cut-off 10/13/2023. Expert Discovery cut-off 11/13/2023. Motions due by 12/11/2023. Final Pretrial Conference set for 12/11/2023 08:30 AM before Judge David O. Carter. Jury Trial set for 1/9/2024 08:30 AM before Judge David O. Carter. (kdu) (Entered: 06/13/2023) |
| 06/13/2023 | 24 | MINUTES of Scheduling Conference held before Judge David O. Carter. The case is called. The Court and counsel confer. The Courts scheduling order to issue. Court Reporter: Court Smart. (twdb) (Entered: 06/13/2023) |
| 06/13/2023 | 25 | ORDER/REFERRAL to ADR Procedure No 2 by Judge David O. Carter. Case ordered to Court Mediation Panel for mediation. ADR Proceeding to be held no later than 12/11/2023. (kdu) (Entered: 06/13/2023) |
| 06/13/2023 | 26 | NOTICE OF MOTION AND MOTION to Dismiss Case *and/or Strike Portions of Plaintiffs First Amended Complaint Pursuant To FRCP 12(b)(6) and 12(f), and/or For A More Definite Statement Pursuant to FRCP 8 And 12(e); Memorandum of Points and Authorities; Declaration of Courtney L. Hylton In Support Thereof* filed by Defendants Jesus Becerra(in his official capacities), Capistrano Unified School District. Motion set for hearing on 7/17/2023 at 08:30 AM before Judge David O. Carter. (Gardiner, Brendan) (Entered: 06/13/2023) |
| 06/26/2023 | 28 | Opposition Opposition re: NOTICE OF MOTION AND MOTION to Dismiss Case *and/or Strike Portions of Plaintiffs First Amended Complaint Pursuant To FRCP 12(b) (6) and 12(f), and/or For A More Definite Statement Pursuant to FRCP 8 And 12(e); Memorandum of Points and Authorities; D 26 filed by Plaintiffs B. B., Chelsea Boyle. (Attachments: # 1 Supplement Certificate of Service)(Haberbush, Alexander) (Entered:* |

| | | |
|---|---|---|
| | | 06/26/2023) |
| 06/30/2023 | 29 | REPLY Reply to Plaintiffs Opposition to Defendants Motion To Dismiss NOTICE OF MOTION AND MOTION to Dismiss Case *and/or Strike Portions of Plaintiffs First Amended Complaint Pursuant To FRCP 12(b)(6) and 12(f), and/or For A More Definite Statement Pursuant to FRCP 8 And 12(e); Memorandum of Points and Authorities; D* 26 *filed by Defendants Jesus Becerra, Capistrano Unified School District. (Gardiner, Brendan) (Entered: 06/30/2023)* |
| 07/07/2023 | 30 | STIPULATION REGARDING SELECTION of Panel Mediator filed. Parties stipulate that Richard T. Copeland may serve as Panel Mediator. Plaintiff obtained the Panel Mediators consent to serve. All parties and the Panel Mediator have agreed that the mediation will be held on 10/25/2023 and counsel will submit mediation statements seven (7) calendar days before the session. Filed by Defendant Capistrano Unified School District(Hylton, Courtney) (Entered: 07/07/2023) |
| 07/10/2023 | 31 | NOTICE OF ASSIGNMENT of Panel Mediator. Mediator (ADR Panel) Richard Copeland has been assigned to serve as Panel Mediator. (lst) (Entered: 07/10/2023) |
| 07/13/2023 | 32 | SCHEDULING NOTICE by Judge David O. Carter re: MOTION to Dismiss Case *and/or Strike Portions of Plaintiffs First Amended Complaint Pursuant To FRCP 12(b)(6) and 12(f), and/or For A More Definite Statement Pursuant to FRCP 8 And 12(e); Memorandum of Points and Authorities; D* 26 *Motion hearing set for 7/17/2023 is CONTINUED to 8/28/2023 at 08:30 AM before Judge David O. Carter. MOTION to Dismiss Case and/or Strike Portions of Plaintiffs Complaint Pursuant To FRCP 12(b)(6) and 12(f)* 14 *is DENIED as moot.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 07/13/2023)* |
| 07/13/2023 | 33 | NOTICE of Association of Counsel associating attorney Ryan Heath, Amber Terry on behalf of Plaintiffs B. B., Chelsea Boyle. Filed by Plaintiffs B. B., Chelsea Boyle (Attachments: # 1 Certificate of Service)(Haberbush, Alexander) (Entered: 07/13/2023) |
| 08/18/2023 | 34 | JOINDER in NOTICE OF MOTION AND MOTION to Dismiss Case *and/or Strike Portions of Plaintiffs First Amended Complaint Pursuant To FRCP 12(b)(6) and 12(f), and/or For A More Definite Statement Pursuant to FRCP 8 And 12(e); Memorandum of Points and Authorities; D* 26 *Cleo Victa's Joinder in Capistrano Unified School District and Jesus Becerra's Notice of Motion to Dismiss and/or Motion to Strike Portions of Plaintiff's First Amended Complaint filed by Defendants Jesus Becerra, Capistrano Unified School District, Cleo Victa. (Hylton, Courtney) (Entered: 08/18/2023)* |
| 08/23/2023 | 35 | MINUTES (IN CHAMBERS) by Judge David O. Carter: GRANTING DEFENDANTS MOTION FOR A MORE DEFINITE STATEMENT AND DENYING AS MOOT DEFENDANTS MOTION TO DISMISS 26 . Plaintiffs are GRANTED LEAVE TO AMEND the pleading. Plaintiffs may not add claims or new defendants to their pleading. Any amended complaint shall be filed by September 8, 2023. Failure to timely file an amended complaint will result in the dismissal of this action and closing of the case without further notice. The hearing set for August 28, 2023, at 8:30am is hereby VACATED. (twdb) (Entered: 08/23/2023) |
| 09/08/2023 | 36 | Second AMENDED COMPLAINT against Defendants All Defendants amending Amended Complaint/Petition, 18 JURY DEMAND, filed by Plaintiffs B. B., Chelsea Boyle (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Certificate of |

| | | Service)(Haberbush, Alexander) (Entered: 09/08/2023) |
|---|---|---|
| 09/11/2023 | 37 | Request for Clerk to Issue Subpoena filed by Plaintiff B. B., Chelsea Boyle. (Attachments: # 1 Certificate of Service)(Haberbush, Alexander) (Entered: 09/11/2023) |
| 09/11/2023 | 38 | Request for Clerk to Issue Subpoena filed by Plaintiffs B. B., Chelsea Boyle. (Attachments: # 1 Certificate of Service)(Haberbush, Alexander) (Entered: 09/11/2023) |
| 09/18/2023 | 39 | APPLICATION of Non-Resident Attorney Amber R. Terry to Appear Pro Hac Vice on behalf of Plaintiffs B. B., Chelsea Boyle (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-36062610) filed by Plaintiffs B. B., Chelsea Boyle. (Haberbush, Alexander) (Entered: 09/18/2023) |
| 09/19/2023 | 40 | NOTICE of Deficiency in Electronically Filed Pro Hac Vice Application RE: APPLICATION of Non-Resident Attorney Amber R. Terry to Appear Pro Hac Vice on behalf of Plaintiffs B. B., Chelsea Boyle (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-36062610) 39 . The following error(s) was/were found: Local Rule 83-2.1.3.3(b) Proposed order not attached. (ak) (Entered: 09/19/2023) |
| 09/20/2023 | 41 | ORRDER by District Judge David O. Carter GRANTING Application of Non-Resident Attorney Amber R. Terry to Appear Pro Hac Vice on behalf of Plaintiffs B. B., Chelsea Boyle (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-36062610) 39 . THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 09/20/2023) |
| 09/21/2023 | 42 | APPLICATION of Non-Resident Attorney Ryan L. Heath to Appear Pro Hac Vice on behalf of Plaintiffs B. B., Chelsea Boyle (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-36085006) filed by Plaintiffs B. B., Chelsea Boyle. (Haberbush, Alexander) (Entered: 09/21/2023) |
| 09/22/2023 | 43 | NOTICE OF MOTION AND MOTION to Dismiss Case *DEFENDANTS NOTICE OF MOTION AND MOTION TO DISMISS AND/OR STRIKE PORTIONS OF PLAINTIFFS SECOND AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6) AND 12(f); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF COURTNEY L. HYLTON IN SUPPORT THEREOF* filed by Defendants' Jesus Becerra(in his official capacities), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities). Motion set for hearing on 10/23/2023 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Proposed Order [PROPOSED] ORDER DISMISSING ALL CLAIMS AGAINST DEFENDANTS, CAPISTRANO UNIFIED SCHOOL DISTRICT; JESUS BECERRA; AND CLEO VICTA) (Hylton, Courtney) (Entered: 09/22/2023) |
| 09/22/2023 | 44 | REQUEST FOR JUDICIAL NOTICE re NOTICE OF MOTION AND MOTION to Dismiss Case *DEFENDANTS NOTICE OF MOTION AND MOTION TO DISMISS AND/OR STRIKE PORTIONS OF PLAINTIFFS SECOND AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6) AND 12(f); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF CO* 43 *filed by Defendants Jesus Becerra, Capistrano Unified School District, Cleo Victa.* (Hylton, Courtney) (Entered: 09/22/2023) |
| 09/27/2023 | 45 | ORDER by District Judge David O. Carter GRANTING Application of Non-Resident Attorney Ryan L. Heath to Appear Pro Hac Vice on behalf of Plaintiffs B. B., Chelsea Boyle (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-36085006) 42 . |

| | | THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 09/27/2023) |
|---|---|---|
| 10/02/2023 | 46 | Opposition Opposition re: NOTICE OF MOTION AND MOTION to Dismiss Case *DEFENDANTS NOTICE OF MOTION AND MOTION TO DISMISS AND/OR STRIKE PORTIONS OF PLAINTIFFS SECOND AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6) AND 12(f); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF CO 43 Plaintiffs' Opposition to Defendants' Motion to Dismiss and/or Strike Portions of Plaintiffs' Second Amended Complaint filed by Plaintiffs B. B., Chelsea Boyle. (Attachments: # 1 Certificate of Service) (Haberbush, Alexander) (Entered: 10/02/2023)* |
| 10/02/2023 | 47 | OBJECTIONS to Request for Judicial Notice, 44 *Plaintiffs' Objection to Defendants' Request for Judicial Notice In Support of Motion to Dismiss Plaintiffs' Second Amended Complaint* filed by Plaintiffs B. B., Chelsea Boyle. (Attachments: # 1 Certificate of Service)(Haberbush, Alexander) (Entered: 10/02/2023) |
| 10/06/2023 | 48 | REPLY In Support of Motion NOTICE OF MOTION AND MOTION to Dismiss Case *DEFENDANTS NOTICE OF MOTION AND MOTION TO DISMISS AND/OR STRIKE PORTIONS OF PLAINTIFFS SECOND AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6) AND 12(f); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF CO 43 DEFENDANTS REPLY TO PLAINTIFFS OPPOSITION TO DEFENDANTS MOTION TO DISMISS PLAINTIFFS SECOND AMENDED COMPLAINT filed by Defendants Jesus Becerra, Capistrano Unified School District, Cleo Victa. (Gardiner, Brendan) (Entered: 10/06/2023)* |
| 10/06/2023 | 49 | REPLY In Support of Motion to Dismiss Case NOTICE OF MOTION AND MOTION to Dismiss Case *DEFENDANTS NOTICE OF MOTION AND MOTION TO DISMISS AND/OR STRIKE PORTIONS OF PLAINTIFFS SECOND AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6) AND 12(f); MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF CO 43 DEFENDANTS REPLY TO PLAINTIFFS OPPOSITION TO DEFENDANTS REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS SECOND AMENDED COMPLAINT filed by Defendants Jesus Becerra, Capistrano Unified School District, Cleo Victa. (Gardiner, Brendan) (Entered: 10/06/2023)* |
| 10/12/2023 | 50 | EX PARTE APPLICATION to Amend Pretrial-Trial Scheduling Order - form only, 23 filed by Defendants Jesus Becerra(in his official capacities), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities). (Attachments: # 1 Declaration Declaration of Courtney L. Hylton ISO Ex Parte to Amend Scheduling Order, # 2 Proposed Order Proposed Order re Ex Parte to Amend Scheduling Order) (Hylton, Courtney) (Entered: 10/12/2023) |
| 10/12/2023 | 51 | Opposition Opposition re: EX PARTE APPLICATION to Amend Pretrial-Trial Scheduling Order - form only, 23 50 filed by Plaintiffs B. B., Chelsea Boyle. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Certificate of Service) (Haberbush, Alexander) (Entered: 10/12/2023) |
| 10/13/2023 | 52 | REPLY Support EX PARTE APPLICATION to Amend Pretrial-Trial Scheduling Order - form only, 23 50 filed by Defendants Jesus Becerra, Capistrano Unified School District, Cleo Victa. (Attachments: # 1 Declaration Declaration of Courtney Hylton ISO Reply to Opp re Ex Parte Application)(Hylton, Courtney) (Entered: 10/13/2023) |

| | | |
|---|---|---|
| 10/16/2023 | 53 | MINUTES (IN CHAMBERS) by Judge David O. Carter: ORDER GRANTING DEFENDANTS EX PARTE APPLICATION TO AMEND THE SCHEDULING ORDER FOR LIMITED PURPOSE OF COMPLETING B.B.S DEPOSITION 50 . The discovery cut-off in this matter is EXTENDED TO NOVEMBER 10, 2023, for the limited purpose of allowing Defendants to complete B.B.s deposition. (twdb) (Entered: 10/17/2023) |
| 10/19/2023 | 54 | SCHEDULING NOTICE by Judge David O. Carter. The Court finds the Motion to Dismiss 43 appropriate for decision without oral argument. Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the motion hearing set for October 23, 2023, is removed from the calendar and the motion is taken under submission. No appearances are necessary on October 23, 2023. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 10/19/2023) |
| 10/27/2023 | 55 | MINUTES (IN CHAMBERS) ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND/OR STRIKE 43 by Judge David O. Carter: Plaintiffs may file a Third Amended Complaint within ten days from the date that this order appears on the docket. Failure to timely submit an amended complaint risks dismissal of this action with prejudice. Granting in part and Denying in part 43 MOTION to Dismiss Case. [SEE DOCUMENT FOR FURTHER INFORMATION.] (es) (Entered: 10/27/2023) |
| 11/06/2023 | 56 | Third AMENDED COMPLAINT against Defendants All Defendants amending Amended Complaint/Petition, 36 , filed by Plaintiffs B. B., Chelsea Boyle (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Certificate of Service) (Haberbush, Alexander) (Entered: 11/06/2023) |
| 11/07/2023 | 57 | EX PARTE APPLICATION to AMEND Pretrial-Trial Scheduling Order - form only, 23 filed by Defendants Jesus Becerra(in his official capacities), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities). (Attachments: # 1 Declaration Declaration of Courtney L. Hylton ISO Ex Parte Application to Amend the Scheduling Order Continuing Motion Cut Off Date and Trial, # 2 Proposed Order Proposed Order re Ex Parte to Amend Scheduling Order) (Hylton, Courtney) (Entered: 11/07/2023) |
| 11/08/2023 | 58 | STATEMENT of Correction EX PARTE APPLICATION to AMEND Pretrial-Trial Scheduling Order - form only, 23 57 *Plaintiff B.B.'s Statement re Capistrano Unifed School District, Jesus Bacerra, and Cleo Victa's Unopposed Notice of and Ex-Parte Application to Amend the Scheduling Order (DKT. No. 23) to Continue the Motion cut off Date and Continue Trial* filed by Plaintiffs B. B., Chelsea Boyle. (Attachments: # 1 Certificate of Service)(Haberbush, Alexander) (Entered: 11/08/2023) |
| 11/08/2023 | 59 | MINUTES (IN CHAMBERS): ORDER GRANTING DEFENDANTS' EX PARTE APPLICATION AMENDING THE SCHEDULING ORDER 57 by Judge David O. Carter: The Court is in receipt of Defendant's Ex Parte Application to Amend the Pre-Trial Scheduling Order ("Application") (Dkt. 57). The Application is unopposed. Good cause appearing, the Court GRANTS the Application. Specifically: The Motion Hearing Cut-Off Date is CONTINUED from December 11, 2023, to January 22, 2024. The Final Pre-Trial Conference is CONTINUED from December 11, 2023, to February 12, 2024 at 8:30 AM. The Trial Date is CONTINUED from January 9, 2024, to February 20, 2024 at 8:30 AM. The Clerk shall serve this minute order on the parties. (bm) (Entered: 11/09/2023) |

| 11/10/2023 | 60 | NOTICE OF MOTION AND MOTION to Dismiss Motion to Dismiss and/or Strike Portions of Plaintiffs Third Amended Complaint *and/or Strike Portions of Plaintiffs Third Amended Complaint Pursuant To FRCP 12(b)(6) and 12(f)* filed by Defendants Jesus Becerra(in his official capacities), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities). Motion set for hearing on 12/11/2023 at 08:30 AM before Judge David O. Carter. (Gardiner, Brendan) (Entered: 11/10/2023) |
|---|---|---|
| 11/13/2023 | 61 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Document RE: NOTICE OF MOTION AND MOTION to Dismiss Motion to Dismiss and/or Strike Portions of Plaintiffs Third Amended Complaint *and/or Strike Portions of Plaintiffs Third Amended Complaint Pursuant To FRCP 12(b)(6) and 12(f)* 60 . The following error(s) was/were found: Proposed document was not submitted or was not submitted as a separate attachment. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (es) (Entered: 11/13/2023) |
| 11/13/2023 | 62 | DISCLOSURE of Expert Witnesses filed by Plaintiffs B. B., Chelsea Boyle (Attachments: # 1 Certificate of Service)(Pauly, Deborah) (Entered: 11/13/2023) |
| 11/20/2023 | 63 | Opposition Opposition re: NOTICE OF MOTION AND MOTION to Dismiss Motion to Dismiss and/or Strike Portions of Plaintiffs Third Amended Complaint *and/or Strike Portions of Plaintiffs Third Amended Complaint Pursuant To FRCP 12(b)(6) and 12(f)* 60 filed by Plaintiffs B. B., Chelsea Boyle. (Attachments: # 1 Certificate of Service) (Attorney Deborah L. Pauly added to party B. B.(pty:pla), Attorney Deborah L. Pauly added to party Chelsea Boyle(pty:pla))(Pauly, Deborah) (Entered: 11/20/2023) |
| 11/20/2023 | 64 | REQUEST FOR JUDICIAL NOTICE *In Support of Plaintiff's Opposition to Defendants' Notice of Motion and Motion to Dismiss Third Amanded Complaint [Dkt No. 63]* filed by Plaintiffs B. B., Chelsea Boyle. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Certificate of Service)(Pauly, Deborah) (Entered: 11/20/2023) |
| 11/27/2023 | 65 | REPLY Support NOTICE OF MOTION AND MOTION to Dismiss Motion to Dismiss and/or Strike Portions of Plaintiffs Third Amended Complaint *and/or Strike Portions of Plaintiffs Third Amended Complaint Pursuant To FRCP 12(b)(6) and 12(f)* 60 filed by Defendants Jesus Becerra, Capistrano Unified School District, Cleo Victa. (Hylton, Courtney) (Entered: 11/27/2023) |
| 12/05/2023 | 66 | SCHEDULING NOTICE by Judge David O. Carter. The Court finds the MOTION to Dismiss Motion to Dismiss and/or Strike Portions of Plaintiffs Third Amended Complaint 60 appropriate for decision without oral argument. Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the motion hearing set for December 11, 2023, is removed from the calendar and the motion is taken under submission. No appearances are necessary on December 11, 2023. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 12/05/2023) |
| 12/19/2023 | 67 | EX PARTE APPLICATION to AMEND Order on Motion to Amend/Correct,, 59 , EX PARTE APPLICATION to Continue Motion Hearing Cut-off from January 22, 2024 to February 19, 2024, EX PARTE APPLICATION to Set Trial Date on March 19, 2024 filed by Defendants Jesus Becerra(in his official capacities), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities). (Attachments: # 1 Declaration, # 2 Proposed Order) (Gardiner, Brendan) (Entered: 12/19/2023) |

| | | |
|---|---|---|
| 12/19/2023 | 68 | ORDER by Judge David O. Carter: Granting 67 Defendants' Unopposed EX PARTE APPLICATION Requesting Order Amending the Scheduling Order to Continue the Motion Cut Off Date and Continue Trial. The trial date in this matter is continued to 3/19/24 at 8:30 a.m. The Motion Hearing Cut off date is continued to 2/19/24. (twdb) (Entered: 12/19/2023) |
| 01/03/2024 | 69 | MINUTES (IN CHAMBERS) by Judge David O. Carter: Granting 60 Defendants' MOTION to Dismiss and/or Strike. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 01/04/2024) |
| 01/12/2024 | 70 | NOTICE OF MOTION AND MOTION for Summary Judgment as to Plaintiff's Third Amended Complaint filed by Defendants Jesus Becerra(an individual in his individual capacities ), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities). Motion set for hearing on 2/12/2024 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Declaration of Courtney L. Hylton, # 2 Separate Statement, # 3 Proposed Order) (Attorney Brendan Gardiner added to party Jesus Becerra(pty:dft)) (Gardiner, Brendan) (Entered: 01/12/2024) |
| 01/12/2024 | 71 | SCHEDULING NOTICE by Judge David O. Carter Jury Trial set for 3/20/2024 is ADVANCED to 3/12/2024 08:30 AM before Judge David O. Carter. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 01/12/2024) |
| 01/17/2024 | 72 | ANSWER to Amended Complaint/Petition, 56 JURY DEMAND. filed by Defendants Jesus Becerra(in his official capacities), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities).(Gardiner, Brendan) (Entered: 01/17/2024) |
| 01/18/2024 | 73 | EX PARTE APPLICATION to Amend EX PARTE APPLICATION to AMEND Order on Motion to Amend/Correct,, 59 EX PARTE APPLICATION to Continue Motion Hearing Cut-off from January 22, 2024 to February 19, 2024 EX PARTE APPLICATION to Set Trial Date on March 19, 2024 67 , Order on Motion to Amend/ Correct,, 59 filed by Defendants Jesus Becerra(in his official capacities), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities). (Attachments: # 1 Declaration Declaration of Courtney L. Hylton ISO Ex Parte to Amend Scheduling Order Continuing Trial & the Final Pre-Trial Conference, # 2 Proposed Order Proposed Order re Ex Parte to Amend Scheduling Order) (Hylton, Courtney) (Entered: 01/18/2024) |
| 01/19/2024 | 74 | MINUTES (IN CHAMBERS) by Judge David O. Carter: Granting in part and Denying in part 73 Defendants' EX PARTE APPLICATION to Amend/Correct the Scheduling Order. Specifically, the final pretrial conference is CONTINUED from February 12, 2024 to March 5, 2024 at 8:30 AM. The trial remains scheduled for March 12, 2024. (twdb) (Entered: 01/19/2024) |
| 01/22/2024 | 75 | OPPOSITION to NOTICE OF MOTION AND MOTION for Summary Judgment as to Plaintiff's Third Amended Complaint 70 *Plaintiff's Opposition of Defendants' Motion for Summary Judgment* filed by Plaintiffs B. B., Chelsea Boyle. (Attachments: # 1 Certificate of Service)(Haberbush, Alexander) (Entered: 01/22/2024) |
| 01/22/2024 | 76 | Objection In Opposition to re: NOTICE OF MOTION AND MOTION for Summary Judgment as to Plaintiff's Third Amended Complaint 70 filed by Plaintiffs B. B., Chelsea Boyle. (Attachments: # 1 Certificate of Service)(Haberbush, Alexander) (Entered: 01/22/2024) |

| | | |
|---|---|---|
| 01/22/2024 | 77 | STATEMENT of Genuine Disputes of Material Facts and Conclusions of Law in Opposition to NOTICE OF MOTION AND MOTION for Summary Judgment as to Plaintiff's Third Amended Complaint 70 filed by Plaintiffs B. B., Chelsea Boyle. (Attachments: # 1 Certificate of Service)(Haberbush, Alexander) (Entered: 01/22/2024) |
| 01/22/2024 | 78 | DECLARATION of Amber R. Terry In Opposition to NOTICE OF MOTION AND MOTION for Summary Judgment as to Plaintiff's Third Amended Complaint 70 filed by Plaintiffs B. B., Chelsea Boyle. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Supplement M, # 14 Exhibit N, # 15 Certificate of Service)(Haberbush, Alexander) (Entered: 01/22/2024) |
| 01/29/2024 | 79 | REPLY Support NOTICE OF MOTION AND MOTION for Summary Judgment as to Plaintiff's Third Amended Complaint 70 filed by Defendants Jesus Becerra, Capistrano Unified School District, Cleo Victa. (Hylton, Courtney) (Entered: 01/29/2024) |
| 01/29/2024 | 80 | RESPONSE IN SUPPORT of NOTICE OF MOTION AND MOTION for Summary Judgment as to Plaintiff's Third Amended Complaint 70 *Defendants' Response to Statement of Genuine Dispute of Material Fact; Evidentiary Objections* filed by Defendants Jesus Becerra, Capistrano Unified School District, Cleo Victa. (Hylton, Courtney) (Entered: 01/29/2024) |
| 01/30/2024 | 81 | NOTICE OF MOTION AND MOTION to to File Oversized Brief filed by Plaintiff B. B.. Motion set for hearing on 2/12/2024 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Certificate of Service) (Haberbush, Alexander) (Entered: 01/30/2024) |
| 01/31/2024 | 82 | OPPOSITION AND REQUEST TO STRIKE in opposition re: NOTICE OF MOTION AND MOTION to to File Oversized Brief 81 filed by Defendants Jesus Becerra, Capistrano Unified School District, Cleo Victa. (Gardiner, Brendan) (Entered: 01/31/2024) |
| 01/31/2024 | 83 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Document RE: NOTICE OF MOTION AND MOTION to to File Oversized Brief 81 . The following error(s) was/were found: Proposed document was not submitted or was not submitted as a separate attachment. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (twdb) (Entered: 01/31/2024) |
| 02/01/2024 | 84 | MINUTES (IN CHAMBERS): ORDER GRANTING PLAINTIFF'S MOTION TO FILE OVERSIZED BRIEF 81 by Judge David O. Carter Granting 81 MOTION: Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Dkt. 75) exceeded the page limit specified in the Local Rules. The Court GRANTS Defendants' Motion to file this oversized brief. The hearing on Plaintiff's Motion to File an Oversized Brief scheduled for February 12, 2024, is VACATED. The parties are ORDERED to appear for the summary judgment hearing on February 12, 2024, at 8:30 a.m. The Clerk shall serve this minute order on the parties. (bm) (Entered: 02/02/2024) |
| 02/09/2024 | 85 | SCHEDULING NOTICE by Judge David O. Carter re: MOTION for Summary Judgment as to Plaintiff's Third Amended Complaint 70 Motion set for hearing on |

| | | |
|---|---|---|
| | | 2/12/2024 is CONTINUED to 02:30 PM before Judge David O. Carter. **TIME CHANGE ONLY**THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 02/09/2024) |
| 02/12/2024 | 86 | MINUTES OF Motion Hearing held before Judge David O. Carter: MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S THIRD AMENDED COMPLAINT 70 . The case is called. The Court and counsel confer. The Court hears oral argument. Motion for Summary Judgment as to Plaintiff's Third Amended Complaint 70 is taken under submission. APPEARANCES: For Plaintiff(s): Alexander Hunt Haberbush; For Defendant(s):Brendan Gardiner, Courtney Lynn Hylton, Courtroom Deputy Clerk: Erica Bustos for Karlen Dubon. Court Reporter: CourtSmart. Time in Court: 0:24. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ev) TEXT ONLY ENTRY (ev) (Entered: 02/13/2024) |
| 02/13/2024 | 87 | MEMORANDUM of CONTENTIONS of FACT and LAW filed by Defendants Jesus Becerra(in his official capacities), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities). (Gardiner, Brendan) (Entered: 02/13/2024) |
| 02/13/2024 | 88 | Witness List filed by Defendants Jesus Becerra(in his official capacities), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities).. (Gardiner, Brendan) (Entered: 02/13/2024) |
| 02/13/2024 | 89 | Joint Exhibit List filed by Plaintiffs B. B., Chelsea Boyle.. (Attachments: # 1 Certificate of Service)(Haberbush, Alexander) (Entered: 02/13/2024) |
| 02/13/2024 | 90 | Witness List filed by Plaintiff B. B., Chelsea Boyle.. (Attachments: # 1 Certificate of Service)(Haberbush, Alexander) (Entered: 02/13/2024) |
| 02/13/2024 | 91 | MEMORANDUM of CONTENTIONS of FACT and LAW filed by Plaintiff B. B., Chelsea Boyle. (Attachments: # 1 Certificate of Service)(Haberbush, Alexander) (Entered: 02/13/2024) |
| 02/22/2024 | 92 | ORDER ORDER GRANTING DEFENDANTS MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS FEDERAL LAW CLAIMS 81 AND DECLINING SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS STATE LAW CAUSES OF ACTION by Judge David O. Carter: RE: 70 . SEE DOCUMENT FOR FURTHER INFORMATION. MD JS-6. Case Terminated. (twdb) (Entered: 02/22/2024) |
| 03/05/2024 | 93 | NOTICE OF LODGING filed re NOTICE OF MOTION AND MOTION for Summary Judgment as to Plaintiff's Third Amended Complaint 70 , Order on Motion for Summary Judgment, 92 (Attachments: # 1 [Proposed] Judgment Granting Defendants' Motion for Summary Judgment, # 2 Proof of Service)(Gardiner, Brendan) (Entered: 03/05/2024) |
| 03/06/2024 | 94 | JUDGMENT by Judge David O. Carter GRANTING DEFENDANTS' CAPISTRANO UNIFIED SCHOOL DISTRICT, JESUS BECERRA, AND CLEO VICTA'S MOTION FOR SUMMARY JUDGMENT 70 . It is further ordered: 1. Plaintiffs B.B. and CHELSEA BOYLE to take nothing by way of their claims; 2. Costs are awarded to Defendants in an amount to be determined by this court. (twdb) (Entered: 03/06/2024) |
| 03/14/2024 | 95 | APPLICATION to the Clerk to Tax Costs against Plaintiffs All Plaintiffs re: Judgment, 94 , filed by Defendants Cleo Victa(an individual in her individual capacities), Capistrano Unified School District, Jesus Becerra(in his official capacities). (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Proof of Service) (Gardiner, Brendan) (Entered: 03/14/2024) |

| | | |
|---|---|---|
| 03/20/2024 | 96 | NOTICE of Appearance filed by attorney Caleb Randall Trotter on behalf of Plaintiff B. B. (Attorney Caleb Randall Trotter added to party B. B.(pty:pla))(Trotter, Caleb) (Entered: 03/20/2024) |
| 03/20/2024 | 97 | NOTICE TO FILER OF DEFICIENCIES in Electronic Filed Document RE: Notice of Appearance 96 . The following error(s) was/were found: Incorrect event selected. Correct event to be used is: Notice of Appearance or Withdrawal of Counsel G123.. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (ak) (Entered: 03/21/2024) |
| 03/22/2024 | 98 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Plaintiff B. B.. Appeal of Judgment, 94 , Order on Motion for Summary Judgment, 92 . (Appeal Fee - $605 Fee Paid, Receipt No. ACACDC-37145429.) (Trotter, Caleb) (Entered: 03/22/2024) |
| 03/22/2024 | 99 | REPRESENTATION STATEMENT re Notice of Appeal to 9th Circuit Court of Appeals 98 . (Trotter, Caleb) (Entered: 03/22/2024) |
| 03/25/2024 | 100 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 24-1770 assigned to Notice of Appeal to 9th Circuit Court of Appeals 98 as to plaintiff B. B.. (mat) (Entered: 03/27/2024) |
| 03/27/2024 | 101 | TRANSCRIPT ORDER re: Court of Appeals case number 24-1770, as to Plaintiff B. B. for Court Smart (CS). Court will contact Brien Bartels, Legal Secretary at BBartels@pacificlegal.org with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Trotter, Caleb) (Entered: 03/27/2024) |
| 03/28/2024 | 102 | Objections To Defendants Application for Bill Of Costs Opposition re: APPLICATION to the Clerk to Tax Costs against Plaintiffs All Plaintiffs re: Judgment, 94 , 95 filed by Plaintiffs B. B., Chelsea Boyle. (Attorney Caleb Randall Trotter added to party Chelsea Boyle(pty:pla))(Trotter, Caleb) (Entered: 03/28/2024) |
| 04/01/2024 | 103 | REPLY in support of APPLICATION to the Clerk to Tax Costs against Plaintiffs All Plaintiffs re: Judgment, 94 , 95 filed by Defendants Jesus Becerra, Capistrano Unified School District, Cleo Victa. (Attachments: # 1 Declaration Declaration of Brendan M. Gardiner)(Gardiner, Brendan) (Entered: 04/01/2024) |
| 04/29/2024 | 104 | TRANSCRIPT for proceedings held on 02/12/2024. Electronic Court Recorder: JAMS CERTIFIED TRANSCRIPTION, phone number (661) 609-4528. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/20/2024. Redacted Transcript Deadline set for 5/30/2024. Release of Transcript Restriction set for 7/29/2024. (yja) (Entered: 04/29/2024) |
| 04/29/2024 | 105 | NOTICE OF FILING TRANSCRIPT filed for proceedings 02/12/2024 re Transcript 104 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (yja) TEXT ONLY ENTRY (Entered: 04/29/2024) |

| 05/01/2024 | 106 | BILL OF COSTS. Costs Taxed in amount of $8,828.47 in favor of Defendant and against plaintiff. RE: APPLICATION to the Clerk to Tax Costs against Plaintiffs All Plaintiffs re: Judgment, 94 , 95 (kr) (Entered: 05/01/2024) |
|---|---|---|
| 05/08/2024 | 107 | NOTICE OF MOTION AND MOTION to Re-Tax Costs against Jesus Becerra(in his official capacities), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities) filed by plaintiffs B. B., Chelsea Boyle. Motion set for hearing on 7/1/2024 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Proposed Order) (Trotter, Caleb) (Entered: 05/08/2024) |
| 05/08/2024 | 108 | TRANSCRIPT ORDER re: Court of Appeals case number 24-1770, as to Defendants Jesus Becerra(in his official capacities), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities) for Court Smart (CS). Court will contact Samantha Ortiz at sortiz@hyltonapc.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Gardiner, Brendan) (Entered: 05/08/2024) |
| 06/10/2024 | 109 | OPPOSITION in opposition re: NOTICE OF MOTION AND MOTION to Re-Tax Costs against Jesus Becerra(in his official capacities), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities) 107 filed by Defendants Jesus Becerra, Capistrano Unified School District, Cleo Victa. (Attachments: # 1 Declaration)(Gardiner, Brendan) (Entered: 06/10/2024) |
| 06/14/2024 | 110 | Notice of Electronic Filing re Objection/Opposition (Motion related) 109 e-mailed to lshelechi@hyltonapc.com bounced due to Unknown address error. The primary e-mail address associated with the attorney record has been deleted. Pursuant to Local Rules it is the attorneys obligation to maintain all personal contact information including e-mail address in the CM/ECF system. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jp) TEXT ONLY ENTRY (Entered: 06/14/2024) |
| 06/17/2024 | 111 | REPLY in support of motion NOTICE OF MOTION AND MOTION to Re-Tax Costs against Jesus Becerra(in his official capacities), Capistrano Unified School District, Cleo Victa(an individual in her individual capacities) 107 filed by Plaintiffs B. B., Chelsea Boyle. (Trotter, Caleb) (Entered: 06/17/2024) |
| 06/17/2024 | 112 | Notice of Appearance or Withdrawal of Counsel: for attorney Courtney Lynn Hylton counsel for Defendants Jesus Becerra, Capistrano Unified School District, Cleo Victa. Ladan Shelechi is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Defendants Capistrano Unified School District; Jesus Becerra & Cleo Victa. (Hylton, Courtney) (Entered: 06/17/2024) |
| 06/18/2024 | 113 | MINUTES (IN CHAMBERS) by Judge David O. Carter: Denying 107 MOTION to Re-Tax or Stay Costs. For the reasons set forth above, the Court DENIES the Plaintiffs Motion to Re- Tax and Stay Costs. The Clerk shall tax costs in the amount of $8,828.47, as determined by their office. The July 1, 2024 hearing in this matter is VACATED. The Clerk shall serve this minute order on the parties. (twdb) (Entered: 06/18/2024) |

| PACER Service Center |
|---|
| Transaction Receipt |
| |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?122202436349919-L_1_0-1

| 07/10/2024 17:05:49 | | | |
|---|---|---|---|
| **PACER Login:** | PLFLegalFoundation | **Client Code:** | 5-000/bpb |
| **Description:** | Docket Report | **Search Criteria:** | 8:23-cv-00306-DOC-ADS Start date: 1/1/2022 End date: 7/10/2024 |
| **Billable Pages:** | 12 | **Cost:** | 1.20 |

7/10/2024, 5:06 PM

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

    s/  Caleb R. Trotter    
CALEB R. TROTTER