**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| B.B., a minor by and through her mother, Chelsea Boyle, | No. 24-1770 |
| *Plaintiff - Appellant*, | D.C. No. 8:23-cv-00306-DOC-ADS |
| v. | |
| CAPISTRANO UNIFIED SCHOOL DISTRICT; JESUS BECERRA, an individual in his individual and official capacities; CLEO VICTA, an individual in her individual and official capacities, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted April 9, 2025
Pasadena, California

Filed March 10, 2026

Before: Consuelo M. Callahan, Roopali H. Desai, and Ana
de Alba, Circuit Judges.

Per Curiam Opinion

## SUMMARY[*]

### First Amendment

The panel vacated the district court's grant of summary judgment for Jesus Becerra, the school principal at Viejo Elementary School in the Capistrano Unified School District, and remanded, in a 42 U.S.C. § 1983 action brought by first-grade student B.B., alleging her First Amendment rights were violated when she was punished after she drew a picture that included the words "Black Lives Mater [sic] any life" and gave it to M.C., an African American classmate.

Under *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), student speech is protected until it collides with the school's interest in (1) preventing disruption and (2) protecting other students. When this occurs, schools must achieve a balance between protecting the safety and well-being of their students and respecting those same students' constitutional rights.

Disagreeing with the district court's determination that the drawing was not protected by the First Amendment, the panel held that elementary students' speech is protected by the First Amendment, *Tinker* applies in the elementary student speech context, and elementary students' young age is a relevant, but non-dispositive, factor. The panel also reaffirmed that under the *Tinker* balancing test school officials have the burden of showing that their actions were

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

reasonably undertaken to protect the safety and well-being of their students.

Here, because there was no suggestion that B.B.'s drawing created a reasonable likelihood of material disruption of classwork or substantial disorder at her school, the panel focused on the second prong of *Tinker*: whether B.B.'s drawing interfered with M.C.'s right to be secure and let alone. Applying *Tinker*, the panel held that B.B. raised genuine disputes of material fact and Becerra was not entitled to summary judgment because there was conflicting evidence about whether Becerra could reasonably conclude that the drawing interfered with M.C.'s rights and whether the actions taken were reasonably necessary. The panel explained that while age is a relevant factor under *Tinker*, it does not negate the existence of a genuine dispute of material fact and the district court erred to the extent that it relied on the students' ages as the dispositive factor. The students' very young ages gave the school broader discretion, but did not relieve the school and Becerra from meeting their burden of showing that their actions were reasonably undertaken to protect the safety and well-being of the school's students.

The panel also vacated the grant of summary judgment for Becerra on B.B.'s First Amendment retaliation claim because the district court's grant of summary judgment on that claim was based on its determination that the drawing was not protected by the First Amendment.

## COUNSEL

Caleb R. Trotter (argued), Pacific Legal Foundation, Sacramento, California; Wilson Freeman, Pacific Legal Foundation, Phoenix, Arizona; Plaintiff-Appellant.

Courtney L. Hylton (argued) and Brendan M. Gardiner, Hylton & Associates, Irvine, California, for Defendants-Appellees.

Ilya Shapiro and Tim Rosenberger, Manhattan Institute, New York, New York; Alan Gura, Institute for Free Speech, Washington, D.C.; Madison Hahn, Young America's Foundation, Reston, Virginia; Timothy D. Keller, Center for the Rights of Abused Children, Phoenix, Arizona; Cynthia F. Crawford and Casey Mattox, Americans for Prosperity Foundation, Arlington, Virginia; for Amici Curiae Manhattan Institute, Institute for Free Speech, Young America's Foundation, Center for the Rights of Abused Children, and Americans for Prosperity Foundation.

J. Michael Connolly and Thomas S. Vaseliou, Consovoy McCarthy Park PLLC, Arlington, Virginia, for Amicus Curiae Parents Defending Education.

Jordan R. Miller and Celia H. O'Leary, Southeastern Legal Foundation Inc., Roswell, Georgia, for Amicus Curiae Southeastern Legal Foundation.

D. Gill Sperlein, The Law Office of D. Gill Sperlein, San Francisco, California; Harmeet K. Dhillon, Mark Trammell, Josh W. Dixon, and Eric A. Sell, Center for American Liberty, Mount Airy, Maryland; for Amicus Curiae Center for American Liberty.

Julie A. Hamill, Hamill Law & Consulting, Rolling Hills Estates, California, for Amici Curiae California Policy Center and Californians for Equal Rights Foundation.

Mathew W. Hoffmann and Tyson C. Langhofer, Alliance Defending Freedom, Lansdowne, Virginia; John J. Bursch, Bursch Law PLLC, Caledonia, Michigan; for Amicus Curiae Douglass Leadership Institute.

Dean McGee and James McQuaid, Liberty Justice Center, Austin, Texas, for Amicus Curiae Liberty Justice Center.

---

## OPINION

PER CURIAM:

In March 2021, B.B., a first-grade student, drew a picture which included the words "Black Lives Mater [sic] any life" and gave it to M.C., an African American classmate. When M.C.'s mother raised concerns, the school principal, Jesus Becerra, spoke to B.B. and allegedly told her that the picture was inappropriate and racist, and that she was not allowed to give her drawings to classmates. B.B., through her mother, sued the school district and Becerra under 42 U.S.C. § 1983, alleging that Becerra's actions punished B.B. and violated her First Amendment rights. The district court granted summary judgment for the defendants, stating that the drawing was not protected by the First Amendment. B.B. filed a timely appeal. This case presents an important issue: to what extent is elementary students' speech protected by the First Amendment? Applying the criteria set forth in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), we hold that elementary

students' speech is protected by the First Amendment, the age of the students is a relevant factor under *Tinker*, and schools may restrict students' speech only when the restriction is reasonably necessary to protect the safety and well-being of its students. Because the *Tinker* analysis raises genuine issues of material fact, we vacate the grant of summary judgment and remand.

## I.   The Controversy

In March 2021, when B.B. was a first-grade student at Viejo Elementary School in the Capistrano Unified School District, her teacher read the class a story about Dr. Martin Luther King, Jr.  After the story, B.B. "felt bad" because "black people . . . were put in a worse position" and made a drawing showing "all her friends holding hands."  B.B. gave the drawing to her classmate, M.C., who is African American.  M.C. thanked B.B.  Here is the drawing:



B.B. did not know that "Black Lives Matter" had any particular meaning but included the phrase because it was at

the end of the book her teacher read to the class.[1] She stated that she included the phrase "any life" in her drawing because "all lives matter."

M.C. took the drawing home, where her mother found it in her backpack. M.C. asked her mother what the drawing meant, and her mother told her not to worry about it as it was not part of the curriculum. However, M.C.'s mother was concerned that M.C. was the only black child in her grade to receive such a drawing. She emailed the school's principal, Becerra, stating, in part:

> While we can appreciate the sentiment of Black Lives Matter, my husband and I do not trust the place where the "any life" is coming from. We do not want this to become a larger issue. My husband and I will not tolerate any more messages given to our daughter because of her skin color. We do not send [M.C.] to school with flyers or propaganda. We only send her to school to learn the curriculum and that is it. As the administrator we trust you know the actions that need to be taken to address this issue. If you want to further discuss, my husband and I will be happy to meet you in person.

The next day at school, Becerra took B.B. aside and told her that the drawing was "not appropriate," she was not to give drawings to other students, and she should apologize to M.C. B.B. thought that Becerra used the word "racist" to

---

[1] When later deposed, B.B. further stated that at the school, in the room where colored papers are kept, there was a picture of a man with a fist raised which read at the top "Black lives" and at the bottom "matters."

describe the drawing but could not remember for sure.[2]  B.B. did not understand why the drawing was inappropriate or racist, but twice apologized to M.C.     In addition, B.B. testified that she was barred from recess for two weeks.

B.B. did not tell her parents about the drawing or her conversation with Becerra.  Over eleven months later, B.B.'s mother learned of the incident from another parent.  She subsequently filed a complaint with the school district.  The complaint proceeded through several administrative levels, but ultimately, the school district found the "weight of the evidence" did not substantiate the allegation that B.B. "was punished or disciplined" for her drawing.

On February 21, 2023, B.B., through her mother, filed a complaint in the United States District Court for the Central District of California pursuant to 42 U.S.C. § 1983 alleging (among other claims) that Becerra violated B.B.'s First Amendment rights by punishing B.B. and retaliating against her for the drawing.   Following discovery and multiple motions to dismiss, the defendants moved for summary judgment on the remaining cause of action, B.B.'s First Amendment claims.[3]

_____

[2] Becerra denies calling the drawing inappropriate or racist.  However, because this is an appeal from a grant of summary judgment, we construe the facts in favor of the nonmoving party, B.B.  *See Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987, 989 (9th Cir. 2016) (en banc).

[3] B.B. and B.B.'s mother brought various other federal and state claims against Becerra, the school district, and a counselor at B.B.'s school. The district court dismissed B.B.'s mother's claims and the federal claims against the school district. The district court later granted summary judgment to Becerra and the counselor on B.B.'s First Amendment claims. After resolving all the federal claims in the defendants' favor, the district court declined to exercise supplemental jurisdiction over B.B.'s

Applying *Tinker*, 393 U.S. 503, and its progeny, the District Court extracted three applicable principles: (1) "where speech is directed at a 'particular vulnerable' student based on a 'core identifying characteristic,' such as race, sex, religion, or sexual orientation, educators have great leeway to regulate it"; (2) "the mere fact that speech touches upon a politically controversial topic is not sufficient to bring it under the First Amendment's protective umbrella"; and (3) "age is an important factor when deciding whether speech is protected." The District Court concluded that "the Drawing is not protected by the First Amendment." It recognized that the drawing interfered with M.C.'s right to be let alone, but it noted that B.B.'s intentions were undoubtedly innocent, and that teachers "are far better equipped than federal courts at identifying when speech crosses the line from harmless schoolyard banter to impermissible harassment." The District Court concluded that Becerra's action, whether right or wrong, "does not warrant federal court intervention." On this ground, the district court granted Becerra summary judgment on B.B.'s First Amendment claims. B.B. timely appealed.

## II. Standards of Review

We review a grant of summary judgment *de novo*. *Animal Legal Def. Fund*, 836 F.3d at 988. "Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, (a) 'the district court correctly applied the relevant substantive law' and (b) there are no genuine issues of material fact." *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 987 (9th Cir. 2001) (quoting *Balint*

---

state-law claims. B.B. appeals only the summary judgment on her First Amendment claims against Becerra.

*v. Carson City*, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc)).

## III.  Discussion

As established in *Tinker*, 393 U.S. at 506, students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."   But *Tinker* also "emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools."  *Id.* at 507.   Here, as in *Tinker*, "[o]ur problem lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities."  *Id.*

The Supreme Court has recognized "three specific categories of student speech that schools may regulate in certain circumstances: (1) indecent, lewd, or vulgar speech uttered during a school assembly on school grounds; (2) speech, uttered during a class trip, that promotes illegal drug use; and (3) speech that others may reasonably perceive as bearing the imprimatur of the school, such as that appearing in a school-sponsored newspaper."  *Mahanoy Area Sch. Dist. v B.L. ex rel. Levy*, 594 U.S. 180, 187–88 (2021) (cleaned up).

Speech that does not fall into one of these categories is nonetheless subject to the balancing test in *Tinker.*   In *Mahanoy*, the court noted that under *Tinker*, "schools have a special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others'" and "[t]hese special characteristics call for special leeway when schools regulate speech that occurs under its supervision."  *Id.* at 188 (quoting *Tinker*, 393 U.S. at 513).   Thus, a student always has rights under the First

Amendment, but the degree to which a school may restrict those rights varies according to a number of factors.  As the Supreme Court noted in *Hazelwood School District v. Kuhlmeier*, "the First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings,' and must be 'applied in light of the special characteristics of the school environment.'"  484 U.S. 260, 266 (1988) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) and *Tinker,* 393 U.S. at 506).

*Tinker* stressed that a school's prescription and control of speech must be "consistent with fundamental constitutional safeguards."  393 U.S. at 507.  The Court held that, "[i]n order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."[4] *Id.* at 509.  Rather, schools may regulate speech

---

[4] The Court explained:

> Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State. In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views.

*Id.* at 511.

only when the speech (1) "materially disrupts classwork or involves substantial disorder," or (2) creates an "invasion of the rights of others." *Id*. at 513. "In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Id*. at 511. Put simply, *Tinker* protects student speech under the First Amendment until it collides with the school's interest in preventing disruption and protecting other students. *Id.* at 507–09. When this occurs, the school's actions are reviewed under the *Tinker* balancing test.

We have followed *Tinker*. For example, in *C.R. v. Eugene School District 4J*, we reiterated that "[s]chools must achieve a balance between protecting the safety and well-being of their students and respecting those same students' constitutional rights." 835 F.3d 1142, 1148 (9th Cir. 2016) (citing *LaVine*, 257 F.3d at 987). We also stated that (1) the targeted student's age was relevant, (2) "grade schools may exercise a greater degree of control over student speech than colleges," and (3) "[b]ecause C.R.'s speech interfered with the younger students' rights to be secure and let alone, . . . his suspension was permissible under *Tinker*." *Id.* at 1153 (footnote omitted). Moreover, we have recognized that "[p]ublic school students who may be injured by verbal assaults on the basis of a core identifying characteristic such as race, religion, or sexual orientation, have a right to be free from such attacks while on school campuses." *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1178 (9th Cir. 2006), *judgment vacated sub nom.*, *Harper ex rel. Harper v. Poway Unified Sch. Dist.*, 549 U.S. 1262 (2007).

The parties agree that B.B.'s drawing qualifies as speech under the First Amendment. They also agree that first graders enjoy some First Amendment protection for their speech at school. And they agree that we must evaluate

whether Becerra permissibly regulated B.B.'s speech under *Tinker*.  But the fact that the *Tinker* balancing test is invoked does not resolve our case.  We do not agree with the District Court's determination that the "Drawing is not protected by the First Amendment."[5]  It overlooks that even when some administrative action is appropriate under *Tinker*, the school has the burden of showing that its interference with a student's First Amendment right was reasonably necessary to protect "the safety and well-being" of its students, *C.R.*, 835 F.3d at 1148, including their rights "to be secure and to be let alone."  *Tinker*, 393 U.S. at 508.

The parties dispute (1) how *Tinker* should apply here, given the young age of the students involved, (2) the scope of *Tinker*'s second prong, and (3) whether there are any genuine disputes of fact material to the application of *Tinker*. We first outline the bounds of elementary schools' authority and students' First Amendment rights under *Tinker*. Next, turning to this case, we hold that there are genuine disputes of material fact relevant to the *Tinker* analysis. We vacate and remand.

## A. The age of the students is a relevant but non-dispositive factor in the *Tinker* balancing test.

As noted by the Fifth Circuit in *Morgan v. Swanson*, 659 F.3d 359, 377 (5th Cir. 2011) (en banc), *Tinker* "did not, by its own terms, address the rights of elementary students . . . ."  However, elementary students' First Amendment rights have been recognized since *West*

---

[5] The statement is ambiguous.  It is not clear whether the District Court was asserting that a first grader has no First Amendment rights—a position that is contrary to *Tinker* and our precedent—or indicating that in this instance the school's obligation to provide a safe environment outweighed any restriction on B.B.'s rights under the First Amendment.

*Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943). Four of our sister circuits have concluded that *Tinker* applies to elementary student speech. *See C.S. v. McCrumb*, 135 F.4th 1056, 1066 (6th Cir. 2025) (applying *Tinker* to an elementary student's First Amendment claim and noting that "elementary students enjoy at least some free speech protections"); *N.J. by Jacob v. Sonnabend*, 37 F.4th 412, 425 (7th Cir. 2022) (holding that "*Tinker* is the controlling authority" in the elementary school setting); *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 110–11 (3d Cir. 2013) (concluding that "*Tinker* applies to elementary school student speech"); *Morgan*, 659 F.3d at 407–09 (applying *Tinker* to elementary student speech).

Although we have not had occasion to apply the *Tinker* balancing test to elementary students, our prior opinions have recognized both that students have First Amendment rights and that the students' ages are relevant to evaluating whether a school's actions were reasonably designed to protect the safety and well-being of its students.

In *Harper*, we upheld the ban on a high school sophomore wearing a T-shirt with an anti-homosexual message because doing so collided "'with the rights of other students' in the most fundamental way." 445 F.3d at 1178 (quoting *Tinker*, 393 U.S. at 508). We recognized that "name-calling is ordinarily protected outside the school context," but held that "[s]tudents cannot hide behind the First Amendment to protect their 'right' to abuse and intimidate other students at school." *Id.* (quoting *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 264 (3d Cir. 2002)). We noted that, "[a]s young students acquire more strength and maturity, and specifically as they reach college age, they become adequately equipped emotionally

and intellectually to deal with the type of verbal assaults that may be prohibited during their earlier years." *Id.* at 1183.

In *C.R.*, we determined that the two-day suspension was a reasonable punishment for a twelve-year-old who had sexually harassed two younger students.[6] 835 F.3d at 1152–53. We recognized that sexual harassment "implicates the rights of students to be secure" and that schools "must have the authority to discipline students for engaging in sexually inappropriate and harassing speech." *Id.* at 1152. Importantly, we further held that the "targeted students' age is also relevant" and that C.R.'s "speech interfered with the younger students' rights to be secure." *Id.* at 1153.

Consistent with our sister circuits, we hold that the age of the students is a relevant factor in evaluating the school's restriction on a student's speech. But age is not dispositive. This is consistent with our general approach in student speech cases in which we "treat the *Tinker* rule as a flexible one dependent upon the totality of relevant facts in each case." *Karp v. Becken*, 477 F.2d 171, 174 (9th Cir. 1973).[7]

---

[6] We noted that the student's harassment could cause the victim to:

> feel less secure in school, affecting her ability to perform as a student and engage appropriately with her peers. Moreover, the harassment had already begun to escalate from the repetition of curse words to sexual comments directed at the victims. The school could reasonably expect the harassment to escalate further if allowed to continue unchecked. Without intervening administrative action, the younger students would be deprived of their right to be secure at school.

*C.R.*, 835 F.3d at 1152–53.

[7] This approach is also consistent with our sister circuits. *See McCrumb*, 135 F.4th at 1062 ("*Tinker* applies the First Amendment to student

In sum, elementary students' speech is protected by the First Amendment, *Tinker* applies in the elementary student speech context, and elementary students' young age is a relevant factor.

> B. Under the *Tinker* balancing test school officials have the burden of showing that their actions were reasonably undertaken to protect the safety and well-being of their students.

As there is no suggestion that B.B.'s drawing created a reasonable likelihood of material disruption of classwork or substantial disorder at her school, we focus on the second prong of *Tinker*: whether B.B.'s drawing interfered with M.C.'s right to be secure and let alone.

"The precise scope of *Tinker*'s interference with the rights of others['] language is unclear" because we have rarely applied it. *C.R.*, 835 F.3d at 1152 (quoting *Wynar v. Douglas Cnty. Sch. Dist.*, 728 F.3d 1062, 1072 (9th Cir. 2013)). But a few principles are clear. On the one hand, "speech that is merely offensive to some listener" is not sufficient and does not fall within *Tinker*'s scope. *Id.* To regulate student speech under this prong of *Tinker*, a school "must be able to show that its action was caused by

---

speech in light of the special characteristics of the school environment, which may include such factors as the age and emotional maturity level of schoolchildren viewing the speech, particularly with respect to sensitive topics.") (citation modified); *L.M. v. Town of Middleborough*, 103 F.4th 854, 881 (1st Cir. 2024) (noting the relevance of the "middle-school setting, with some kids as young as ten," to the *Tinker* analysis); *Sonnabend*, 37 F.4th at 426 ("The application of *Tinker* must account for such factors as the age and grade level of the students to whom the speech is directed."); *Ayers*, 710 F.3d at 109 ("[T]he *Tinker* test has the requisite flexibility to accommodate the age-related developmental, educational, and disciplinary concerns of elementary school students.").

something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509.

On the other hand, targeted speech that threatens, harasses, or bullies a specific student interferes with the right to be secure and let alone, and may be regulated by schools under *Tinker*. *See Mahanoy*, 594 U.S. at 188 (describing how schools may regulate "severe bullying or harassment targeting particular individuals" and "threats aimed at teachers or other students"); *Wynar*, 728 F.3d at 1072 (holding that the school could regulate speech that threatened to commit a school shooting and "targeted specific students by name"); *C.R.*, 835 F.3d at 1152 (holding that the school could punish speech that constituted sexual harassment of two other students); *see also Doe v. Hopkinton Pub. Schs.*, 19 F.4th 493, 509 (1st Cir. 2021) ("Speech or conduct that actively and pervasively encourages bullying by others or fosters an environment in which bullying is acceptable and actually occurs . . . is not protected under the First Amendment.").

But what of student speech that does not bully, threaten, or harass a specific student but has potential consequences beyond avoiding discomfort and unpleasantness?  We tackled this gray area in *Harper*, 445 F.3d 1166.  There, a high school student wore a shirt to school that "displayed derogatory remarks about homosexuals." *Id.* at 1171.  He wore the shirt on the day that the school's Gay-Straight Alliance held an event, but his speech did not target any particular student. *Id.*

We held that the school could lawfully regulate the student's speech because "verbal assaults on the basis of a core identifying characteristic such as race, religion, or

sexual orientation" interfere with other students' "right to be free from such attacks while on school campuses." *Id.* at 1178. We reasoned that "such attacks on young minority students can be harmful to their self-esteem and to their ability to learn," and thus fall under *Tinker*'s second prong. *Id.* at 1180. Although the student's right to wear the t-shirt is protected outside of school, we held that *Tinker* allowed the school to regulate or prohibit this speech given its "special need to maintain a safe, secure and effective learning environment." *Id.* at 1176.

*Harper* thus clarified that, under *Tinker*'s "rights of others" prong, schools may regulate not only speech that bullies or harasses particular students, but also speech that generally denigrates other students on the basis of a core identifying characteristic. Although "political speech, even when it is offensive to others, is an important right of all Americans and learning the value of such freedoms is an essential part of a public school education," the school may restrict "instances of derogatory and injurious remarks directed at students' minority status such as race, religion, and sexual orientation." *Id.* at 1183. We focused on "the type and degree of injury the speech involved cause[d] to impressionable young people" in high schools and elementary schools. *Id.*

Although *Harper* was vacated as moot,**[8]** we find its reasoning sound: schools may regulate student speech under *Tinker*'s second prong when it involves "derogatory and injurious remarks directed at students' minority status such

---

[8] *See Harper ex rel. Harper v. Poway Unified Sch. Dist.*, 549 U.S. 1262 (2007).

as race, religion, and sexual orientation." 445 F.3d at 1183.[9]
Indeed, the First Circuit recently adopted a similar rule. *See
L.M. v. Town of Middleborough,* 103 F.4th 854, 872–74 (1st
Cir. 2024) (allowing schools to regulate speech under *Tinker*
if it demeans other students' personal identities and will have
a "serious negative psychological impact on" those students
and "poison[s] the educational atmosphere"). Several other
circuits have similarly recognized that derogatory comments
about other students' personal identity, when sufficiently
severe, may be regulated under *Tinker*. *See Nuxoll ex rel.
Nuxoll v. Indian Prairie Sch. Dist. #204*, 523 F.3d 668, 672,
675–76 (7th Cir. 2008) (upholding a school rule forbidding
derogatory comments about personal identity, but
determining that a specific phrase could not be prohibited
because it was "only tepidly negative," and not "derogatory"
or "demeaning"); *Sypniewski*, 307 F.3d at 263–66
(upholding a school policy prohibiting racial harassment and
intimidation "by name calling, using racial or derogatory
slurs, wearing or possession of items depicting or implying
racial hatred or prejudice . . . [or] that is racially divisive or
creates . . . hatred" under *Tinker*).

Of course, the students' ages affect what is derogatory or
injurious. Certain speech may be merely negative or
controversial to high schoolers, but may constitute
derogatory and injurious remarks against elementary
students given their greater vulnerability. *See C.R.*, 835 F.3d
at 1152–53 (holding that "questions about sex acts and

---

[9] B.B. notes that at least one circuit previously limited the second prong
of *Tinker* to school regulation of speech that would render the school
liable for torts. *See Kuhlmeier v. Hazelwood Sch. Dist.*, 795 F.2d 1368,
1376 (8th Cir. 1986), *rev'd on other grounds*, 484 U.S. 260 (1988). We
reject such a limited reading of *Tinker*, which has not been endorsed by
the Supreme Court. *See Kuhlmeier*, 484 U.S. at 273 n.5.

whether [students] were dating" are "inappropriate and unsettling questions for students just out of elementary school" and thus interfere with the students' right to be let alone); *see also L.M.*, 103 F.4th at 881 (concluding that, "while oral argument indicated the Shirt's message is not at the farthest end of demeaning, neither is it, on its face, only tepidly negative" in part because the shirt was worn in "a middle-school setting" around "kids as young as ten") (citation modified); *Morgan*, 659 F.3d at 387 (concluding that an analysis of whether student speech infringes on the right to be let alone may "look different in the elementary-school context" given that elementary students are "more susceptible to coercion and peer pressure" than older students) (Benavides, J., separate opinion).

In sum, we reaffirm that although a school's decision is entitled to deference, the school has the burden of showing that its actions were reasonably designed to protect the safety and well-being of its students. *See LaVine*, 257 F.3d at 989 (stating that "school officials must justify their decision by showing facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities") (cleaned up). Age is relevant as younger students are more vulnerable than students who are approaching adulthood. But, as all students, including elementary school students, have First Amendment rights, the school has the burden, under the *Tinker* balancing test, of showing that its actions were reasonably undertaken to protect the safety and well-being of its students. *See Karp*, 477 F.2d at 176 (stating that, "for discipline resulting from the use of pure speech to pass muster under the First Amendment, the school officials have the burden to show justification for their action").

C. Applying the *Tinker* balancing test, Becerra is
   not entitled to summary judgment.

We now turn to this case. Has Becerra shown that the
restrictions on B.B's First Amendment rights were
reasonably necessary to protect the safety and well-bring of
the students?

Becerra presents some evidence suggesting that the
school could reasonably believe the drawing invaded M.C.'s
right to "be secure and let alone" at school. *See Harper*, 445
F.3d at 1178. M.C.'s mother emailed Becerra that she would
"not tolerate any more messages given to [M.C.] at school
because of her skin color." She also testified that M.C. "was
the only black child" to get such a message and that she
"does not go to school to be judged because she's a black
girl." M.C.'s mother further stated that, although she knew
that B.B. did not intend to hurt M.C. by including the phrase
"any life" in the drawing, "those kind[s] of things hurt."
Additionally, her statement that she "did not want this to
become a larger issue" could be interpreted as threatening
additional action if Becerra did not act. Accordingly,
Becerra may have believed that B.B.'s drawing interfered
with M.C.'s right to be "let alone" because it targeted her
based on her race, a core identifying characteristic. *See id.*
At a minimum, M.C.'s mother's email required Becerra to
investigate the situation to determine whether some action
was necessary to protect M.C.'s right to be "let alone." *See
LaVine*, 257 F.3d at 989 ("*Tinker* does not require school
officials to wait until disruption actually occurs before they
may act."); *see also Karp*, 477 F.2d at 175 ("*Tinker* does not
demand a certainty that disruption will occur, but rather the
existence of facts which might reasonably lead school
officials to forecast substantial disruption.").

But there is also evidence that M.C. was unaffected by the drawing and thus did not experience the kind of expressive attack on the basis of a core identifying characteristic required for a restriction on speech under *Tinker*. M.C.'s mother testified that M.C. did not understand the drawing, and she told M.C. not to worry about it. Nor is there evidence connecting the phrase "any life"—used by B.B. in the drawing—to the somewhat controversial phrase "All Lives Matter" or to show that M.C. made that connection.[10] B.B. argues that Becerra could not reasonably think that the drawing communicated a denigrating message that required a reprimand.

The parties also dispute whether B.B. was punished for the drawing. For instance, Becerra denies telling B.B. that the drawing was "inappropriate" or "racist" and denies that B.B. was prohibited from playing at recess in the weeks following the incident.[11] He does not, however, deny that he spoke to B.B. We assume the facts in B.B.'s favor for the purposes of summary judgment. *See LaVine*, 257 F.3d at 987. But if a factfinder later determines that B.B. was not actually punished for her drawing, her First Amendment

---

[10] The district court cited a news article that commented that "the phrase 'All Lives Matter' gained popularity in response to the growth of the Black Lives Matter movement ("BLM"), a social movement protesting violence against Black individuals and communities, with a focus on police brutality." The article noted that the phrase is seen by some as an offensive response to BLM because it obscures "the fact that [B]lack people have not yet been included in the idea of 'all lives.'"

[11] It appears that B.B.'s suspension from recess was not documented. B.B., however, testified that although Becerra did not tell her she had to miss recess, after Becerra talked to her, her teachers told her she wasn't allowed to have recess. Denying a student recess may constitute punishment. *See* Cal. Code Regs. tit. 5, §§ 304, 352.

claim will fail. *See Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 419 (3d Cir. 2003) ("Absent punishment for expression, a significant pattern of concrete suppression, or some other form of clear suppression of the expression of elementary school students, a federal First Amendment action is not an appropriate forum for resolution of disputes over schools' control of third graders' conduct."). Thus, there is conflicting evidence about whether Becerra could reasonably conclude that the drawing interfered with M.C.'s rights and whether the actions taken were reasonably necessary. Applying the *Tinker* balancing test, B.B. has raised genuine disputes of material fact, and Becerra is not entitled to summary judgment.

The district court emphasized that B.B. and M.C. were in first grade at the time of the incident. But while age is a relevant factor under *Tinker*, it does not negate the existence of a genuine dispute of material fact. The students' very young ages gave the school broader discretion, but it does not relieve the school and Becerra from meeting their burden of showing that their actions were reasonably undertaken to protect the safety and well-being of the school's students. *Tinker* remains a "demanding standard," and schools must prove that they meet it. *Mahanoy*, 594 U.S. at 193. The district court erred to the extent that it relied on the students' ages as the dispositive factor because genuine issues of material fact exist as to the reasons for restricting B.B.'s First Amendment rights and the extent of the restrictions. We vacate the district court's grant of summary judgment on B.B.'s First Amendment claim against Becerra.

        D.   Summary judgment on B.B.'s retaliation claim is vacated.

We also vacate the grant of summary judgment for Becerra on B.B.'s First Amendment retaliation claim because the district court's grant of summary judgment on that claim was based on its determination that the drawing was not protected by the First Amendment. To establish a retaliation claim in the student speech context, a plaintiff must allege "that (1) [she] was engaged in constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents,* 824 F.3d 858, 867 (9th Cir. 2016) (citation modified). As there may be material issues of fact relevant to these criteria, we decline to reach the merits of B.B.'s retaliation claim.[12]

## CONCLUSION

Although schools have comprehensive authority to "prescribe and control conduct" in schools, *see Tinker*, 393 U.S. at 507, when their actions infringe on a student's First Amendment rights to expression, even for an elementary school student, the school has the burden of showing that its actions were reasonably undertaken to protect the safety and well-being of its students. Because the district court failed to properly apply the *Tinker* balancing standard, the grant of

---

[12] The parties raise other dispositive issues, such as Becerra's assertion of qualified immunity. We decline to reach those issues in the first instance. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.").

summary judgment is **vacated,** and the case is **remanded** to the district court.[13]

---

[13] The motions for leave to file amici briefs by (1) the California Policy Center and Californians for Equal Rights Foundation, (2) the Center for American Liberty, (3) the Douglas Leadership Institute, (4) the Liberty Justice Center, (5) the Manhattan Institute, Institute for Free Speech, Young America's Foundation, Center for the Rights of Abused Children, and Americans for Prosperity Foundation, (6) the Parents Defending Education, and (7) the Southeastern Legal Foundation are **granted.**